Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ANGELA MALCICH,                )
                               )
          Plaintiff,           )
                               )
          vs.                  ) No. 4:20-CV-01030
                               )
ST. LOUIS COUNTY, et           )
al.,                           )
                               )
          Defendants.          )

DEPOSITION OF CONNIE HEITMAN, RN
Taken on behalf of the Plaintiff
July 15, 2021

DEBRA S. KAESBERG, CSR, CCR, RPR

STURM REPORTING SERVICES, INC.
7419 Stratford Avenue
St. Louis, MO 63130
314.780.2816
joann@sturmreporting.com
www.sturmreporting.com

Page 2

1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MISSOURI
2                       EASTERN DIVISION

3
   ANGELA MALCICH,              )
4                              )
              Plaintiff,       )
5                              )
              vs.              ) No. 4:20-CV-01030
6                              )
   ST. LOUIS COUNTY, et        )
7   al.,                       )
                              )
8              Defendants.     )

9

10             DEPOSITION OF CONNIE HEITMAN, RN,

11   produced, sworn, and examined on behalf of the

12   Plaintiff, July 15, 2021, between the hours of

13   2:06 p.m. and 4:08 p.m. of that day, at the

14   offices of Pleban & Petruska Law, LLC, 2010 South

15   Big Bend Boulevard, St. Louis, Missouri, before

16   DEBRA S. KAESBERG, a Registered Professional

17   Reporter and a Certified Court Reporter within

18   and for the State of Missouri.

19

20

21

22

23

24

25

Page 3

1                    A P P E A R A N C E S

2

3    ANGELA MALCICH was represented by:

4         Benjamin P. Kates, Esq.

5         J.C. Pleban, Esq.

6         Pleban & Petruska Law, LLC

7         2010 South Big Bend Boulevard

8         St. Louis, Missouri   63117

9         314-645-6666

10        bkates@plebanlaw.com

11        jc@plebanlaw.com

12

13   ST. LOUIS COUNTY, BRIAN MITCHELL, NATHANIEL

14   MELLENTHIN, ALEXIS WOODS, and MICHELLE

15   WRIGHT-BERRY were represented by:

16        Catherine M. Robertson, Esq.

17        Associate County Counselor

18        Office of the County Counselor

19        41 South Central Avenue, 9th Floor

20        Clayton, Missouri   63105

21

22

23

24

25

Page 4

```
 1    TROY DOYLE was represented by:

 2         Eric Kendall Banks, Esq.

 3         Banks Law LLC

 4         1824 Chouteau Avenue

 5         St. Louis, Missouri  63103

 6         314-583-7075

 7         ericbanks@bankslawllc.com

 8

 9    JANET DUWE, CONNIE HEITMAN, and ROBERT ADAMS were

10    represented by:

11         Gregory D. DeBeer, Esq.

12         Wiedner & McAuliffe, Ltd.

13         101 South Hanley, Suite 1450

14         St. Louis, Missouri  63105

15         314-818-7941

16         gddebeer@wmlaw.com

17

18

19

20

21

22

23

24

25
```

Page 5

1                    INDEX OF EXAMINATION

2                                              Page

3    DIRECT EXAMINATION BY MR. KATES          6

4    CROSS-EXAMINATION BY MS. ROBERTSON       90

5

6

7

8                    INDEX OF EXHIBITS

9                                              Page

10   Plaintiff's Exhibit 45                    59

11   Plaintiff's Exhibit 46                    64

12   Plaintiff's Exhibit 47                    66

13   Plaintiff's Exhibit 48                    82

14   Plaintiff's Exhibit 49                    87

15   Plaintiff's Exhibit 50                    88

16

17        (Exhibits retained by Mr. Kates.)

18

19

20

21

22

23

24

25

Page 6

1              IT IS HEREBY STIPULATED AND AGREED by

2      and between Counsel for the Plaintiff and Counsel

3      for the Defendants that this deposition may be

4      taken in shorthand by DEBRA S. KAESBERG, a

5      Registered Professional Reporter and a Certified

6      Court Reporter, and afterwards transcribed into

7      typewriting, and that the signature of the

8      witness was waived by agreement and consent in my

9      presence.

10

11                              o-O-o

12

13                  CONNIE HEITMAN, RN,

14      of lawful age, being produced, sworn, and

15      examined on the part of the Plaintiff, deposes

16      and says:

17

18                  DIRECT EXAMINATION

19      BY MR. KATES:

20          Q.     Could you please state your name for

21      the record.

22          A.     Connie Heitman.

23          Q.     And spell your name too, please.

24          A.     C-O-N-N-I-E, H-E-I-T-M-A-N.

25          Q.     And where do you currently live?

Page 7

```
 1        A.    5568 Winford Drive, St. Louis,

 2   Missouri 63129.

 3        Q.    Okay.  Ms. Heitman, have you ever

 4   given your deposition before?

 5        A.    Yes.

 6        Q.    Okay.  How long ago?

 7        A.    For this case?

 8        Q.    Ever.

 9        A.    Ever?  This year.

10        Q.    Do you remember the approximate month

11   or day?

12        A.    No.

13        Q.    Okay.  Sometime this year.

14              And what was the nature of the

15   deposition?

16        A.    Similar to this.

17        Q.    Okay.  Was that for the John Shy

18   case?

19        A.    Yes.

20        Q.    Okay.  Let's see.  Any other

21   depositions other than the -- this current one

22   and the John Shy case?

23        A.    Maybe when I was young.  I was in a

24   car accident.

25        Q.    Okay.  Do you know how long ago you
```

Page 8

```
 1     were in the car accident?
 2          A.    I was like 19.
 3          Q.    Okay.  So --
 4          A.    We're talking decades.
 5          Q.    Okay.  So it's --
 6                MR. DEBEER:  Don't age her, Ben.
 7                MR. KATES:  Say what?
 8                MR. DEBEER:  Don't age her.
 9          A.    Don't age me.
10          Q.    (By Mr. Kates)  I didn't ask --
11          A.    Don't even say that.
12          Q.    Okay.  So you have a recent
13     experience with a deposition, but I'll go over
14     some of the ground rules first.  All of our
15     answers have to be taken down verbally, because
16     the court reporter is typing everything that we
17     say.  So nods of the head, shakes, yeses --
18     excuse me, uh-huhs or huh-uhs can't be
19     transcribed that easily.  So if you could please
20     keep your answers verbalized, okay?
21          A.    Okay.
22          Q.    If I correct you, it's just to make
23     sure we have a clean record, okay?
24          A.    Okay.
25          Q.    You understand that you are under
```

Page 9

1    oath today --

2         A.    Yes.

3         Q.    -- just like in court in front of a

4    judge or a jury, correct?

5         A.    Yes.

6         Q.    I don't expect to go super long

7    today.  I'm sure that will be very happy -- very

8    good news for the other attorneys in here.  But

9    if, for whatever reason, you need to take a

10   break, let me know.  I will be happy to take a

11   couple minutes.

12              I would just ask that if I have asked

13   a question and you have to take a break, you give

14   an answer before we take a break, okay?

15        A.    Okay.

16        Q.    If for some reason you don't

17   understand my question and you need me to repeat

18   it, just let me know, and I will be happy to do

19   that, okay?

20        A.    Okay.

21        Q.    Okay.  If I -- if you do give me an

22   answer, is it fair to say that you understood the

23   question that I asked?

24        A.    I can't answer for something in the

25   future.

Electronically signed by Debra Kaesberg (101-145-449-5392)        5ad9cd31-73d2-4e33-a941-98eb5b26e7cb

Connie Heitman, RN
7/15/2021                          Angela Malcich v. St. Louis County, et al.

                                                        Page 10

    1           Q.      Okay.  Fair enough.

    2                   If you don't understand a question

    3      when I ask you one, will you --

    4           A.      Yes.

    5           Q.      -- be sure to tell me that you didn't

    6      understand something?

    7           A.      Okay.

    8           Q.      So are you currently employed?

    9           A.      Yes.

   10           Q.      Actually, before I get into all that,

   11      let me ask you a question about your preparation.

   12                   What did you do to prepare for your

   13      deposition today?

   14           A.      I got dressed and came here.

   15           Q.      Okay.  Did you review any documents?

   16           A.      No.

   17           Q.      Okay.  Did you speak to anyone

   18      outside of your attorney?

   19           A.      No.

   20           Q.      Okay.  Have you ever spoken to

   21      anybody about this lawsuit, other than your

   22      attorney?

   23           A.      About the lawsuit?  No.

   24           Q.      Okay.  Have you ever discussed the

   25      possibility that a lawsuit might be filed with

Page 11

1    anyone?

2         A.    I don't remember if I did.

3         Q.    And to clarify that, after -- as

4    background, we're here to talk about the inmate

5    Daniel Stout who passed away on June 11th, 2019.

6               You understand that, right?

7         A.    Yes.

8         Q.    Okay.  So after Mr. Stout passed away

9    in June of 2019, but before the lawsuit was

10   filed, do you recall having any conversations

11   with anybody about the situation with Mr. Stout?

12               MR. DEBEER:  I will object to the

13   form that it's vague, "the situation."  Which

14   situations?

15               You can answer, if you understand the

16   question.

17         A.    I think we talked to supervisors at

18   work, and --

19         Q.    (By Mr. Kates)  Okay.  Do you

20   remember having any conversations with Janet Duwe

21   about Mr. Stout's death after it took place, but

22   before the lawsuit was filed?

23         A.    I don't recall any.

24         Q.    Okay.  Do you -- and maybe I asked

25   that, and if I did, I apologize.  But did you

Page 12

1    speak to anybody else about -- other than your

2    supervisors, about Mr. Stout's death?

3         A.    I think justice services.

4         Q.    Okay.  Do you remember approximately

5    when that would have happened?

6         A.    No.

7         Q.    Okay.  And as far as the supervisors,

8    do you remember approximately when you would have

9    spoken with your supervisors about that?

10        A.    Usually within a week.  They meet

11   with everybody that was working.

12        Q.    So are you currently employed now?

13        A.    Yes.

14        Q.    Where do you work now?

15        A.    St. Louis County Department of

16   Health.

17        Q.    Okay.  And where within the county --

18   within the Department of Health do you work?

19        A.    Corrections medicine.

20        Q.    Okay.  Is this the same role that you

21   were in in June of 2019?

22        A.    Yes.

23        Q.    Okay.  What's your title there?

24        A.    Registered nurse.

25        Q.    Okay.  And prior to working with the

Page 13

1    Department of Justice Services at the jail, where

2    did you work?

3           A.    Apria Healthcare.

4           Q.    And --

5           A.    Oh, wait.  Wait, no.  I think it's --

6    it's no longer -- it's Mercy Jefferson County

7    now, but that's not who owned it then.

8           Q.    Okay.

9           A.     It was a different -- I worked there

10   for a very short time, and then it was Apria

11   Healthcare before that.

12          Q.    Okay.  So when did you start with the

13   jail?

14          A.    14, 15 years ago.

15          Q.    Okay.  And before that, it was Apria

16   Healthcare?

17          A.     I think just a few months at the

18   hospital, and then it was Apria Healthcare.

19          Q.    Okay.  And how long did you work in

20   that capacity?

21          A.    At Apria?

22          Q.    Yes.

23          A.    Probably five, six years.

24          Q.    Okay.  And that would have preceded

25   your employment with the jail?

Page 14

```
 1          A.    Yes.

 2          Q.    Okay.

 3          A.    Well, I had a short stint with the

 4    hospital.  I didn't like that job, so I left.

 5          Q.    Was that in between Apria and the

 6    jail?

 7          A.    Yeah.

 8          Q.    Okay.  After -- as far as your

 9    education goes, after high school, you went on to

10    college, right?

11          A.    Yes.

12          Q.    What was your degree?

13          A.    I have a couple.  I have a general

14    transfer studies, and then I have an ADN.

15          Q.    Say that again?

16          A.    ADN.

17          Q.    What is an and?

18          A.    Associate's degree in nursing.

19          Q.    Okay.  Anything above the ADN?

20          A.    No.  I did take -- I think I got to

21    junior level with the BSN, and I just never

22    finished.

23          Q.    Okay.  As an ADN, you are registered

24    as a registered nurse, right?

25          A.    Correct.
```

Electronically signed by Debra Kaesberg (101-145-449-5392)          5ad9cd31-73d2-4e33-a941-98eb5b26e7cb

Page 15

1        Q.     Do you have any other specialized

2    certificates or licenses?

3        A.     ACLS.

4        Q.     And what is ACLS?

5        A.     Advanced cardiac life support.

6        Q.     Okay.

7        A.     BLS.  And BLS, which is encompassing

8    that, which is basic life support, which is CPR.

9        Q.     Oh, I see.  Okay.  So it's advanced

10   and basic?

11       A.     Yeah.

12       Q.     Okay.  In 2019 you are aware that

13   before Mr. Stout's death, there were three other

14   deaths at the jail, correct?

15       A.     Possibly.  I know there was other

16   deaths.

17       Q.     Okay.

18       A.     I don't know if they're the same ones

19   that you're incurring.

20       Q.     Okay.  So I'll say there is an inmate

21   named Reavis.  Do you recall that death?

22       A.     Yes.

23       Q.     Do you recall John Shy, right?

24       A.     Yeah.  I testified in --

25       Q.     And Lamar Cathings?

Connie Heitman, RN
7/15/2021                                    Angela Malcich v. St. Louis County, et al.

Page 16

1       A.      The name is familiar.

2       Q.      Okay.  Do you know of any others

3  other than those three?  And this is to say

4  before Mr. Stout's death in 2019.

5            MR. DEBEER:  You're just asking if

6  any inmates have died in any capacity?

7            MR. KATES:  Yeah.

8       A.      In 14 years?

9       Q.      (By Mr. Kates)  No.  No.  No.

10           My question is:  In 2019, before

11  Mr. Stout's death, do you know of any inmates who

12  have died in custody other than those three?

13      A.      I'm sure there's been several.

14      Q.      Okay.  As you sit here today, do you

15  recall the names of any of those inmates?

16      A.      No.

17      Q.      Okay.  Are any of those inmates'

18  deaths related to not getting medical treatment?

19           MR. DEBEER:  I'll object to form of

20  the question.  Calls for speculation.  Calls for

21  a legal conclusion.

22           You can answer.

23      A.      You would have to give me their names

24  and refresh me.  I really wouldn't be able to

25  just pull that from air.

Page 17

1          Q.     (By Mr. Kates)  Okay.  Okay.

2     Anything stand out in your mind that any other

3     deaths before Mr. Stout's, but in 2019, were

4     related to a lack of medical care?

5               MR. DEBEER:  Same objections.  Asked

6     and answered.

7               You can answer.

8               THE WITNESS:  Oh, okay.  I thought I

9     wasn't supposed to answer.

10               MR. DEBEER:  You already have, but if

11     you want to answer again.

12          A.     Same answer, I guess.  It's just you

13     would have to be more specific with me because I

14     can't --

15          Q.     Fair enough.

16          A.     -- just vaguely.

17          Q.     Do you -- okay.  So we talked about

18     Mr. Reavis is one of those deaths that you're

19     aware of, right?

20          A.     Yes.

21          Q.     Okay.  Do you, as you sit here today,

22     independently know if you had any interaction

23     with Mr. Reavis on the day he died?

24          A.     No, I don't think I did.

25          Q.     Okay.

Page 18

1          A.      I wasn't his nurse.

2          Q.      Okay.  What about Mr. Shy?  He died

3    on February 23rd, 2019.

4                  Did you have any interaction with him

5    on that day?

6          A.      The day he died, no.  I was his first

7    nurse he saw for that complaint, and called the

8    provider.  And, actually, another -- I worked

9    with Janet Duwe, and together we got the provider

10   to send him to the hospital for the first time.

11         Q.      Okay.  Do you know when, in

12   proximity, that would have been in relation to

13   the day he died?  Was that the day before or

14   further than that?

15         A.      When I left, I was under the

16   impression -- I did a sick call, and I went up to

17   see him.  He was transferred to the infirmary.  I

18   didn't agree with that.  I told Janet, Get him

19   out to the hospital, we're going to call again

20   until he goes out to the hospital.  Even if I had

21   to wake the director up, because I knew there was

22   something going on.

23                 And so we got them to send him out to

24   the hospital.  I went back to my location in the

25   jail, and from what I understood, he had went out

Connie Heitman, RN
7/15/2021                          Angela Malcich v. St. Louis County, et al.

                                                          Page 19

 1    to the hospital, which he did.  And I went home,

 2    because I work nights.  When I came back, he was

 3    dead.

 4         Q.    Okay.  Were you working the next day?

 5         A.    Yes, I was.  I work nightshift.

 6         Q.    Okay.  Fair enough.

 7               And you were ultimately sued in his

 8    lawsuit, right?

 9         A.    Yes.  And I was dismissed.

10         Q.    Okay.  Do you -- as far as that

11    lawsuit, what's your understanding -- strike

12    that.

13               When you saw Mr. Shy, he was

14    complaining of stomach pains to you, wasn't he?

15         A.    Yes.

16               MR. DEBEER:  I'm going to object --

17               MS. ROBERTSON:  I'm going to --

18               MR. DEBEER:  Go ahead.

19               MS. ROBERTSON:  I'm going to object

20    that this violates Mr. Shy's HIPAA protected

21    information and it's confidential.

22               MR. DEBEER:  I'll also object that it

23    lacks foundation and calls for speculation.

24               MR. BANKS:  And I will also object

25    because it's irrelevant and immaterial.

Page 20

```
 1                MR. PLEBAN:  Oh.

 2                MR. DEBEER:  Here we go.

 3                MR. PLEBAN:  Look at that, the three

 4      amigos with objections.

 5                MR. KATES:  Well, I'm not going to

 6      tell you what to do.

 7                MR. DEBEER:  You can answer the

 8      question.

 9           A.    Okay.  Repeat the question, because

10      now I've forgotten it.

11                MR. DEBEER:  Unless I tell you not to

12      answer, you can answer.  Just wait until everyone

13      is done objecting.

14                MS. ROBERTSON:  Ben, just so we don't

15      interrupt, can we have a running objection for

16      any further questions on that?  The same rule as

17      the other depositions, an objection by one is an

18      objection for all?

19                MR. KATES:  Just so it's on the

20      record, that's fine.

21                Okay.  Can we go back a couple

22      seconds and repeat my question?

23                (Discussion off the record.)

24                MR. DEBEER:  Ben, you are in

25      agreement that the running objection, the
```

Page 21

1    objections that defense counsel just made to your

2    question about Mr. Shy, apply to questions about

3    the three prior inmates that you referred to

4    before:  Reavis, Shy, Cathings?

5              MR. KATES:  Yes.

6              MS. ROBERTSON:  Or any other inmate

7    that comes up, anybody's medical history or

8    diagnoses?

9              MR. KATES:  Yes.

10             Now, could you please read back my

11   last question to the witness.

12             (Whereupon the reporter read back the

13   requested portion of testimony.)

14        A.   Yes.

15        Q.   (By Mr. Kates)  Okay.  When he gave

16   you those complaints, did you do a physical

17   assessment?

18        A.   Yes.

19        Q.   Okay.  And what did that physical

20   assessment consist of?

21        A.   I did vitals.  I listened to his

22   abdomen.  I pushed on his abdomen.  I took a

23   history and called the provider, and called the

24   medical provider.

25        Q.   Okay.  Did anything from his vitals

Page 22

1    give you any indication of symptoms?  Why did you

2    take his vitals -- strike that.  That's a

3    compound question.

4              Why did you take his vitals?

5         A.    Generally, that's what we do.  If

6    somebody has something wrong, you want to get a

7    good set of vitals to give those to the doctor.

8    That's part of your assessment.

9         Q.    Why did you listen to his stomach?

10        A.    For bowel sounds, anything abnormal.

11        Q.    And why did you push on his stomach?

12        A.    To see if he had any rebound

13   tenderness or pain with palpation.

14        Q.    What types of bowel sounds are

15   considered abnormal to you?

16        A.    Absent, none.  You can have

17   hyperactive.

18        Q.    What's --

19        A.    Hearing some in one area but not the

20   other, with certain symptoms, can be abnormal.  I

21   mean, it's just a whole chapter in a book.

22        Q.    What is hyperactive?

23        A.    Too fast.  You're hearing too much,

24   too fast.

25        Q.    Are you familiar with hypoactive

Electronically signed by Debra Kaesberg (101-145-449-5392)

Page 23

1    bowel sounds?

2         A.    Yes.

3         Q.    What is that?

4         A.    That's the opposite of hyper.  It's

5    too little, not enough.

6         Q.    Okay.  And when you're saying "not

7    enough," not enough what?

8         A.    Bowel sounds.  They're not -- when

9    they contract, they make sounds, things move

10   through, you hear that.

11        Q.    Okay.

12        A.    So it means they're not moving that

13   much.

14        Q.    Okay.  So --

15        A.    As opposed to moving normal or too

16   fast.

17        Q.    I see.  So hypo means they're moving

18   too slowly, right?

19        A.    Yeah.

20        Q.    So the bowels are moving too slowly,

21   right?

22        A.    Yeah.  You're not hearing what would

23   be a normal.

24        Q.    And hyperactive means they're moving

25   too fast?

Electronically signed by Debra Kaesberg (101-145-449-5392)          5ad9cd31-73d2-4e33-a941-98eb5b26e7cb

Connie Heitman, RN
7/15/2021                                    Angela Malcich v. St. Louis County, et al.

Page 24

1          A.      Too much, yeah.

2          Q.      Too much, okay.

3                  As far as pushing on his stomach, you

4    said you're looking for rebound.  What is -- what

5    about the rebound is it that you're looking for?

6          A.      Okay.  So rebound tenderness is when

7    you palpate or push in on his stomach.  Normally

8    it should hurt -- it could not hurt or can hurt

9    when you push in, depending on what their

10   symptoms are.  But when you release, if it gets

11   worse and does not -- the pain does not improve

12   or go away, then that is what we consider rebound

13   tenderness.

14         Q.      Okay.  As far as pain with palpation,

15   are you looking for continued -- continued pain

16   when you finish palpating?

17         A.      Whatever they present with.

18         Q.      Okay.

19         A.      I mean, it's just part of the

20   assessment.

21         Q.      Okay.

22         A.      I'm not getting what you're asking, I

23   guess.

24         Q.      If -- if you do have those rebound

25   tenderness, does that require hospitalization?

Page 25

1        A.    That would require us calling a

2   doctor, and them making a -- generally they do

3   send them out for further evaluation.

4        Q.    Okay.  Is there -- is there a doctor

5   on call at the jail 24/7?

6        A.    Yes.

7        Q.    Okay.

8        A.    Or a nurse practitioner or -- it's a

9   medical provider on call.

10        Q.    Okay.  What about guarding?  Do you

11   look for guarding?

12        A.    Yes.

13        Q.    And what is guarding?

14        A.    Guarding is like -- like if I would

15   push on somebody's stomach and they would kind of

16   like react to it, pull away, kind of move your

17   hands.

18        Q.    Okay.  And if they --

19        A.    Or hold.  You know, they could be

20   bracing the area.

21        Q.    If they demonstrate signs of

22   guarding, does that require hospitalization?

23        A.    Not necessarily.

24        Q.    Okay.

25        A.    It's a full assessment that you do,

Page 26

1   you give to the provider.  And I don't determine

2   hospitalization.  That's the provider.

3        Q.    But it would require a call to the

4   provider?

5        A.    Yes.

6        Q.    Okay.

7              MR. DEBEER:  Wait.  I'm -- that

8   assumes facts not in evidence.  Are you talking

9   about guarding?

10             MR. KATES:  I'm asking about

11   guarding.

12             MR. DEBEER:  Okay.  That's my

13   objection.

14             (Discussion off the record.)

15             MR. KATES:  Back on the record.

16        Q.    (By Mr. Kates)  Are you aware of

17   what -- are you aware of what peritonitis is?

18        A.    Yes.

19        Q.    Is guarding a sign of peritonitis?

20        A.    It could be.

21        Q.    Okay.

22        A.    It could be something totally

23   different.  Gas.  It could be anything.

24        Q.    Is rebounding a sign of peritonitis?

25        A.    Yes.

Connie Heitman, RN
7/15/2021                                    Angela Malcich v. St. Louis County, et al.

Page 27

1        Q.      Is pain with palpation a sign of

2   peritonitis?

3        A.      By itself, no -- I mean, pain with

4   palpation is pain with palpation.  But in the

5   clinical picture of all the symptoms put

6   together, yes.

7                Does that make sense to you?

8        Q.      It's one of the factors that you look

9   for?

10       A.      Yeah.  It's something that we would

11  look at.

12       Q.      Okay.  Let me get this out real

13  quick.

14               It's one of the factors that, taken

15  as a whole, is a sign that could give an

16  indication of peritonitis?

17       A.      Possibly, yes.

18       Q.      Are you aware that peritonitis can

19  lead to death?

20       A.      Yes.

21       Q.      And signs of peritonitis would

22  require an inmate to go to the hospital

23  immediately?

24       A.      We would call the provider, and they

25  would make that determination.

Page 28

```
 1          Q.     Is the provider on-site at the jail?

 2          A.     Now they are.

 3          Q.     Back in 2019?

 4          A.     I don't believe so.

 5          Q.     Okay.  So who would -- strike that.

 6                 Is there a list of providers that

 7   you're supposed to call?

 8          A.     We have an on-call provider --

 9          Q.     Okay.

10          A.     -- for that each day, that we would

11   call.

12          Q.     So -- okay.  So in 20 -- in June

13   of 2019, Monday's provider might be different

14   from a Tuesday's provider?

15          A.     Correct.

16          Q.     They are just on a weekly rotation

17   and they --

18          A.     Daily, yeah, whatever the schedule

19   is.

20          Q.     Okay.  But they're -- where are they

21   located out of?  Are they -- strike that.

22                 Are they at a specific hospital?

23          A.     Okay.  So they're our providers.

24          Q.     Okay.

25          A.     They do come in and see patients in
```

Page 29

1    the clinic during the day hours, back then.  It's

2    a little bit different now.  We have 24-hour

3    providers in site.  They do sleep at night, and

4    we do wake them up and can call them to come see

5    people.  So now we have an on-call 24/7.

6           Q.    Okay.

7           A.    That I can, Hey, come look at this

8    person, or I can call.

9           Q.    But -- and I think I missed it.  Back

10   in 2019, were they on-site or were they off-site?

11          A.    It depends on the time of the day.

12          Q.    Okay.  What hours were they on-site?

13          A.    They have a schedule.  I work nights,

14   so they wouldn't have been at night.

15          Q.    Okay.

16          A.    Does that help you?

17          Q.    Yes.  Does -- do you know when

18   they --

19          A.    Generally day shift-ish hours.

20          Q.    Okay.  So at nightshift, they

21   wouldn't have been on-site?

22          A.    Correct.

23          Q.    Okay.  So you would have had to call

24   out to them --

25          A.    Yes.

Page 30

1          Q.     -- in 2019?

2                 Okay.  Are you aware of what

3    Mr. Reavis's complaints were?

4          A.     No, not -- I mean, generally, no.  I

5    mean, it's -- I know what he died of, supposedly,

6    but I wasn't involved with that case.  So --

7          Q.     Okay.

8          A.     -- it's kind of -- I read the

9    media --

10         Q.     Okay.

11         A.     -- reports.

12         Q.     Back to Mr. Shy.  You did your

13   assessment on him, and you arranged for him to

14   get to the hospital, right?

15         A.     Yes.

16         Q.     Okay.  You leave your shift.  And

17   when you come back, you learned that he died,

18   right?

19         A.     Yeah.

20         Q.     What's your understanding of what he

21   died from?

22         A.     From what I understand, he bled out.

23   Some sort of rare condition.  They really

24   couldn't figure out where from.

25         Q.     Okay.

Page 31

1      A.    It was nothing clinically evident of

2  where he bled from.

3      Q.    And when did you -- did you learn

4  about that cause of death the next day when you

5  arrived at work?

6      A.    When I arrived at work, I was

7  downstairs and I got called up to the infirmary,

8  because the person that was coming in was going

9  to be late.

10     Q.    Uh-huh.

11     A.    She was covering a -- she was one of

12  our clinic nurses outside of our building.  And

13  she was coming in to help, but she couldn't come

14  in till like midnight or so.  And there was a lot

15  going on, and I didn't know what was going on.

16         And Janet Duwe said to me, Can you

17  just come up?  There's a lot going on up here, I

18  need another person up here.  Because I was

19  working down at intake.

20     Q.    Okay.

21     A.    And so I came up.  And when I came

22  up, he was on the floor and had been deceased.

23     Q.    He physically was still there?

24     A.    Yes.

25     Q.    Okay.

Page 32

1          A.      The police were there, and I think

2     the coroners, or somebody from the corners came

3     in.

4          Q.      Was it prior to Mr. Stout's death

5     that you learned that Mr. Shy purportedly died of

6     bleeding out from a rare condition?

7          A.      I don't remember when.

8          Q.      Okay.

9          A.      But it was kind of obvious.  There

10     was blood.

11          Q.      Lamar Cathings was the other inmate

12     that we mentioned earlier.  He passed away on

13     March 1st, 2019.

14               Did you have any interaction on the

15     day of his death with him?

16          A.      I do not recall.  I may -- at night

17     we're part of a code team.  So I may have

18     responded if it was during my shift.  But as far

19     as triaging or caring for him, no, I was not part

20     of -- while he was alive.

21          Q.      Okay.  Do you have any understanding

22     of what the cause of his death was?

23          A.      No.

24          Q.      And we kind of touched on it already,

25     but I want to just specifically ask these

Connie Heitman, RN
7/15/2021                                    Angela Malcich v. St. Louis County, et al.

Page 33

 1    questions.

 2              As a nurse at the jail, you have --

 3    you -- part of your job duties include seeing

 4    sick patients, right?

 5        A.    Yes.

 6        Q.    Okay.  And those sick patients

 7    include the inmates?

 8        A.    That's generally who they are, yes.

 9        Q.    And, obviously, the inmates

10    themselves, because they're incarcerated, are

11    restricted in their ability to contact medical

12    providers on their own for any illnesses or

13    injuries that they might have, correct?

14              MR. DEBEER:  Objection.  Lacks

15    foundation.  Calls for speculation.

16        A.    Okay.  Can you clarify, inside help

17    or outside help?

18        Q.    (By Mr. Kates)  Well, the inmate

19    can't call the doctor himself, can he?

20        A.    Our doctor?

21        Q.    Any doctor.

22        A.    Well, they can call -- if they have

23    phone privileges, they can call somebody.  We've

24    had doctors come up there to see them.  It's

25    usually arranged through their attorneys or

Page 34

1    whatever.  But they can ask for help through a

2    corrections officer.

3         Q.    Okay.

4         A.    And then the nurse would come up and

5    then steps would --

6         Q.    Okay.  But they can't physically go

7    to a hospital on their own, right?

8         A.    No.

9         Q.    Okay.  And when they do reach out for

10   help to get a corrections officer or a nurse to

11   treat them for any illness or injury that they

12   might have, you, as the nurse, have to act in

13   their best interest, right?

14        A.    Do my nursing duty.

15        Q.    Right.

16              As far as your job goes with calls

17   for sick inmates, right --

18        A.    Uh-huh.

19        Q.    -- you have an obligation to treat

20   the sick inmates, right?

21        A.    If -- if I feel they need to be

22   treated, and it's within my scope.  I would call

23   a doctor if I couldn't treat them.

24        Q.    Okay.

25        A.    You know, if -- if it's appropriate.

Page 35

1        Q.    In order to determine whether or not

2    they have an illness or injury that needs to be

3    seen by a doctor, you need to actually physically

4    see the patient and do an assessment on them,

5    right?

6        A.    That's generally what I do, yes.

7        Q.    Okay.  And if you get a call about a

8    sick inmate who has complaints, you have to go up

9    and see them, right?

10       A.    I do go see them when they call.

11       Q.    Right.

12             So you have an obligation to go and

13   see them.  You don't just pick and choose which

14   inmates you get to go see and which ones you

15   don't go out to see, right?

16             MR. DEBEER:  Objection.

17   Argumentative.  Lacks foundation.

18             You can answer.

19       A.    There are occasions with certain

20   complaints from -- that we know the patient has

21   been seen and treated, that we can -- depending

22   on what time of day, we can hold off.

23             Like, say, the patient's been

24   complaining of a dental abscess and they've been

25   given their medications and they're still saying

Page 36

1    I'm still having pain.  If I don't have time to

2    go see them and I have something more urgent

3    pressing, then I may not.  And they put them off

4    till, depending what time of day it is and how

5    much time I have left on my shift, they may be

6    seen by the next nurse.  But generally I go up

7    and see them, for the most part.

8         Q.    And to make that determination, you

9    pull up the inmate's file, right?

10        A.    I would be given the name, date of

11   birth, and their complaint, yes.

12        Q.    And then you look at their file,

13   right?

14        A.    Yes.

15        Q.    Okay.  And you'd check to see what

16   their history is, right?

17        A.    Yeah.

18        Q.    And based on their history, you make

19   a determination of whether it's something that

20   needs your physical appearance and assessment

21   immediately, or whether you can push it off to

22   another nurse?

23        A.    Well, I don't always try to push it

24   off.  I try to go up and see them.  But you can't

25   be in multiple places at multiple times, and you

Page 37

1  don't have -- like if you're at the end of your

2  shift and I have something, like, a chest pain

3  pressing as far as a dental pain, I'm going to

4  see the chest pain, and then triage that to the

5  morning nurse.  But, generally, yeah, I do go up

6  and see them.

7       Q.    Generally -- okay.  Strike that.

8             As far as June 11th -- June 10th to

9  the 11th, 2019, what part of the jail were you

10  working at that night?

11      A.    Umm, I believe it was intake, on the

12  open seating side.

13      Q.    Where are the other locations within

14  the jail that the nursing staff work?

15      A.    Intake LEL, infirmary.  On

16  nightshift, those are the places.

17      Q.    You said intake, LEO --

18      A.    The intake LEL side, or -- that's

19  when they first come in.  They see a nurse, and

20  then they go to the other side and there's a

21  nurse on the other side.  I was working on the

22  open seating on the other side area.

23      Q.    Okay.  And I'm just going to ask you

24  for clarification.  So you said intake LEL.

25      A.    Yeah.  Law enforcement lobby --

Page 38

1        Q.     Are they --

2        A.     -- is the spelling.

3        Q.     So are they lumped together?  Like

4   it's identified as intake/LEL.

5        A.     Right.  There's two sides of intake.

6        Q.     Okay.

7        A.     There's when you first come in, you

8   see a nurse.  And then -- then once they're

9   accepted into the jail by that nurse, then they

10  go to the other side, which is the open seating.

11       Q.     Okay.

12       A.     And that's where I was working.

13       Q.     Okay.  And other than intake and open

14  seating, where else is there within the jail?

15       A.     The infirmary.  You have a medical

16  and sick side.  On nightshift, that's it.

17       Q.     Just those three different locations?

18       A.     Well, really, yeah, at night.

19  Because that's -- the clinic's closed down.

20  The -- there's no one in the med room at night.

21       Q.     Okay.

22       A.     Overnights, I should say, for you

23  guys.

24       Q.     There's documentation that you were

25  training Janet Duwe that evening.

Page 39

1        A.    I was training her.

2        Q.    Do you recall that?

3        A.    Yeah.  I was training her on how to

4   use the computer to do the floor assessment,

5   which is what we do on the open seating side, and

6   the procedures for doing the floor assessment.

7        Q.    Okay.  What were the hours that you

8   were working those days?

9        A.    Around 10:00 -- they may have

10  switched a little bit.  Around 10:30 to 7:00.

11       Q.    Was it exhausting training Janet that

12  night?

13       A.    Training for me is always exhausting.

14       Q.    Do you train others -- other nurses

15  often?

16       A.    Occasionally.  It's not my

17  preference.

18       Q.    Did you consider yourself stressed

19  after training Janet that night?

20       A.    Possibly.

21       Q.    Did Janet appear to you that she was

22  stressed that night?

23       A.    It's -- stress is an internal factor,

24  so it's --

25       Q.    Did she show any signs to you that

Connie Heitman, RN
7/15/2021                                    Angela Malcich v. St. Louis County, et al.

Page 40

1     she might be stressed?

2          A.    Can you tell me what signs that you

3     would --

4          Q.    I'm just asking for your input as to

5     the situation.

6                MR. DEBEER:  Yeah.  I'll just object

7     that it calls for an expert opinion.  It calls

8     for her to speculate.

9          A.    Stress is an internal stimuli.  So

10    you need to tell me what you feel is signs of

11    stress.

12         Q.    (By Mr. Kates)  Well, I'm asking you

13    what your perception was that night.  We have --

14    we have the internal affairs report, which is

15    Exhibit 6 in this case.  And I'll turn the page

16    to --

17         A.    I can say she was having difficulty

18    processing the information I was giving her.

19         Q.    Okay.

20         A.    Because it was newer to her.  She had

21    it before, but it was different.

22         Q.    Okay.  So what did you notice about

23    how she was reacting that gave you the impression

24    that she was having difficulty in processing the

25    information.

Page 41

1        A.    I guess trying to figure out

2    everything in the computer, maybe.  I don't --

3    it's been a while, so it's hard for me to say.  I

4    just remember she was having difficulty with the

5    process.

6        Q.    Okay.  So let's get to the phone call

7    that came in that night.  You recall that phone

8    call came in that asked -- oh, okay.

9              As far as --

10             MR. DEBEER:  I was going to let that

11   slide.

12             MR. PLEBAN:  I wasn't.

13             MR. DEBEER:  Thank you, J.C.

14             MR. PLEBAN:  You're welcome.

15       Q.    (By Mr. Kates)  Do you remember a

16   phone call coming in the morning of June 11th,

17   2019, specifically related to a sick inmate?

18       A.    No.  Because I wasn't told of any

19   sick inmate.

20       Q.    Okay.  As far as this case goes, you

21   are aware that a phone call came in that Janet

22   answered --

23       A.    Yes.

24       Q.    -- the morning of June 11th, 2019,

25   correct?

Page 42

1          A.    Yes.

2          Q.    Okay.  How did you become aware of

3    that phone call?

4          A.    I was sitting in the room behind her,

5    and she was up here by the computer on the phone.

6          Q.    Did you hear the phone ring?

7          A.    A little bit, yes.

8          Q.    Okay.  And Janet came to talk to you

9    about the phone call, right?

10         A.    She had some just strange questions.

11         Q.    What did she -- what questions did

12   she have?

13         A.    Something about -- I don't remember

14   exactly what it was.  Something about movement of

15   an inmate, and I just told her I didn't

16   understand what she was asking.

17         Q.    Okay.  Did you ever learn

18   specifically what she was asking?

19         A.    Not until the next day when --

20         Q.    Okay.  So what did you say in

21   response to Janet when she said something about

22   moving a patient -- an inmate?

23         A.    I don't remember.

24         Q.    Was there any further dialog between

25   you and Janet about the phone call?

Page 43

1        A.     I don't remember.

2        Q.     Did you ask for any specific

3   information about the movement that she was

4   asking about?

5        A.     I may have asked her to clarify what

6   she was saying, because I didn't understand it.

7        Q.     Did she ever clarify?

8        A.     I don't know.  I don't remember the

9   conversation totally.

10        Q.     Did she say anything to you about a

11   patient that -- an inmate that had vomited?

12        A.     No.

13        Q.     She never told you anything about an

14   inmate that vomited?

15        A.     No.

16        Q.     And did you --

17        A.     I think there was a question, if an

18   inmate vomits, can they go to prison?  And I was,

19   like, they could.

20        Q.     So she did say something about

21   somebody vomiting?

22        A.     No.  She said hypothetically.  She

23   was asking a question.

24             MR. DEBEER:  I think the disconnect

25   here is, I think she's interpreting your question

Electronically signed by Debra Kaesberg (101-145-449-5392)          5ad9cd31-73d2-4e33-a941-98eb5b26e7cb

Page 44

1    as asking about a particular inmate.

2         A.    There was no particular inmate.

3               MR. DEBEER:  Does that make -- I'm

4    not trying to mess up your question.

5         A.    No.

6               MR. DEBEER:  I'm just trying to

7    broker down her understanding.

8         A.    I think it was like an informational

9    thing.

10        Q.    (By Mr. Kates)  I want to know the

11   words that Janet said to you.

12        A.    I don't remember.

13        Q.    Okay.  But you recall specifically

14   that it had to do with vomiting?

15        A.    Not at first.  I think -- I think she

16   went back on the phone, and then she said, So in

17   a situation, or something, if this happens.  And

18   I said, Well, I don't know.  It's possible.

19        Q.    Okay.  So as you sit here today,

20   what's your recollection of what her hypothetical

21   was that you two discussed?

22        A.    I don't remember totally what it was.

23   I just remember that it was something like, you

24   know, they want to know if an inmate vomits, can

25   they go to prison?

Page 45

1              And I said, Well, maybe, it's not

2    going to stop them.  But, I said, you know, They

3    vomit all the time when they go to prison,

4    because they're withdrawing.  That's just a sign

5    of withdrawal, period.

6              And she's like -- I said, Well, what

7    is this?  And she's, like, I don't know, they

8    just want information, something to that effect.

9         Q.    Okay.  Information regarding an

10   inmate that vomited?

11        A.    Not an inmate.  In general.  Just

12   information in general.  Like can they, if they.

13        Q.    Who's "they"?

14        A.    I guess it was the person on the

15   other end of the phone.  You would have to ask

16   Janet, because I didn't talk to them.

17              MR. PLEBAN:  Could you wait for just

18   two seconds?

19              MR. DEBEER:  Sure.

20              (Whereupon a short recess was taken

21   at 2:47 p.m. and resumed at 2:53 p.m.)

22              MR. KATES:  Okay.  We'll go back on

23   the record.

24        Q.    (By Mr. Kates)  Janet -- Janet --

25   Ms. Heitman, after -- strike that.

Page 46

1          Do you remember speaking to internal

2    affairs about Mr. Stout's death?

3          A.    Vaguely.

4          Q.    Okay.  Do you remember you provided

5    them a statement, correct?

6          A.    Vaguely.

7          Q.    Okay.  I'll hand you Exhibit 6, all

8    right?  It's open to page 10.  Take a look at

9    that for me, please.  Second paragraph -- or the

10   first full paragraph is specifically what I'm

11   looking at.  I want to know if that's a statement

12   that you provided to IA.  So take your time and

13   take a look at it.

14          MR. DEBEER:  Yeah.  And I was going

15   to say, Connie, turn to the prior page.  Since

16   she has not looked at this, I just want to make

17   sure that she is able to look at the entirety of

18   it.

19          Q.    (By Mr. Kates)  The page before has

20   your name underlined in bold down at the bottom.

21          A.    I don't remember exactly what I

22   wrote, so --

23          Q.    Feel free to read it.  First -- or

24   first -- I'm sorry.  I believe it's the second

25   full paragraph is in quotations.  So go ahead and

Connie Heitman, RN
7/15/2021                                    Angela Malcich v. St. Louis County, et al.

Page 47

1    take a look at that for me.

2              MR. DEBEER:  Just so we're clear,

3    you're not saying she wrote this?

4              MR. KATES:  I'm going to find out.

5              MR. DEBEER:  You're asking her if she

6    physically wrote this?

7         Q.   (By Mr. Kates)  Take a look at that,

8    and I'll ask a question and we can get it all

9    sorted out.

10             (Whereupon an off-the-record

11   discussion was held.)

12        A.   Okay.

13        Q.   (By Mr. Kates)  Okay.  So we're on

14   page 10 of Exhibit 6.  The very, very, very first

15   paragraph says:  Nurse Heitman was working on the

16   intake side on the morning of this incident,

17   submitted the following statement.

18             Did I read that correct?

19        A.   Yes.

20        Q.   And then the next full paragraph is

21   in quotation marks.  Is that paragraph a

22   paragraph that you provided to IA relating to

23   this incident?

24        A.   When you say "provided," how?

25        Q.   In any way.  Did you write it out in

Page 48

1    handwriting?  Or did you type it up?

2         A.    They spoke to me.  They spoke to me.

3    I do remember them speaking to me.

4         Q.    Did you type up an e-mail statement

5    and send it to anyone?

6         A.    I don't know.  I don't remember.

7         Q.    Did you physically put pen to paper

8    and write something out to give to someone?

9         A.    I don't remember.

10        Q.    Is it possible that you typed out an

11   e-mail and sent it to someone?

12             MR. DEBEER:  Object to form.

13             MR. BANKS:  Calls for speculation.

14        A.    I don't remember.

15        Q.    (By Mr. Kates)  Is it possible?

16             MR. DEBEER:  Same objection.

17        A.    Same answer.

18        Q.    (By Mr. Kates)  You don't know one

19   way or the other whether -- you don't remember

20   one way or the other whether you did --

21        A.    Yeah.  It's too long ago to remember

22   if I typed something up or not.

23        Q.    Okay.  This statement -- this

24   paragraph, second paragraph, second line down

25   reads:  Janet asked something like, If someone

Page 49

1    vomits, can they be moved?

2              Does that sound similar to the

3    question she asked you on June 11th, 2019?

4         A.    Possibly, yeah.

5         Q.    And it says:  I -- purportedly you --

6    was confused about what she was asking, and asked

7    why they can't be moved?

8              MR. DEBEER:  Hold on a second.  I'm

9    sorry.  Where are you?

10             MR. KATES:  Third line down of the

11   second paragraph.

12             MR. DEBEER:  Okay.  I got you.

13        Q.    (By Mr. Kates)  I was confused about

14   what she was asking, and asked, why can't they be

15   moved?

16        A.    Where it says -- where does it say

17   "I"?

18        Q.    Third line down of the second

19   paragraph.

20             MR. DEBEER:  That's --

21        A.    That's not the same -- are we on the

22   same paragraph?

23        Q.    (By Mr. Kates)  Right here.

24        A.    Oh, we're on the wrong paragraph.

25        Q.    Second -- yeah.  So the first

Page 50

1    paragraph I lumped in as the Nurse Heitman was

2    working.

3               MR. DEBEER:  Right.  We got you,

4    okay.

5         A.    And I was looking down here.

6         Q.    (By Mr. Kates)  My apologies.

7         A.    Sorry.

8         Q.    So to clarify, what I was referring

9    to as the second paragraph starts with quotation

10   marks, and says:  I did not receive a sick call

11   request for vomiting.

12              Are we at the same spot?

13        A.    Okay.

14        Q.    Okay.  That is what I was asking

15   of -- is that portion, that paragraph, something

16   that you prepared and sent to someone?

17        A.    I don't remember.

18        Q.    We went through a whole line of

19   questioning, and you didn't know.  I want to make

20   sure that we were talking about the same portion

21   of this piece of paper.

22              Is that what you were referring to

23   when I was asking those questions?

24              MR. DEBEER:  He's asking --

25              MR. KATES:  I can go through and ask

Page 51

1    again.

2              MR. DEBEER:  Sure.  Well, I'm trying

3    to think of how to do it that's --

4              THE WITNESS:  What were the

5    questions --

6              MR. DEBEER:  -- clean for the record.

7              So we will label this the second

8    paragraph on that page.  The first paragraph is

9    just that sentence, right?

10             MR. KATES:  Right.

11             MR. DEBEER:  So what he's asking you

12   is, you went through a whole line of questioning

13   with him as to whether you remembered either

14   verbally giving a statement, written statement.

15             THE WITNESS:  Okay.

16             MR. DEBEER:  He's talking about this

17   entire paragraph right here.  This second full

18   paragraph on page 10.

19        A.    I remember talking just in general to

20   justice services.  Other than that, I really

21   don't remember specifically.

22             MR. KATES:  Can I go back?

23             MR. DEBEER:  Yeah, absolutely.

24             MR. KATES:  I want to make sure it's

25   clean.

Page 52

1              MR. DEBEER:  Yeah, absolutely.

2              MR. PLEBAN:  Let's go off the record

3      for a second.

4              (Whereupon an off-the-record

5      discussion was held.)

6              MR. KATES:  We're back on the record.

7         Q.   (By Mr. Kates)  We are on page 10 of

8      Exhibit 6.  It's Bates-labeled STLCO000010.  I --

9      when I refer to the second paragraph, it starts

10     with quotation marks:  I did not receive a sick

11     call request for vomiting.  And it continues

12     until the end of the paragraph.

13             Do you remember physically writing or

14     typing --

15        A.   No.

16             MR. DEBEER:  Wait till he finishes.

17             THE WITNESS:  Oh, okay.

18        Q.   (By Mr. Kates)  Do you remember

19     physically writing or typing that paragraph?

20        A.   No.  And I wouldn't have put

21     quotation marks in my own words.

22        Q.   Understood.

23             MR. DEBEER:  Yeah, just answer.

24        A.   No.

25             MR. DEBEER:  Just answer the

Page 53

1    question.

2            A.    That's weird.

3            Q.    (By Mr. Kates)  Do you remember

4    writing out a statement to provide to anyone?

5            A.    No.

6            Q.    Do you remember sending an e-mailed

7    statement to anyone?

8            A.    No.

9            Q.    Okay.  So in that paragraph that

10   we're referring to as the second paragraph, you

11   mentioned that Janet said to you that:  If

12   someone vomits, can they be moved?  Third line

13   down.

14           A.    Asked something like --

15           MR. DEBEER:  Hold on.  Is that --

16   what's the question?

17           Q.    (By Mr. Kates)  I'm asking if Janet

18   asked you something like that.  According to this

19   statement, it says:  Janet asked something like,

20   if someone vomits, can they be moved?

21           Do you remember Janet asking you a

22   question similar to that?

23           A.    Vaguely.

24           Q.    Okay.  And it even goes on to say:  I

25   was confused about what she was asking and asked

Page 54

 1    why can't they be moved.

 2            Do you remember making a statement to

 3    Janet similar to that?

 4        A.    I remember asking for more

 5    information because I was confused.  It was a

 6    weird question.

 7        Q.    Okay.  I'm going down now to the

 8    fifth line down.  This sentence reads:  She said

 9    this was informational only.  If someone is out

10    of the system and vomited, can they be moved to

11    go to prison?

12            MR. DEBEER:  Starting right here and

13    ending -- it's just that sentence right there.

14        A.    I -- she probably asked something to

15    that sort.  I mean, I don't remember.

16        Q.    (By Mr. Kates)  Okay.  Something to

17    the -- something to the effect that someone is

18    out of your system?

19        A.    I don't know what that means.

20        Q.    You've never heard anybody say

21    there's someone out of your system with regard to

22    the jail?

23        A.    Usually when they're out of the

24    system, they're gone.

25        Q.    Okay.  What about being moved to

Page 55

1    prison?  Do you remember Janet mentioning

2    anything like that?

3          A.    Vaguely.

4          Q.    Okay.  So somebody being moved to

5    prison was brought up in the conversation between

6    you and Janet?

7          A.    Not somebody, just in general.  It

8    was a question in general for information.

9          Q.    To your recollection, what was the

10   question?

11         A.    Just if somebody vomits, are they --

12   can they be moved?  And then I clarified, I

13   think, and asked more questions.

14               And I think she said, Well, if

15   someone vomits, can they be moved to prison?

16               And I was just kind of confused.  I'm

17   just like -- and asking for more.

18               And she said, No, this is just for

19   information.

20               And I was kind of like, Well, maybe.

21   It just depends on what's going on, you know.

22         Q.    So she was asking about someone being

23   moved to prison after having vomited?

24         A.    Not anybody in particular.  Just

25   information if it's possible if that could occur.

Page 56

1          Q.     Okay.

2                 MR. KATES:  Can you re-read my

3     question to me, and the answer, please.

4                 (Whereupon the reporter read back the

5     requested portion of testimony.)

6          Q.     (By Mr. Kates)  But she was

7     mentioning to you that someone vomited?

8          A.     No.

9          Q.     She didn't -- she wanted to know if

10    somebody could be moved after vomiting, right?

11         A.     She said it was just for information,

12    and this -- like a scenario.  If this happens,

13    could they do -- and I was just like, well, I

14    don't know.  I mean, that's kind of vague.

15         Q.     But the scenario she gave you, vague

16    or not, mentioned someone being moved after

17    vomiting?

18         A.     She said --

19                MR. DEBEER:  I'm going to object --

20         A.     Not for any particular person.  Just

21    in general, can a person -- if they vomit, can

22    they go to prison?  Does that stop the -- not

23    like a particular person, like a request for help

24    or anything like that.  She was just saying, is

25    that -- kind of like does it -- I guess -- you

Page 57

1    know, I -- I -- and I was like, well, possibly.

2    I mean, just depends.

3        Q.    I'm not asking if she gave you a

4    person's name.  I'm not asking if she gave you

5    anybody's status, whether inmate or corrections

6    officer.  I'm just specifically asking you if she

7    said, can a person be moved to prison if they

8    vomited?

9        A.    I don't know if she said it that way.

10   I mean, she was asking something about movement.

11   And then she was asking, Well, if someone vomits,

12   can they go to prison?

13            And I was like, Well, possibly.  It

14   just depends what's going on.  And she says it's

15   just informational only.

16       Q.    Is it possible she was referring to a

17   corrections officer going to prison?

18       A.    A corrections officer?

19       Q.    Yeah.

20       A.    I don't know.  I wasn't on the phone

21   call.

22       Q.    Okay.  But -- is it possible she was

23   referring to an inmate going to prison after

24   vomiting?

25       A.    I don't know.  I don't know.  She

Page 58

1   said it wasn't a -- she said it was just

2   informational only.  Like they call all the time

3   for, like, okay, so I have this patient -- I have

4   a patient.  If a patient's bottom bunk, bottom

5   tier, with a cellmate, and they also are on

6   seizure precautions, and the cellmate ends for

7   five days for, I guess, withdrawal protocol -- I

8   don't know if you understand that part -- they'll

9   call for some, like, random questions, not

10  related to a particular patient.

11             They're just trying to figure out

12  can, like -- can you drop off the seizure

13  precautions or something like that.  And then we

14  have a lot of new people there, so we kind of

15  just tell them, Well, no, you can't drop the

16  seizure precautions off, something like that.

17  And from what I understand, this was just a

18  generalized question.  It wasn't --

19       Q.    You knew that people were going to

20  prison that day, though, didn't you?

21       A.    No.

22       Q.    Did they have a mandatory day when

23  inmates are being transferred to MDC?

24       A.    I don't -- I do the MDC runs, but

25  they -- they send us notice now.  But back then

Page 59

1    we didn't do the MDC runs.  The floor nurses did.

2    So it's random.  Sometimes they have people going

3    to prison, and sometimes they don't.

4         Q.    Okay.

5         A.    Sometimes they have people coming

6    from prison.  So it's, you know -- there's

7    nothing mandatory.

8         Q.    Okay.  Let's try it this way:  I'm

9    going to hand you -- following Mr. Stout's death,

10   you received some discipline, didn't you?

11             MS. ROBERTSON:  What did you say,

12   Ben?

13        Q.    (By Mr. Kates)  You received

14   discipline following Mr. Stout's death, didn't

15   you?

16        A.    Can you be more specific?

17        Q.    Did you get a suspension after

18   Mr. Stout's death?

19        A.    Yes.

20        Q.    Okay.  Do you consider suspension

21   discipline?

22        A.    Yes.  I -- I grievanced it and won.

23        Q.    Okay.  I hand you Exhibit 45.

24             (Whereupon the Reporter marked

25   Plaintiff's Exhibit 45 for identification as

Page 60

1    requested.)

2              MR. BANKS:  Thank you.

3              MR. DEBEER:  Uh-huh.

4              MS. ROBERTSON:  Thank you.  I have

5    some extra.

6              MR. KATES:  I was afraid I

7    short-changed somebody, so I printed off a bunch.

8         Q.    (By Mr. Kates)  When you get a chance

9    to look over that, let me know when you're

10   finished.

11        A.    Okay.

12        Q.    Did you have a chance to read

13   Exhibit 45?

14        A.    Yeah, I'm just going over it.

15        Q.    Okay.  Is that the notice of

16   suspension that you received on July 15th, 2019?

17        A.    It is a notice of suspension.  I

18   don't remember when I received it, but that's --

19   it's dated --

20        Q.    It's dated July 15th, 2019.  Do you

21   recall receiving that in July 2019, correct?

22        A.    Sometime in July.

23        Q.    Okay.  On page 2, the very, very last

24   bottom line, the sentence starts:  Your failure

25   to take the necessary action to respond -- and

Page 61

1    then it carries over into the third page -- to a

2    call concerning a sick inmate demonstrated a

3    failure of your duty as the senior nurse and the

4    charge nurse on duty.

5              Did I read that right?

6         A.    You read that right, but it is

7    incorrect.

8         Q.    The question is:  Did I read it

9    right?

10        A.    You did read it right.

11        Q.    Okay.  So based on this document,

12   according to the document, the -- they suspended

13   you for failing to take necessary action to

14   respond to a call concerning a sick inmate,

15   correct?

16        A.    And I grievanced it and won.

17        Q.    The question is, is based on the

18   document, they suspended you for failing to take

19   the necessary action to respond to a call

20   concerning a sick inmate, correct?

21        A.    Yes.

22        Q.    Okay.  And, in fact, you had been

23   disciplined for that before, right?

24        A.    Not that I recall.

25        Q.    The second -- that same -- page 3 on

Page 62

1    the same document, the first paragraph, three

2    lines down, the sentence reads:  You were

3    disciplined in 2013 for failing to provide

4    appropriate medical care for an inmate/patient,

5    receiving a ten-day suspension.

6              Did I read that right?

7        A.    You did.  But that wasn't exactly

8    what you had said previously.

9              MR. KATES:  Okay.  Can you read back

10   the question for me?

11             (Whereupon the reporter read back the

12   requested portion of testimony.)

13       Q.    (By Mr. Kates)  Okay.  So in 2013,

14   you received discipline for failing to provide

15   appropriate medical care for an inmate or

16   patient, correct?

17       A.    Yes.

18       Q.    Okay.  Thank you.

19             Did you make -- in response to the

20   2013 discipline, did you make any comments, or

21   did you contest it, indicating that any calls for

22   help were for informational purposes?

23             MR. DEBEER:  I'm going to object to

24   the form, to lack of foundation.

25       A.    I just don't understand that.

Electronically signed by Debra Kaesberg (101-145-449-5392)        5ad9cd31-73d2-4e33-a941-98eb5b26e7cb

Connie Heitman, RN
7/15/2021                                        Angela Malcich v. St. Louis County, et al.

Page 63

1               MR. DEBEER:  Ambiguous and confusing

2    question.

3          Q.    (By Mr. Kates)  Let me rephrase the

4    question.

5          A.    What's he talking about?

6          Q.    In 2013, the call for the -- the

7    medical needs of the inmate, did you make any

8    comments that that call was for information only?

9               MR. DEBEER:  Objection.  Calls for

10   speculation.  Lacks foundation.

11              You can answer, if you can.

12         A.    No.  It wasn't for informational

13   only.

14         Q.    (By Mr. Kates)  Okay.  You mentioned

15   that -- so that prior call wasn't for information

16   only?

17         A.    Are you referring to the 2013?

18         Q.    2013.  If that call was not for

19   information, would you agree that you failed to

20   provide the appropriate medical care for the

21   inmate?

22         A.    No.

23         Q.    Did you contest that?

24         A.    I did.

25         Q.    Did you succeed?

Electronically signed by Debra Kaesberg (101-145-449-5392)          5ad9cd31-73d2-4e33-a941-98eb5b26e7cb

Page 64

1          A.     No.  Although there was significant

2     protest by one of the people on the board

3     suspecting that a further investigation needed to

4     be done; that the investigation and how they

5     wrote me up was improper.

6               MR. KATES:  Okay.  I'm going to move

7     to strike the response after the initial answer.

8          Q.    (By Mr. Kates)  Okay.  I'm going to

9     hand you what's Exhibit 46.

10              (Whereupon the Reporter marked

11    Plaintiff's Exhibit 46 for identification as

12    requested.)

13              MR. DEBEER:  Thank you.

14              MR. KATES:  There's extra, too.

15              MS. ROBERTSON:  Okay.  Thanks.

16         Q.    (By Mr. Kates)  Let me know when you

17    had a chance to look it over.

18         A.    I am familiar with this.

19         Q.    Okay.  Did you receive this document

20    in July 2019?

21         A.    No.

22         Q.    You never received this document?

23         A.    No.

24         Q.    Have you ever seen this document

25    before --

Page 65

1       A.      Yeah.

2               MR. DEBEER:  Sorry.  Connie, let him

3       finish his question.

4               THE WITNESS:  Okay.

5       Q.      (By Mr. Kates)  Have you ever seen

6       this document before today?

7       A.      Yes.

8       Q.      When did you see this document?

9       A.      At some point, I had grievanced this,

10      and I was told I won; that it was totally being

11      removed from my record; that I had no

12      implications whatsoever.  I never received the

13      notice or the letter in the mail stating that I

14      was cleared from this.

15              So I went over to check my personnel

16      file and found this in here, and was shocked that

17      I had 24 hours to grievance this and I had never

18      received it.

19              So I called my boss and I said, You

20      need to clear this up, or I'm not coming back to

21      work for you.  Let me know when you get it

22      cleared up.  And we got Kathy Eller involved, who

23      is head of, I guess, grievances and suspensions.

24      And she made some calls and said -- and indeed,

25      that they had removed all of this and I had won

Connie Heitman, RN
7/15/2021                                    Angela Malcich v. St. Louis County, et al.

Page 66

1    my grievance; that I had no responsibility in

2    this at all.

3           Q.    Okay.  So you're saying they never

4    sent you this document?

5           A.    No.

6           Q.    You didn't find it until you went to

7    your own personnel file?

8           A.    Yeah.  Something -- I was, like, I

9    should have received this by now.  I should have

10   gotten that letter.

11          Q.    Okay.  So going back to Exhibit 45,

12   did you first discover this exhibit, this

13   document, when you went to your personnel file?

14          A.    No.  They did give me this one.

15          Q.    Okay.  So you received Exhibit 45?

16          A.    Yes.

17          Q.    And then filed a grievance?

18          A.    Correct.

19          Q.    Okay.  I hand you Exhibit 47.

20                (Whereupon the Reporter marked

21   Plaintiff's Exhibit 47 for identification as

22   requested.)

23          Q.    (By Mr. Kates)  Let me know when you

24   had a chance to look that over to get familiar

25   with it.

Page 67

1                MR. DEBEER:  This is 46, you said?

2                MR. KATES:  47.

3                MS. ROBERTSON:  Can we take a

4      five-minute break?

5                MR. KATES:  Sure.

6                MR. PLEBAN:  Sure.

7                (Whereupon a short recess was taken

8      at 3:25 p.m. and resumed at 3:33 p.m.)

9                MR. KATES:  We're back on the record.

10        Q.    (By Mr. Kates)  Ms. --

11        A.    Heitman.

12        Q.    Sorry.  I was going to call you

13     Ms. Duwe, but I knew that was not right.

14                Ms. Heitman, you've had an

15     opportunity to look at Exhibit 47, right?

16        A.    Yes.

17        Q.    Is that the grievance you filed in

18     response to your suspension?

19        A.    Yes.

20        Q.    And did you prepare that?

21        A.    I did.

22        Q.    Okay.  So let's look at the -- the

23     page that contains the -- the statement.  It's

24     the second page of Exhibit 47.  I'm going to go

25     down about three-quarters of the way down.  And I

Page 68

 1    can point you right to it.  Right -- I was asked.

 2              Okay.  So, the sentence reads:  I was

 3    asked, this is information only, and if someone

 4    is going to prison, can they be moved?

 5              You wrote that, correct?

 6       A.    I did.

 7       Q.    Okay.  That's what you were asked,

 8    correct?

 9       A.    That's what I wrote.

10       Q.    That's what you were asked?

11       A.    I don't remember exactly.  But I

12    wrote that, so --

13       Q.    Do you remember when you wrote this

14    statement?

15       A.    No.

16       Q.    Okay.

17       A.    I mean, I remember writing it, but I

18    don't remember everything.

19       Q.    Okay.  So is it possible that you

20    were being dishonest in this document?

21       A.    No.

22       Q.    Okay.  Go back to the first page for

23    me.  It's dated July 23rd, 2019, correct?

24       A.    Okay.  Yes.

25       Q.    Would your memory have been better

Page 69

1    back in July of 2019 than it is today?

2         A.    Possibly.

3         Q.    Is it possible that it was worse back

4    then?

5         A.    I mean, it was very stressful for me,

6    so it's possible.

7         Q.    Okay.  So is it likely that it was

8    more -- that you had a better memory back then

9    than you have now?

10        A.    I don't know.

11              MR. DEBEER:  Objection.  Calls for

12   speculation.

13        Q.    (By Mr. Kates)  All right.  So this

14   time was stressful for you, right?  You just

15   testified to that, correct?

16        A.    It was.

17        Q.    Okay.  What was stressful about this

18   time?

19        A.    Being blamed for something I didn't

20   do.

21        Q.    Who blamed you?

22        A.    Well, according to this suspension,

23   St. Louis County, Spring Schmidt.

24        Q.    Okay.  So you filed this grievance in

25   response to your suspension, right?

Page 70

1        A.     Correct.

2        Q.     And you're saying that right now, you

3    don't know if any of the information in this

4    document is accurate?

5               MR. DEBEER:  Objection.  Misstates

6    prior testimony.

7        A.     That's not what I'm saying.

8        Q.     (By Mr. Kates)  Okay.  But you're

9    saying that it's possible that your memory wasn't

10   as good back then as it is now?

11       A.     Or both bad.

12       Q.     Okay.  Is it possible that the stress

13   of the time made you misremember --

14       A.     It's possible --

15       Q.     -- this situation?

16       A.     It's possible.

17              MR. DEBEER:  Calls for speculation.

18       Q.     (By Mr. Kates)  Okay.  If you go to

19   the very top of the document, it says the

20   notice -- this is two lines down.  The notice of

21   suspension states:  Connie Heitman was the charge

22   nurse on June 11th, 2019.

23              Is that what the statement says?

24       A.     I was --

25       Q.     Is that what the statement says?

Page 71

1          A.     Yes.

2                 MR. DEBEER:  Is that what that

3    sentence says, is what he asked.

4          A.     That sentence says that, yes.

5          Q.     (By Mr. Kates)  Okay.  Were you the

6    charge nurse on June 11th, 2019?

7          A.     I was not charge nurse.

8          Q.     Okay.  All right.  Well, then --

9    okay.  So as we sit here today, I want to know

10   what information in this document is not

11   accurate.

12                MR. DEBEER:  Objection.  Calls for

13   speculation.  She's already testified as to her

14   memory then, her memory now.  It's already been

15   asked.

16                MR. PLEBAN:  No, it hasn't.

17                MR. DEBEER:  Yes, it has.

18                MR. PLEBAN:  No, it has not.

19                MR. DEBEER:  Yes, it has.

20                MR. PLEBAN:  This has been

21   ridiculous.  This is -- like I'm losing my

22   patience with this while I'm sitting here,

23   because we now have an exhibit that she wrote.

24   And we have testimony in this case that's, I

25   don't know if this is true or other things are

Page 72

1    true, and I don't know what part of this is true.

2    I don't think that we've asked any of that.

3              MR. DEBEER:  Then that's her answer.

4    You asked her that, and that's her answer.

5              She doesn't recall which parts --

6    whatever is on the record.  You've asked it 100

7    different ways.  Just like you asked a bunch of

8    questions 100 different ways.

9              MR. PLEBAN:  That's easy --

10             MR. DEBEER:  And I've given you

11   plenty of slack on it.  But here's the thing is,

12   if she says that -- whatever her answer is, is

13   her memory is not good, she doesn't recall

14   something, she doesn't recall.  That is her

15   answer.

16             MR. PLEBAN:  But I think that --

17             MR. DEBEER:  So if you want to go

18   line by line, go line by line.

19             MR. PLEBAN:  No, no, no.  I think the

20   easier way is what you just said, which hasn't

21   been answered here today, is can you go line by

22   line and tell me what is accurate and what isn't?

23             MR. DEBEER:  That's not what he

24   asked.  He asked what in there is accurate and

25   what's not.  That's not the question he asked.

Page 73

```
 1                 MR. PLEBAN:  Then it's a different

 2      way and maybe that's better.  Ask it that way,

 3      and we'll do it that way.

 4           Q.    (By Mr. Kates)  Is there -- if you go

 5      line by line, can you tell me which of these

 6      statements are accurate and which are not

 7      accurate, in Exhibit 47?

 8                 MR. DEBEER:  And I'll object that it

 9      misstates prior testimony that she ever said that

10      anything in there is not accurate.  She was

11      strictly testifying to her memory at the time

12      versus her memory now.

13           Q.    (By Mr. Kates)  Can you tell me of

14      anything?

15                 MR. DEBEER:  You can answer the

16      question.

17           A.    Ask it again.

18                 MR. KATES:  Can you please repeat the

19      question?

20                 (Whereupon the reporter read back the

21      requested portion of testimony.)

22           A.    That would require me seeing the

23      future.  Why don't we just try.

24                 MR. KATES:  Can you re-read my

25      question, please?
```

Page 74

```
 1              MR. DEBEER:  If you can answer the

 2    question, Connie, answer the question.  If you

 3    don't know, say you don't know.

 4         A.    I don't know, because we haven't done

 5    it yet.

 6         Q.    (By Mr. Kates)  All right.

 7         A.    Does it make sense?  He's asking a

 8    future thing.

 9         Q.    Okay.  Let's do that, then.  Under

10    step one --

11              MR. PLEBAN:  Just have her do it.

12         Q.    (By Mr. Kates)  All right.  Can you

13    read that first line for me and tell me if that's

14    accurate or not?

15         A.    The notice of suspension contains

16    inaccurate and libelous information.

17         Q.    Is that an accurate statement?

18         A.    That's very accurate.

19         Q.    Okay.  Go ahead.

20         A.    The notice of suspension states that

21    Connie Heitman was a charge nurse for June 11th,

22    2019.

23         Q.    Is that an accurate statement?

24         A.    No.  The notice of suspension states,

25    yes.  I was not the charge nurse, though.  I'm
```

Electronically signed by Debra Kaesberg (101-145-449-5392)         5ad9cd31-73d2-4e33-a941-98eb5b26e7cb

Page 75

1    trying to figure out which question you were

2    asking.

3        Q.    Okay.  It will be faster if we do it

4    this way.  Read these to yourself and tell me

5    which ones of these lines are accurate and which

6    ones are not accurate?

7            MR. DEBEER:  We're not going to do

8    that.  We just went over this.  We're not going

9    to do that.

10           MR. PLEBAN:  Then tell her not to

11   answer, this is ridiculous.

12           MR. DEBEER:  No, no.  The answer is

13   she doesn't remember.  So if the answer is I

14   don't remember -- you know, you can go through,

15   was your memory better closer to the event?  Was

16   it better now?  She's already answered those

17   questions.

18           If she doesn't know, she doesn't

19   know.  We're not going to go line by line.  She's

20   already said she can't definitively say whether

21   certain sentences are accurate or not accurate.

22   You're making it black and white.  That's not her

23   answer.

24           MR. PLEBAN:  Is that her -- I don't

25   remember her saying that.  If that's her

Page 76

1    testimony, then have her put on the record

2    that --

3             MR. DEBEER:  It's on the record.

4             MR. KATES:  No, she didn't because --

5             MR. DEBEER:  Yes.

6             MR. PLEBAN:  Greg, we asked the

7    question that you told us to ask.  Which of these

8    are accurate and which are inaccurate, and her

9    answer was, I can't read the future.

10            All I want to know -- and I apologize

11   that I'm getting frustrated with this, but this

12   is one of the most frustrating things that I've

13   been through, is what -- I want to be at trial

14   and know which one of these sentences are real

15   and which one of these are hogwash, and we

16   haven't done that.

17            The questions that were asked were,

18   was your memory better then or now?  That has

19   nothing to do with which stuff in here is real

20   and which is fake.

21            MR. DEBEER:  So you did ask that

22   question.  You asked it about the specific line.

23   You had her go down to the line, and you said, is

24   this an accurate statement?  Do you remember

25   writing it.  She goes, I don't know.  I don't

Page 77

1    know is her answer.

2              MR. KATES:  Do we have to ask if

3    she -- if looking at any of these, if she recalls

4    any of these statements are accurate or not?  If

5    your memory is accurate or not?

6              MR. DEBEER:  If you want to phrase

7    the question as, if she reads that whole thing

8    and as she sits here today, she can 100 percent,

9    crystal-clear tell you that she wrote that at

10   that time, then fine, you can have her do that.

11       Q.    (By Mr. Kates)  I want to know if

12   looking at all of these -- all of these sentences

13   in here, if you can look at them now and tell me

14   any one of them that you, sitting here today,

15   know is not accurate.

16              MR. DEBEER:  Are we on the record?

17              COURT REPORTER:  Yeah.

18              MR. DEBEER:  Okay.  Do you understand

19   that question?

20       A.    Is the content accurate, or did I

21   write them?

22              MR. PLEBAN:  Both.

23              MR. KATES:  Both.

24              MR. DEBEER:  He's asking if you read

25   every single --

Page 78

```
 1              MR. KATES:  Go ahead.

 2              MR. DEBEER:  I'm not trying to step

 3    on your toes.

 4              He's asking if you read every single

 5    sentence in this document, if you could

 6    definitively say to them, this sentence I wrote

 7    is not correct, if you went through every one.

 8         A.   There may be one or two that maybe

 9    not, that are iffy, because maybe my memory

10    was -- I was stressed in my memory.  But I did

11    write this, if that's what you want.

12         Q.   (By Mr. Kates)  You've had an

13    opportunity to read this one once before.

14         A.   I glanced over it, yeah.

15         Q.   Okay.  Greg's got a document in front

16    of him.  I want to go through, and I want you to

17    look at -- you don't have to read them word for

18    word, but I want you to look at the ones that you

19    see and mark the ones that you know, sitting here

20    today, are not accurate.

21         A.   That are not accurate.

22              MR. DEBEER:  By the way, we're still

23    on the record, correct?  That does not -- I had a

24    highlighter -- we're not talking about statements

25    where the answer is I don't know.  Because I
```

Page 79

1    don't know is a perfectly acceptable answer.

2    We're talking about statements that you know

3    definitively, as you sit here today, that you

4    somehow know definitively are false.  If you

5    could --

6              MR. PLEBAN:  Greg, if her

7    testimony -- I agree with you.  If her testimony

8    is, if I went through this whole thing, I don't

9    know what is 100 percent definitive accurate and

10   what isn't, that's fine.

11             We don't have that question and

12   answer.  If that's the answer, I agree with you,

13   that's the answer.

14             MR. DEBEER:  Just get it.  I mean,

15   here's a way to do it.  She has already admitted

16   to writing it.  If you want to ask her if she

17   wrote that based upon her memory at that time.

18   She already testified to her memory.  If you want

19   to write her, did she write that based upon her

20   memory at the time, that's a perfectly acceptable

21   question.

22        A.   And I did.

23             MR. PLEBAN:  But she said --

24             MR. DEBEER:  And that -- she's

25   admitted to writing it.  It's -- if you want to

Page 80

1    go back now and say -- see, what you're doing is

2    you're trying to have her go back and, like,

3    reverify something she wrote, whatever it is,

4    over two years ago.

5              Just verify that she wrote it at the

6    time, and it was based upon her recollection at

7    the time.

8              MR. PLEBAN:  But she didn't say that.

9    What she said is something to the effect that I

10   was stressed at the time and my memory might

11   not -- there might be a couple sentences in there

12   that aren't accurate.

13             I mean, if the testimony -- clearly

14   she wrote it.  She said that, right?  These are

15   her words, but what she's saying is, the words

16   that I put on this paper may not be accurate.

17   And there's no way for us to tell which ones are

18   accurate and which ones are inaccurate.

19             MR. DEBEER:  Okay.

20             MR. PLEBAN:  And if that's the

21   testimony --

22             MR. DEBEER:  Yeah, all right.  So

23   here's what we will do.  We will do that, we'll

24   have Connie read the whole thing.

25             And, Connie, if there is any

Page 81

1    sentences in that that you believe are not true,

2    or not truthful, then highlight those --

3                MR. PLEBAN:  Accurate.

4         A.    There's none that I believe are not

5    truthful.  Does that help you?

6         Q.    (By Mr. Kates)  Say that again so

7    it's clear.

8                MR. PLEBAN:  Hold on, hold on, hold

9    on, okay?  This is going to be jumbled.  You ask

10   that question of, you know, you've looked at

11   this, and are there anything that's not truthful?

12   Then she can answer and we'll have a clean

13   record.

14               MR. DEBEER:  That's fine.

15        Q.    (By Mr. Kates)  Janet --

16        A.    Connie.

17        Q.    Connie, excuse me.

18               Connie, as you look at Exhibit 47,

19   going through that document, the statement that

20   you wrote, are you able to look at that statement

21   and see if any of the statements within it are

22   accurate or not accurate, based on your

23   recollection --

24        A.    I don't --

25        Q.    Sorry.  Based on your recollection as

Page 82

1    we sit here today?

2          A.    I would say that I don't see anything

3    that's not accurate.  Does that help you?  Is

4    that --

5                MR. DEBEER:  Yeah.  That's fine.

6    We're done with that topic.

7          A.    Okay.  Okay.

8          Q.    (By Mr. Kates)  One more, just so I

9    have it --

10         A.    I think it was semantics.

11         Q.    One more just so I have it.  I'm

12   going to look at Exhibit 48.

13               (Whereupon the Reporter marked

14   Plaintiff's Exhibit 48 for identification as

15   requested.)

16         Q.    (By Mr. Kates)  Have you ever seen

17   Exhibit 48 before today?

18               MR. DEBEER:  Take your time to read

19   it.

20         A.    I think I may have seen this one

21   before.

22         Q.    (By Mr. Kates)  Do you have any

23   recollection as to when you saw that?

24         A.    I don't know, because I don't think

25   it came to me right away.

Page 83

1          Q.    Okay.  The letter states that your

2    suspension dated July 15th, 2019, was withdrawn

3    on Wednesday, July 24th, 2019, right?

4          A.    Correct.

5          Q.    Okay.  Did you have any -- strike

6    that.

7                Did you ever have any conversations

8    with either Spring Schmidt or Emily Doucette

9    threatening to file a lawsuit over Mr. Stout's

10   death?

11         A.    I may have, because I was mad at

12   this.

13         Q.    Okay.  Did you --

14         A.    Because it was libel, clear and --

15   but I don't know that I talked to Spring

16   Schmidt -- I don't know that I directly talked to

17   her at all.

18         Q.    Do you know if you talked to either

19   of them before you submitted your appeal?

20               MR. DEBEER:  Objection.  Vague.  What

21   do you mean talked to them?  Are you talking

22   about, talked to them about filing a lawsuit?

23               MR. KATES:  Yeah.

24               MR. DEBEER:  Her filing?  Sorry.

25   Just re-ask it, yeah, for the record.

Page 84

1          Q.     (By Mr. Kates)  Did you ever discuss

2     filing a lawsuit against the County with Emily

3     Doucette or Spring Schmidt prior to filing your

4     grievance?

5          A.     I don't -- no, I don't think so.

6          Q.     Okay.  Was the answer I don't know,

7     or --

8          A.     No, I don't believe that that's the

9     case.

10         Q.     Okay.

11         A.     From my recollection.

12         Q.     Okay.  Going back to the phone call.

13    You never got on the phone, right?

14         A.     Correct.

15         Q.     Okay.  You never went up to see any

16    inmates following the phone -- strike that.

17                You never went up to see Daniel Stout

18    following the phone call, did you?

19         A.     I was never informed -- I didn't even

20    know of his existence there.

21         Q.     But you never went up to see Daniel

22    Stout following the phone call, did you?

23         A.     That's correct.

24         Q.     Okay.  You never took his vitals,

25    correct?

Page 85

1          A.    I didn't know he existed in the

2    building, so I couldn't have taken his vitals.

3                MR. DEBEER:  Connie, just focus on

4    the question, okay?

5          A.    No.  Yeah.

6                MR. PLEBAN:  Re-ask it.

7          Q.    (By Mr. Kates)  You never took his

8    vitals, did you?

9          A.    That's correct.

10         Q.    You never listened for bowel sounds,

11   did you?

12         A.    That's correct.

13         Q.    You never palpated his stomach,

14   correct?

15         A.    That's correct.

16         Q.    You never looked to see if it was

17   guard -- you never performed any -- any test to

18   determine whether there was guarding?

19         A.    That's correct.

20         Q.    You never performed any test to

21   determine if there was any rebound?

22         A.    That's correct.

23         Q.    You never determined whether he was

24   in pain?

25         A.    That's correct.

Page 86

1        Q.     You never made any phone calls to

2    transportation staging area about any sick

3    inmates, did you?

4        A.     That is correct.

5        Q.     You never saw him while he was in

6    transportation staging, did you?

7        A.     No.

8        Q.     Okay.  Do you ever look at MDC

9    transfer lists?

10        A.     Then or now?

11        Q.     Then.

12        A.     So if I were working -- like there

13    was a time when I used to work med room on a

14    different shift.  We would pull meds and get them

15    ready.  Or we would be advised in the med room of

16    who was going to prison.  But working at intake

17    on nightshift at that particular time, no.

18        Q.     What is a medical transfer sheet?

19        A.     Medical transfer sheet is a paper

20    where they write down the patient's name, date of

21    birth, medications, and problems.  And it goes to

22    the next facility as a communication tool for

23    care.

24        Q.     You didn't complete any medical

25    transfer sheets on June 11, 2019, as it relates

Page 87

1    to Mr. Stout, did you?

2          A.    I don't believe I did, no.  I think

3    the medical assistants were doing those.

4          Q.    Did you ever -- ever have regular

5    meetings between corrections medicine and the

6    director of justice services in 2019?

7          A.    Regular meetings?

8          Q.    Did you ever have any meetings?

9          A.    Regular meetings, like -- I -- no,

10   not that I -- not that I know of.

11         Q.    Okay.  Okay.

12               Okay.  I'm going to play for

13   you Exhibit 49.

14               (Whereupon an off-the-record

15   discussion was held.)

16               MR. KATES:  I'm playing an audio for

17   you that's going to be marked as Exhibit 49.  I

18   want you to take a listen to this and tell me if

19   this is your voice on the recording.

20               (Audio recording playing.)

21               (Whereupon the Reporter marked

22   Plaintiff's Exhibit 49 for identification as

23   requested.)

24         Q.    (By Mr. Kates)  You heard the

25   recording that's been marked as Exhibit 49.  Is

Page 88

1      that your voice on the call?

2           A.    Yes, I believe it to be.

3                 MR. KATES:  Okay.  Can we play just

4      the beginning of this one?

5                 MR. DEBEER:  Yes, absolutely, please.

6                 MR. PLEBAN:  Is that a stipulation

7      that that's for the entire recording from you?

8                 MR. DEBEER:  I just want to hear the

9      second part of it, but yeah, yeah.  Absolutely.

10          Q.    (By Mr. Kates)  Okay.  I'm about to

11     play for you a recording that I'm going to mark

12     as Exhibit 50, okay?  And I want you to listen to

13     it.

14                (Audio recording playing.)

15                (Whereupon the Reporter marked

16     Plaintiff's Exhibit 50 for identification as

17     requested.)

18          Q.    (By Mr. Kates)  You heard that

19     recording?

20                MR. DEBEER:  Yeah.

21          A.    Yeah.

22          Q.    (By Mr. Kates)  And as you sit here

23     today, you're able to confirm that that's your

24     voice on the recording?

25          A.    Yeah.

Page 89

```
 1                  MR. DEBEER:  We'll stipulate to the
 2     rest.
 3                  MR. PLEBAN:  For the rest of the
 4     recording?
 5                  MR. DEBEER:  Yes.
 6                  MR. KATES:  I've got nothing else.
 7     Oh, okay, real quick.
 8          Q.    (By Mr. Kates)  Real quick.  I was
 9     asking you following the phone call.  As of where
10     the intake section is, where you were the night
11     of the phone call, how long does it take for you
12     to get from there to the sally port on the fifth
13     floor?
14          A.    Variable, depending on -- because
15     there's locked doors.  So you have to wait for
16     them to open.
17          Q.    Okay.  With all of that accounted
18     for, how long might it take, on average?
19          A.    Three to five minutes, maybe.
20          Q.    Okay.  And how long does an abdominal
21     pain -- or excuse me, how long does an abdominal
22     assessment take?
23          A.    As long as it takes.  Some people are
24     very quick.  Some people have more history, you
25     know.
```

Page 90

1        Q.     What's the typical assessment take?

2        A.     Maybe ten minutes or less --

3               MR. KATES:  Okay.  I have no other

4    questions.

5        A.     -- or even that.

6               MR. BANKS:  I have no questions.

7               MS. ROBERTSON:  Just a couple.  I'll

8    be super fast.

9

10                   CROSS-EXAMINATION

11   BY MS. ROBERTSON:

12       Q.     Ms. Heitman, my name is Kate

13   Robertson.  I represent some of the defendants in

14   this case.

15       A.     Uh-huh.

16       Q.     Do you understand the purpose of a

17   deposition?

18       A.     Yes.

19       Q.     Okay.  And so I don't get a chance to

20   talk to you any other time, so this is my

21   opportunity to try to find out what you know or

22   don't know; is that fair?

23       A.     That's fair.

24       Q.     Okay.  And you understand that?

25       A.     Yeah.

Page 91

```
 1        Q.     Okay.  So I'm just going to ask you a

 2   couple questions.  I believe Mr. Kates asked you

 3   a question, and your answer was something to the

 4   effect of, well, the next day I learned what

 5   Janet was asking.  And this was in reference to

 6   this June 11th phone call that Janet received --

 7        A.     Uh-huh.

 8        Q.     -- and that you kind of talked to her

 9   back and forth about.

10          What is it that you -- when you said

11   the next day I learned what she was asking, what

12   is it that you learned?

13        A.     Jeanie Stevens was asking --

14          COURT REPORTER:  I'm sorry, who?

15        A.     Jeanie Stevens, I think, was saying

16   there was an inmate death that didn't dye where

17   we were at, but died when he went to prison.  And

18   I think she was just saying, you know, did you

19   have any care with that?  Were you involved with

20   that?

21        Q.     (By Ms. Robertson)  Okay.  I could be

22   wrong.  I thought you told Mr. Kates the next day

23   you learned what Janet Duwe was asking.  So did

24   you have a different --

25        A.     Well, I mean, I guess --
```

Page 92

```
 1        Q.     Wait.

 2               MR. DEBEER:  Let her finish the

 3   question.

 4        A.     Okay.

 5        Q.     (By Ms. Robertson)  I'm sorry, I

 6   don't mean to be rude.  And this lady right here

 7   is taking down everything that we're saying, and

 8   so if we talk over each other, she can't do her

 9   job.  And so I apologize.

10        A.     Okay.

11        Q.     Let me ask my question a different

12   way.

13        A.     Okay.

14        Q.     The next day, so June 12th, 2019, did

15   you have any additional information -- or strike

16   that.

17               Did you have a different

18   understanding of what Janet Duwe was asking you

19   on June 11th?

20        A.     I think the ramifications of what

21   happened, but not -- I mean, she asked particular

22   questions and I answered particular questions.

23   But I think that there was an inmate death after

24   he went to prison.  And maybe that was what the

25   call was about, maybe was generally, but not that
```

Page 93

1    there was a particular -- about any particular

2    person.

3              I mean, I still -- at that particular

4    time that I had -- was talking to Janet, there

5    was nothing about a particular person or a sick

6    call request or anything like that.

7              I think it was after the fact I went,

8    you know, are they related?

9       Q.    Okay.  So you -- you deduced on your

10   own there might be some correlation between the

11   call Janet received and Mr. Stout's death?

12             MR. DEBEER:  I'm going to object to

13   lack of foundation.  Calls for speculation.

14       Q.    (By Ms. Robertson)  You can still

15   answer my question.

16             MS. ROBERTSON:  Would you read it

17   back?

18             (Whereupon the reporter read back the

19   requested portion of testimony.)

20       A.    Possibly, yes.  Just that there --

21   that I was starting to get questions about

22   something, you know, did something -- did you

23   take care of this person?  You know, what

24   happened?  That maybe something happened.

25       Q.    (By Ms. Robertson)  Did anyone -- did

Page 94

1    anything or anyone else -- well, strike that.

2              Did you have -- did anything -- did

3    you learn anything additional from Ms. Duwe on --

4    after June 11th?

5         A.    I don't believe so.

6         Q.    Okay.  Ms. Duwe specifically told

7    you -- did she use the word -- did she use the

8    words the call is informational only?

9         A.    Yes.

10        Q.    Okay.  Have you personally ever

11   received calls from corrections officers where

12   corrections officers begin the call with the

13   words, "this is for information only"?

14        A.    Not those exact words, but they may

15   say, I just need to know, or something to that

16   effect.  Or can this happen?  What does this

17   mean?

18        Q.    When Janet Duwe took this call on

19   June 11th of 2019, can you tell me all the

20   reasons you believed this didn't involve a

21   particular person?

22        A.    I think -- I think I asked if this

23   was a sick call.  And she said, no, this is for

24   informational only.

25        Q.    And any other reasons?

Page 95

1             And if you don't have any --

2        A.    Not that I can think of right now.  I

3    mean --

4        Q.    Okay.  And if you think of any, will

5    you let your lawyer know?

6        A.    Okay.

7        Q.    When was the last time you spoke to

8    Janet Duwe?

9        A.    Probably -- we did depositions for

10   Shy, and on the same day we passed each other.

11   And we said hi to each other, and how are you

12   doing?  How's the family?

13       Q.    Okay.  Anything beyond that?

14       A.    No.

15       Q.    How would you characterize your

16   relationship with Janet Duwe?

17       A.    Very pleasant.

18       Q.    Are you friends?

19       A.    We don't go out and do things

20   together.  We don't call each other all the time

21   but, you know, when we worked together, we got

22   along and --

23       Q.    Do you call each other sometimes?

24       A.    No, not -- not recently.  I called

25   her after she left just to see how she was doing,

Page 96

1    to make sure she was okay.

2         Q.    Do you still have in front of you a

3    copy of Exhibit 47?

4         A.    Okay.

5              MR. DEBEER:  Is that a yes?

6         A.    Yes.  Sorry.

7              MR. DEBEER:  That's okay.

8         Q.   (By Ms. Robertson)  Just bear with me

9    for a second, because now I've lost the page

10   where I wanted to ask you.  Okay.

11              On the third page of the exhibit.

12        A.    Page 1, 2, 3.

13        Q.    That's correct.  So kind of there's a

14   half paragraph that starts the page.

15        A.    Okay.

16        Q.    The last two sentences of that

17   paragraph say:  I did report Janet Duwe was

18   stressed about the training on the intake

19   process.  I was also stressed while training

20   Ms. Duwe.

21              Did you two have any arguments on

22   June 10th and 11th, 2019?

23        A.    I don't believe so, no.  I don't

24   think we've ever had an argument.

25              MS. ROBERTSON:  Okay.  I don't think

Page 97

1    I have any other questions.  Thank you.

2              MR. KATES:  No more from us.

3              THE WITNESS:  Okay.

4              MR. DEBEER:  We'll waive.

5              (Deposition concluded at 4:08 p.m.)

6              (Whereupon signature was waived and

7    the witness was excused.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Debra Kaesberg (101-145-449-5392)          5ad9cd31-73d2-4e33-a941-98eb5b26e7cb

Page 98

1

2                     REPORTER CERTIFICATE

3

4        I, DEBRA S. KAESBERG, Certified
Shorthand Reporter, do hereby certify that there
came before me at the law offices of Pleban &
5   Petruska Law, LLC, 2010 South Big Bend Boulevard,
St. Louis, Missouri.

6
             CONNIE HEITMAN, RN,
7
who was by me first duly sworn; that the witness
8   was carefully examined, that said examination was
reported by myself; translated and proofread
9   using computer-aided transcription, and the above
transcript of proceedings is a true and accurate
10  transcript of my notes as taken at the time of
the examination of this witness.

11

12       I further certify that I am neither
attorney nor counsel for nor related nor employed
by any of the parties to the action in which this
13  examination is taken; further, that I am not a
relative or employee of any attorney or counsel
14  employed by the parties hereto or financially
interested in this action.

15

16       Dated this 24th day of July, 2021.

17

18

19       _____
         DEBRA S. KAESBERG, CSR, CCR, R
20

21

22

23

24

25