Exhibit C

Janet Duwe

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


ANGELA MALCICH,                        )
                                       )
    Plaintiff,                         )
                                       )
                                       )
vs.                                    )   Case 4:20-CV-01030
                                       )
                                       )
ST. LOUIS COUNTY, et al.,              )
                                       )
Defendants.                            )


THE DEPOSITION OF JANET DUWE


Taken on behalf of Plaintiff

July 14, 2021


Jo Ann Sturm, CSR, CCR
ILLINOIS CSR NUMBER: 084-002267
MISSOURI CCR NUMBER: 716


STURM REPORTING SERVICES, INC.
7419 Stratford Avenue
St. Louis, Missouri  63130
(314) 780-2816

Janet Duwe

Page 2

1        I N D E X   O F   E X A M I N A T I O N

2

3   DEPONENT JANET DUWE

4        Direct Examination By Mr. Kates ...............6

5        Cross-Examination By Ms. Robertson ...........97

6        Redirect Examination By Mr. Kates ...........106

7

8

9            I N D E X   O F   E X H I B I T S

10

11  Exhibit 33 .......................................9
         Document
12
    Exhibit 34 ......................................27
13       Nursing Schedule

14  Exhibit 35 ......................................30
         Infirmary Care Manual
15
    Exhibit 38 ......................................39
16       Policy 1307

17  Exhibit 39 ......................................45
         Policy CM-30
18
    Exhibit 40 ......................................47
19       Policy CM-33

20  Exhibit 41 ......................................49
         Policy CM-40
21
    Exhibit 42 ......................................62
22       Clinic Desk Duty

23  Exhibit 43 ......................................66
         Training document
24

25

Janet Duwe

1   Exhibit 44 ........................................86
        Termination letter
2

            The original exhibits were retained by
3   counsel.  There was no Exhibit 36 and 37 marked.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Janet Duwe

Page 4

```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MISSOURI
 2                       EASTERN DIVISION

 3

 4
      ANGELA MALCICH,                    )
 5                                       )
      Plaintiff,                         )
 6                                       )
                                         )
 7    vs.                                )   Case 4:20-CV-01030
                                         )
 8                                       )
      ST. LOUIS COUNTY, et al.,          )
 9                                       )
      Defendants.                        )
10

11

12

13              THE DEPOSITION OF JANET DUWE, produced,
      sworn, and examined on behalf of the Plaintiff, on
14    July 14, 2021, between the hours of 2:07 p.m. and
      5:21 p.m. on that day, at the law offices of Pleban &
15    Petruska, LLC, 2010 South Big Bend Boulevard, St.
      Louis, Missouri 63117, before JO ANN STURM, an
16    Illinois Certified Shorthand Reporter and a Certified
      Court Reporter within and for the County of St. Louis,
17    State of Missouri.

18

19

20

21

22

23

24

25
```

Janet Duwe

Page 5

1           A P P E A R A N C E S

2

3           The Plaintiff, ANGELA MALCICH, was
represented by Mr. Benjamin Kates and Mr. J.C. Pleban
of the law firm of Pleban & Petruska, LLC, 2010 South
4    Big Bend Boulevard, St. Louis, Missouri 63117.

5           The Defendant, TROY DOYLE, was represented
by Mr. Eric Banks of the law firm of Banks Law, LLC,
6    1824 Chouteau Avenue, St. Louis, MO  63103.

7           The Defendants, DUWE, HEITMANN and
ADAMS, were represented by Mr. Gregory D. DeBeer of
8    the law firm of Wiedner, McAuliffe, Ltd., 1010 South
Hanley, Suite 1450, St. Louis, MO  63105.

9

10          The Defendants, ST. LOUIS COUNTY,
MITCHELL, WRIGHT-BERRY, WOODS and MELLENTHIN were
represented by Ms. Catherine M. Robertson, St. Louis
11   County Counselor's Office, 41 South Central Avenue,
St. Louis, Missouri  63105.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Janet Duwe

1          IT IS HEREBY STIPULATED AND AGREED by and

2    between counsel for the Plaintiff and counsel for the

3    Defendants that the deposition of JANET DUWE may be

4    taken in shorthand by Jo Ann Sturm, a Certified Court

5    Reporter, and afterwards transcribed into typewriting,

6    and the signature of the witness is waived by

7    agreement of counsel and the witness.

8                        * * * * *

9                     JANET DUWE,

10   of lawful age, being produced, sworn, and examined on

11   the part of the Plaintiff, and after responding "I do"

12   to the oath administered by the court reporter,

13   deposes and says:

14                      * * *

15                 DIRECT EXAMINATION

16                 BY MR. KATES

17       Q    Could you state your name for the record,

18   please?

19       A    Janet K. Duwe.

20       Q    And what's your address?

21       A    2001 Trailcrest Lane, Trailcrest is one

22   word, Lane, No. 1, Kirkwood, Missouri.

23       Q    Have you ever been deposed?

24       A    Yes.

25       Q    Under what -- how long ago was that?

Janet Duwe

Page 7

```
 1        A     December.

 2        Q     Of 2020?

 3        A     2020.

 4        Q     What was the nature of that deposition?

 5        A     It was the Shy case.

 6        Q     We're going to do something very similar to

 7   what happened at that deposition, so it will be pretty

 8   fresh for you.  But I'm going to go over the ground

 9   rules.

10              Other than that one, have you ever been

11   deposed other than that case?

12        A     A long time, back in '94, '3; '93, I think

13   it was.

14        Q     So we'll go over the ground rules.  We have

15   the court reporter here to my right, your left.  She's

16   taking down everything we say, so all of our answers

17   have to be verbal.  Nods and shakes of the head,

18   uh-huhs, uh-uhs, those kinds of things don't translate

19   onto the record.  So if you tend to do one of those

20   and I correct you, it's not to be rude, it's just to

21   make sure we have a clean record.

22        A     Uh-huh.  I just said that.

23        Q     Is that right?  If I ask a question, if you

24   answer it, I'm going to assume that you understood the

25   question that I asked.  If you don't understand a
```

Janet Duwe

1    question, let me know and I'll rephrase it.  I don't

2    typically ask very good questions, so if there's

3    something you don't understand, let me know and I'll

4    be happy to rephrase it, okay?

5        A    Okay.

6        Q    If you need a break at any point, we can

7    take a break.  I just ask that if I have a question

8    pending, that we get an answer on record before we

9    take the break, okay?

10       A    Okay.

11       Q    So what did you do to prepare for your

12   deposition today?

13       A    Read through some of the things that Greg

14   sent me online.

15       Q    Do you remember any specific documents that

16   you looked at?

17       A    The document -- the first one I got was the

18   one that -- where I was served.  I don't know the name

19   of it.

20       Q    Did you review a copy of the lawsuit?

21       A    I'm not sure.  Oh, yeah.

22       Q    I don't think it's marked.

23            MR. DeBEER:  Just, I think it might be, to

24   save time, when I was asking her about waivers of

25   service, it could have been the waiver of service, not

Janet Duwe

Page 9

1    the actual petition itself.

2            MR. KATES:  That's fair enough.  Might as

3    well mark it.

4                (Exhibit 33 was marked for

5                identification.)

6    BY MR. KATES:

7        Q    I'll give you what's marked as Exhibit 33.

8    If you scroll through that and see if that looks

9    familiar from what you've already looked at before.

10       A    Yes.

11       Q    You're glancing over Exhibit 33.  You

12   believe that that's one of the documents that you

13   looked at?

14       A    Yes.

15       Q    Any other documents other than that that you

16   looked at?

17       A    The Internal Affairs report.

18       Q    And is that --

19           MR. DeBEER:  I think it's 6.

20           MR. KATES:  Yes, I think it's 6.

21   BY MR. KATES:

22       Q    I'll hand you Exhibit 6.  Does that look

23   like the document that you looked at?

24       A    Yes.

25           MS. ROBERTSON:  I'm sorry, what did you mark

Janet Duwe

Page 10

1   as 33?

2           MR. KATES:   That's our First Amended

3   Petition.

4   BY MR. KATES:

5       Q    Exhibit 6 and Exhibit 33.   Anything other

6   than those two?

7       A    Just my statement that I made to the county.

8   Uh-huh.

9       Q    And that's contained within Exhibit 6,

10  correct?

11      A    Let's see.

12      Q    I think it's on page 11.

13      A    Thank you.  Yes.

14      Q    I've got Exhibit 6 and 31.  Anything else?

15      A    This is 33.

16      Q    Thirty-three, excuse me.  Thirty-three.

17  Exhibit 33 and Exhibit 6 you looked at in preparation

18  for the deposition.

19      A    Yes.

20      Q    Anything other than that?

21      A    No.

22      Q    Did you have any conversations with anybody

23  outside your attorney about your deposition?

24      A    No.

25      Q    Have you talked to anybody about the lawsuit

Janet Duwe

Page 11

1    that was filed against you, other than your attorney?

2         A    At what time frame?

3         Q    Since it was filed.

4         A    Not since it was filed.

5         Q    Where are you currently employed -- so after

6    the lawsuit was filed, you didn't talk to anybody

7    about it, but did you ever talk to anybody about the

8    possibility of a lawsuit being filed?

9         A    Yes.

10        Q    Who did you speak to about that?

11        A    Connie Heitman.

12        Q    Do you remember when you spoke to Connie

13   about that?

14        A    It was around the time we were going to a

15   meeting for the postmortem meeting.

16        Q    Do you have an approximate date that the

17   postmortem meeting was?

18        A    Trying to think when that was.  I can't

19   remember the date.  It was mid-June, mid to -- the

20   second or third week in June.

21        Q    2019?

22        A    2019, yes.

23        Q    So you talked to Connie about -- this is

24   before the postmortem meeting, right?

25        A    Yes.

Janet Duwe

Page 12

1      Q      What did you and Connie talk about?

2      A      What happened.

3      Q      Can you give us your recollection of the

4   actual specifics of the conversation?

5      A      Just retracing our steps what happened that

6   night.

7      Q      Can you go into detail about what you said

8   to Connie and what Connie said in response to you?

9      A      Oh, gosh.  I just remember that we talked

10  about the phone call that we got from Officer English,

11  and that he had passed away, how he died, things like

12  that.

13     Q      Tell me about this postmortem meeting.  Is

14  that a standard practice to have a postmortem meeting?

15     A      Yes.

16     Q      Does that happen after every inmate dies in

17  custody?

18     A      I believe so.

19     Q      Have you been to other postmortem meetings

20  other than the one for Mr. Stout?

21     A      No.

22     Q      Did you ever go to a postmortem meeting

23  relating to the death of John Shy?

24     A      No.

25     Q      Was there a postmortem meeting following the

Electronically signed by Jo Ann Sturm (201-381-537-0608)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 13

1    death of Mr. Shy?

2         A    Yes.

3         Q    Do you know why you didn't go to that

4    meeting?

5         A    I don't remember.

6         Q    Do you know if they notified you of a

7    postmortem meeting and you just didn't go?

8         A    I don't remember if they did.

9         Q    Take me through what happens at these

10   postmortem meetings.

11             MS. ROBERTSON:  Object.  Look, I think

12   you're getting into privilege.  St. Louis County is

13   not waiving its privilege.  Peer review meetings are

14   prohibited by law from disclosure under state statute

15   and federal statute, and St. Louis County is not

16   waiving its privilege as to these matters.

17             MR. PLEBAN:  Off the record.

18                  (Discussion off the record.)

19   BY MR. KATES:

20        Q    Before we took our break, Miss Duwe, we were

21   talking about a postmortem meeting that you were

22   attending, correct?

23        A    Yes.

24        Q    And you recall that that meeting occurred

25   approximately June of 2019, correct?

Electronically signed by Jo Ann Sturm (201-381-637-0600)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

1      A    Yes.

2      Q    It was following the death of Daniel Stout,

3   correct?

4      A    Yes.

5      Q    You went into the meeting.  Can you tell me

6   who was there?

7      A    I can tell you some of the people.  I don't

8   know everybody.  But Emily Doucette, she's a doctor;

9   Dr. Kathy Davis, Kathy, with a K; there was a

10  physician assistant.  I can't remember his name.  He's

11  the only physician assistant that's male.

12  Connie Heitman; Rob -- I don't remember his last name.

13           MR. DeBEER:  Adams.

14           THE WITNESS:  Rob Adams; myself.  And that's

15  all I can remember that was there.  There were other

16  people there.

17  BY MR. KATES:

18     Q    Okay.  I've got six names you gave me.  Do

19  you know the number of people that were there?  Can

20  you recall that?

21     A    I can guess.

22     Q    Can you give me an estimate?

23     A    Ten to 12, maybe.

24           MS. ROBERTSON:  Can I just interject real

25  quick?  I'm still asserting the privilege, and we're

Janet Duwe

Page 15

1    trying to go through these foundational questions.

2    And I just want to make that clear, I'm giving some

3    leeway to make sure what the witness does or doesn't

4    know before I seek further action from the court.

5            Sorry I didn't make that clear before you

6    started.

7            MR. KATES:  No, that's fine.

8    BY MR. KATES:

9        Q    Did you give your actions to the group of

10   people that were there?  Did you tell them what you

11   did at -- as it related to Mr. Stout?

12       A    Yes.

13           MR. DeBEER:  Object to form.  Foundation.

14   BY MR. KATES:

15       Q    Did you talk about the phone call from

16   Officer English?

17       A    Yes.

18       Q    Did you discuss with them what

19   Officer English told you on the phone?

20       A    Yes.

21       Q    And what did you tell them as far as what

22   Miss -- Officer English told you on the phone?

23       A    That she called -- excuse me -- that she

24   called for information about sending a patient to

25   prison.

Janet Duwe

Page 16

1      Q    At the meeting, what did you say the

2  information was that Officer English was asking about?

3      A    She wanted to know if someone can go to

4  prison if they had vomited.

5      Q    I'm sorry?

6      A    She wanted to know if someone could go to

7  prison if they had vomited.

8      Q    As far as a response to Officer English,

9  what is it that you told the panel or the group of

10  people that were there what your response was to

11  Officer English?

12      A    Trying to remember.  I know I discussed it

13  with Connie, because she was training me, and she told

14  me that the patient could go, he just needed to be

15  seen in transportation before he left.

16      Q    So that's what you told the group of people

17  at this meeting what your response was to

18  Officer English.

19      A    Yes.

20      Q    Now, to backtrack real quick.  You named

21  these individuals, and you also said that there were a

22  total of somewhere between ten and 12 individuals

23  there, correct?

24      A    I believe so.

25      Q    Was everyone in the room together at the

Electronically signed by Jo Ann Sturm (201-381-637-0609)       73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 17

1    same time?

2         A    Yes.

3         Q    So it was a group in a conference room type

4    setting where there was nobody outside waiting to come

5    in later that you're aware of.

6         A    Correct.

7         Q    And when you're giving the stuff that you

8    just told me about what Officer English said and what

9    you said in response, when you told that to the group,

10   you told that out loud, verbally, so everyone who was

11   paying attention could hear.

12        A    Yes.

13        Q    After you reported to the group that you had

14   told Officer English that Mr. Stout could be seen when

15   he came down, did you tell the group anything relating

16   your actions following the phone call?

17             MR. DeBEER:  Objection.  Vague.

18             MR. KATES:  Yeah, that was a bad question.

19   BY MR. KATES:

20        Q    Let me ask it this way.  So after you tell

21   Officer English that he can be seen downstairs, did

22   you tell the panel or the group of people that were

23   there that you took any steps to follow up that

24   Mr. Stout was seen upon arriving with the

25   transportation officer?

Electronically signed by Jo Ann Sturm (201-381-637-0609)        73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

```
 1            MR. DeBEER:  Object to form.
 2            You can answer, if you understand the
 3   question.
 4            THE WITNESS:  I don't remember.
 5   BY MR. KATES:
 6       Q    Did Connie Heitman give any statements at
 7   this meeting?
 8       A    Yes.
 9       Q    As far as the -- as far as Connie Heitman's
10   statements, specifically as they relate to what she
11   said and heard between you and her the day that
12   Mr. Stout died, what were her statements at the
13   meeting?
14            MR. DeBEER:  Hold on.  Hold on a second.
15   Are you asking her to testify specifically what
16   Connie Heitman said at the meeting?
17            MR. KATES:  Yes.
18   BY MR. KATES:
19       Q    So you were a witness -- strike that.
20            You were present at the meeting.  You heard
21   Connie Heitman make statements.  I want to know what
22   she said at the meeting of what she did the day of
23   June 11, 2019 when Mr. Stout died.
24            MS. ROBERTSON:  I'm going to object on the
25   basis of the privilege we've been talking about.
```

Janet Duwe

Page 19

1   Could you lay a foundational question?

2          MR. DeBEER:  Yeah, I'm going to object to

3   foundation, too.

4   BY MR. KATES:

5      Q    Connie made statements there, correct?

6      A    I believe so.  Well, I know she did.

7      Q    What I want to know is specifically what she

8   said.  That's what I'm asking.  My question was very

9   bad.

10          So specifically, that's what I'm wanting to

11   know.  I wanted to avoid any of this opinion stuff

12   that we're trying get away from.  But I want to know

13   what it was that she said to the group, the meeting,

14   at the meeting.

15          MS. ROBERTSON:  Same objection.  Before that

16   question, because I really don't want to stop this,

17   could you ask a foundational question about like the

18   content?  Was it opinion, was it peer review, or was

19   it just facts.

20          MR. KATES:  Sure, we'll go that route.

21   BY MR. KATES:

22      Q    As far as the statements that Connie Heitman

23   made, did Connie present factual statements as to what

24   she said and heard surrounding the phone call with

25   Officer English?

Electronically signed by Jo Ann Sturm (201-381-837-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 20

1       A    I believe so.

2       Q    Did she give peer review statements as to

3   criticisms or critiques of other people's actions or

4   behaviors as it related to Inmate Stout's treatment?

5       A    No.

6       Q    I'm specifically asking you what factual

7   statements she made relating to the phone call and

8   your interaction with Miss Heitman about the phone

9   call with Officer English.

10          MR. BANKS:  Objection.  Hearsay.

11          MR. DeBEER:  You can answer.

12          THE WITNESS:  I don't remember.

13  BY MR. KATES:

14      Q    Do you remember any statements that Connie

15  made of a factual nature at that meeting?

16      A    I don't.

17      Q    I'm going to go through the same kind of

18  questions with Mr. Adams.

19          I asked you about whether or not Connie had

20  any kind of peer review critiques or criticisms, but

21  did she have any opinions about the interaction?

22      A    I can't recall.

23      Q    I'm going to go through these with

24  Nurse Adams.  You said Robert Adams was there at the

25  meeting, too, correct?

Electronically signed by Jo Ann Sturm (201-381-637-0608)        73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 21

1      A    Yes.

2      Q    Did Nurse Adams make a statement at the

3   meeting?

4      A    Yes.

5      Q    Did he make statements of a factual nature

6   as to what he did or said or saw as it related to

7   Mr. Stout's treatment?

8      A    Yes.

9      Q    Did he make peer review statements with

10   regards to criticisms or critiques of Mr. Stout's

11   statements?

12      A    No.

13      Q    Did he give any opinions relating to

14   Mr. Stout's treatment?

15      A    Just facts.

16      Q    Can you tell me what those factual

17   statements were that Mr. Adams said at the meeting?

18      A    He basically just talked about the night

19   before, that he had gone up to see him because he had

20   gotten a call to go see him, that he was complaining

21   of stomach pain.

22      Q    These are the things that Nurse Adams said

23   at the meeting, correct?

24      A    Yes.

25      Q    Did he mention any complaints that Mr. Stout

Electronically signed by Jo Ann Sturm (201-381-637-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 22

1    had told to him?

2          A    It was mostly stomach.

3          Q    I'm sorry?

4          A    Mostly stomach, vomiting.

5          Q    Adams reported at this meeting that

6    Mr. Stout had told him he was having some stomach

7    pains.

8          A    Yes.

9          Q    And that he had vomited.

10         A    Yes.

11         Q    Any other symptoms that Mr. Stout had

12    mentioned to Mr. Adams that Mr. Adams reported at this

13    meeting?

14             MR. DeBEER:  Objection.  Hearsay.

15             You can answer.

16             THE WITNESS:  Not symptoms, but I know he

17    wanted to go to the infirmary.

18    BY MR. KATES:

19         Q    Nurse Adams reported at the meeting that

20    Stout told him he wanted to go to the infirmary.

21         A    Correct.

22         Q    That Stout wanted to go to the infirmary.

23         A    Correct.

24         Q    Did Mr. Adams make any statements as to what

25    his course of treatment for Mr. Stout was?

Electronically signed by Jo Ann Sturm (201-381-637-0608)    73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 23

1      A     No, I don't remember.

2      Q     You don't remember if Nurse Adams said what

3   the course of treatment was or you don't remember --

4   strike that.  Okay.

5            Did Nurse Adams make any comments about

6   returning to see Mr. Stout a second time?

7      A     I think he did, but I don't know why.

8      Q     You think Mr. Adams saw Stout a second time.

9      A     I think so.

10           MR. DeBEER:  Hold on, that misstates prior

11   testimony.

12   BY MR. KATES:

13     Q     Let me say this again.  You think Mr. Adams

14   made a comment at this meeting that Stout -- that he

15   saw Stout the second time.

16     A     Yes.

17     Q     But you're saying -- you said you don't know

18   why.  Do you mean Mr. Adams didn't know why Mr. Stout

19   came to see him a second time?

20     A     No, I didn't know.

21     Q     Anyone else that you can think of that might

22   have been at the meeting other than Doucette,

23   Kathy Davis, the male physician's assistant, you,

24   Adams or Heitman?

25     A     I don't remember who they were.

Electronically signed by Jo Ann Sturm (201-381-537-0609)    73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 24

1      Q    Did the physician's assistant make any

2   comments?

3      A    Yes.

4      Q    Were they factual comments?  Did he make any

5   factual comments?

6      A    Yes.

7      Q    Did he give any peer review comments?

8      A    No.

9      Q    Did he give any opinion comments?

10     A    No.

11     Q    What were the factual comments that the

12   physician's assistant said?

13          MR. DeBEER:  Objection.  Hearsay.

14          THE WITNESS:  I know he had seen him earlier

15   in his stay, but it was not related to his stomach.  I

16   believe it was something to do with his hand, or he

17   had an injury somewhere.  I think it was his hand.

18   BY MR. KATES:

19     Q    Surprisingly, we've been here for an hour

20   and I haven't gotten through any of your other

21   background stuff, but I do want to go through some of

22   your background information.

23          Where are you currently employed?  Are you

24   currently employed?

25     A    Yes.

Janet Duwe

Page 25

1      Q      Where are you currently employed?

2      A      St. Luke's Hospital.

3      Q      St. Luke's?

4      A      St. Luke's in Chesterfield.

5      Q      How long have you been there?

6      A      Since January 6 of 2020.

7      Q      What's your role there?

8      A      Physician referral nurse -- or physician

9   referral specialist.

10     Q      Do you actively see patients?

11     A      We see clients that come in for referrals.

12     Q      And before that, where were you employed?

13     A      Actually, when I did a -- I'm still there,

14  but I work as a concierge for Aberdeen Heights.

15     Q      What's your role there?

16     A      Front desk concierge.  I work there one day

17  a week.

18     Q      What's Aberdeen Heights?

19     A      It's a retirement community.  It's

20  independent living, assisted living, memory care,

21  skilled nursing.

22     Q      When did you start at Aberdeen Heights?

23     A      I started in September of 2019.

24     Q      You're still currently there?

25     A      Yes.

Janet Duwe

Page 26

1      Q    How about where were you before then?

2      A    St. Louis County.

3      Q    Was that in your role as a nurse with the

4  Department of Health?

5      A    Yes.

6      Q    In corrections medicine?

7      A    Yes.

8      Q    You stopped working there July 1st, 2019,

9  correct?

10     A    Yes.

11     Q    How long were you a nurse through the

12  corrections medicine?

13     A    It was just one month shy of seven years.

14  Well, three weeks shy.  I started there July 23rd of

15  2012.

16     Q    What degree do you have as far as nursing?

17     A    Bachelor's of Science in nursing.

18     Q    When did you get the BSN?

19     A    When or where?

20     Q    When?

21     A    1983.

22     Q    And have you been nursing ever since you got

23  the degree?

24     A    Yes.

25     Q    Do you have any other specific certificates

Janet Duwe

Page 27

1    relating to medicine?

2         A    CPR, ACLS.

3         Q    What is ACLS?

4         A    Advanced cardiac life support.

5         Q    Anything else?

6         A    No.

7         Q    Are there specific areas of study that you

8    can take to get your BSN?

9         A    My BSN?

10        Q    Yeah.  Your standard Bachelor's, is there a

11   specific area of study that you can go?

12        A    I see what you mean.  Just the general

13   courses that they have.

14        Q    You were working at the Justice Center the

15   day that Mr. Stout passed away, right?

16        A    Yes.

17                   (Exhibit 34 was marked for

18                    identification.)

19   BY MR. KATES:

20        Q    I hand you Exhibit 34.  Do you recognize

21   that document?

22        A    Yes.

23        Q    What is the document?

24        A    Nurse schedule.

25        Q    And it's got June 10th and 11th on it,

Electronically signed by Jo Ann Sturm (201-381-637-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 28

1    correct?

2        A    Yes.

3        Q    And it shows the people that are working on

4    those two days, right?

5        A    Yes.

6        Q    If you go down to the very bottom of the two

7    columns, June 10th and June 11th, to the far left it

8    says night.  Do you see that?

9        A    Yes.

10       Q    Underneath there, there's a couple boxes.

11   One of them says INT, NOC.

12       A    Yes.

13       Q    What does that mean?

14       A    Intake night shift.

15       Q    Intake night shift?

16       A    Well, intake night.

17       Q    What about INT orientation?

18       A    That's just intake orientation.

19       Q    And then next to Pam's name, there's CN.

20   Does that stand for charge nurse?

21       A    Charge nurse.

22       Q    What does INF and OC mean?

23       A    Infirmary, night shift.

24       Q    What location were you assigned to on

25   June 10th and June 11th?

Electronically signed by Jo Ann Sturm (201-381-537-0600)    73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

1      A    I was only there June 10th, but it was

2    intake department.

3      Q    You were only there on June 10th?

4      A    I wasn't there June 11th.

5      Q    It was an overnight shift, correct?

6      A    Yeah.  I see what you mean.

7      Q    So you started your shift at 11:00 p.m. on

8    June 10th and it ended at 7:00 a.m. on June 11th,

9    correct?

10     A    Yes.

11     Q    Where was your posting?

12     A    Intake.

13     Q    Are there different locations within the

14   jail where nurses are stationed?

15     A    Yes.

16     Q    Where are those locations?

17     A    Intake has two parts.  It has the part where

18   they come into -- I forget what they call it -- where

19   they first come into the facility, and then a part

20   where they're seen over in the waiting room -- waiting

21   area, to be the holding area.

22     Q    Is this considered to be infirmary?

23     A    No, this is intake.

24     Q    Intake as in when prisoners are brought into

25   the jail from outside from the arrest -- strike that.

Janet  Duwe

Page 30

1              This intake as when officers bring inmates

2    into the jail.

3         A    Yes.

4         Q    And so you're saying there's a separate

5    location for the infirmary.

6         A    Yes.

7         Q    And that's kind of what's referenced in here

8    on this exhibit with the infirmary night shift, right?

9         A    Yes.

10        Q    So there's two locations, intake and then

11   the infirmary, right?

12        A    Correct.

13                  (Exhibit 35 was marked for

14                  identification.)

15   BY MR. KATES:

16        Q    I'm going to hand you Exhibit 35.  Exhibit

17   35 says it's the infirmary care manual.  Have you seen

18   that before?

19        A    I believe so.

20        Q    If you turn to page four, at the bottom it

21   says STLCO 00585.  Are you on the page?

22        A    Yes.

23        Q    The top of it has missions of corrections

24   medicine, correct?

25        A    Yes.

Electronically signed by Jo Ann Sturm (201-381-537-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 31

1      Q     You were corrections medicine on June 10th

2   and into the 11th on 2019, right?

3      A     Yes.

4            MR. DeBEER:  Can I have a running objection

5   to this exhibit in that it's titled Infirmary Care

6   Manual, and she was not working in the infirmary --

7            MR. KATES:  That's fine.

8            MR. DeBEER:  -- on the day in question?

9   Thank you.

10  BY MR. KATES:

11     Q     So under the mission of the corrections

12  medicine, it states that:  The corrections medicine

13  department, under the direction of the St. Louis

14  County Department of Public Health, strives to provide

15  high quality services to the incarcerated population

16  of St. Louis County.  This is accomplished by

17  encouraging a collaborative relationship with the St.

18  Louis County Court System, Justice Services and

19  community resources to facilitate an increased

20  awareness of health issues amongst the incarcerated

21  residents.

22           Did I read that right?

23     A     Yes.

24     Q     Do you have any understanding of whether or

25  not that mission applies to the infirmary and does not

Janet Duwe

Page 32

1    apply to intake?

2            MR. DeBEER:  Objection.  Calls for

3    speculation.

4            You can answer.  Jan, unless I instruct you

5    not to answer, you can answer.

6            THE WITNESS:  I don't know law terms.

7            MR. DeBEER:  I should have told you that

8    much earlier.

9            THE WITNESS:  I believe it does.

10   BY MR. KATES:

11       Q    I'm sorry?

12       A    I believe it does.

13       Q    So you believe that that mission statement

14   would also apply to your role in the intake.

15       A    Correct.

16       Q    Going down under customer service

17   expectations, it first reads:  Nurses are the

18   patient's advocates.

19            Correct?

20       A    Yes.

21       Q    And the patients are inmates, right?

22       A    Yes.

23       Q    It goes on to state:  Correction nurses

24   recognize that inmates are our patients.  Nurses

25   maintain a nonjudgmental relationship with all

Electronically signed by Jo Ann Sturm (201-381-537-0608)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 33

1  patients.  Correctional nurses are the inmate's

2  advocate for healthcare while they are incarcerated.

3  Each incarcerated patient is guaranteed healthcare by

4  law, and each nurse is responsible for advocating

5  their care.

6          Did I read that right?

7      A    Yes.

8      Q    You understand that inmates are obviously

9  confined to the jail and cannot summon healthcare on

10  their own, right?

11     A    Correct.

12         MR. DeBEER:  Object to form.

13  BY MR. KATES:

14     Q    Next paragraph, middle of the way down,

15  says:  They recognize that healthcare is available 24

16  hours a day and respond to needs of patients when

17  asked by the correctional officer.

18         Did I read that right?

19     A    Yes.

20     Q    In your role as a nurse at the corrections

21  medicine, you understood that medical care will be

22  provided to the patients on a 24-hour basis, right?

23     A    Yes.

24     Q    The sentence before that also reads:  They

25  recognize that each nurse has skills based on their

Janet Duwe

Page 34

1    experience, and they work together to learn from each
2    other's experiences and skills.
3             Right?
4    A    Yes.
5    Q    This was a collaborative environment where
6    you worked with other nurses around you, right?
7    A    Correct.
8    Q    To address the needs of the inmates, right?
9    A    Correct.
10   Q    Turn to page five.  Section B., midway
11   through, says:  The following behaviors are seen as
12   professional and expected.  They include, but are not
13   limited to.
14            Number five down says:  To work together as
15   a team.
16            Did I read that right?
17   A    Yes.
18   Q    That was understood of you as a nurse
19   working with the other nurses that you would all work
20   together as a team.
21   A    Yes.
22   Q    And this is an effort to make sure the
23   healthcare of the inmates is met appropriately,
24   correct?
25            MR. DeBEER:  Objection.  Calls for

Electronically signed by Jo Ann Sturm (201-381-637-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 35

1   speculation.

2            THE WITNESS:  Yes.

3   BY MR. KATES:

4       Q    I'm going to hand you what's been marked as

5   26.

6            MR. DeBEER:  Where are we on 26?

7            MR. KATES:  I'm going back.  It's already

8   been marked.

9            MR. DeBEER:  What's this?

10           MR. KATES:  Thirty-five.  Infirmary care

11  manual is 35.

12  BY MR. KATES:

13      Q    You have 26 in front of you, right?

14      A    Yes.

15      Q    Have you ever seen this document before?

16      A    I'm not sure.  I think so.

17      Q    The very top, it says policies and

18  procedures number 1301.  The subject says medical care

19  services.  You think you may have seen this at some

20  point during your employment with corrections

21  medicine?

22      A    I do.

23      Q    The policy states at the very beginning:

24  The St. Louis County Department of Justice services,

25  in cooperation with the Department of Health, will

Electronically signed by Jo Ann Sturm (201-381-937-0608)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 36

1    provide inmate access to medical services.

2            Correct?

3        A    Yes.

4        Q    And responsibilities, it also says that

5    corrections medical -- excuse me, strike that.  All --

6    strike that.

7            The responsibility section says that:  All

8    St. Louis County Department of Justice services

9    corrections staff, corrections medicine staff and

10   Department of Health medical providers are responsible

11   for the following procedures.

12           Correct?

13       A    Yes.

14       Q    It states that, is what I'm saying.  That's

15   what it states, right?

16           MS. ROBERTSON:  The document says what it

17   says.

18           MR. KATES:  Right.

19   BY MR. KATES:

20       Q    The document says what I just read, correct?

21       A    Correct.

22       Q    You were corrections medicine, so this

23   policy would have applied to you, correct?

24       A    Yes.

25           MS. ROBERTSON:  I'm going to object to the

Janet Duwe

Page 37

1    foundation and form.  Also, this witness is not the

2    corporate representative of St. Louis County.  This is

3    a justice services policy and not a corrections

4    medicine policy.

5           MR. DeBEER:  I'll join.

6    BY MR. KATES:

7      Q    Page two of this document says STLCO 003346

8    at the bottom.  Are you there?

9      A    Yes.

10     Q    Section G says:  The corrections medicine

11   staff will provide scheduled and nonscheduled sick

12   calls in the housing units on a daily basis,

13   parentheses, see policy 1307, sick call.

14          Did I read that right?

15     A    Yes.

16     Q    So it's an expectation of you and the

17   corrections medicine staff to provide sick calls,

18   whether they were scheduled or nonscheduled, correct?

19     A    Yes.

20     Q    Paragraph H.

21          MS. ROBERTSON:  What policy number is this?

22          MR. DeBEER:  1301.

23          MS. ROBERTSON:  Thanks.

24   BY MR. KATES:

25     Q    You understood that paragraph G applied to

Janet Duwe

1   you, right?

2          MR. DeBEER:  I'm going to reassert the same

3   objections that Catherine -- sorry, that Kate just

4   asserted.  Do you want to just give us a running

5   objection to that?

6          MR. KATES:  That's fine.  I'll rephrase the

7   question.

8          MR. DeBEER:  It wasn't the form.  It was --

9          MS. ROBERTSON:  This is a DJS policy, not a

10  corrections medicine policy.

11         MR. DeBEER:  Right.

12  BY MR. KATES:

13     Q    You believed that this policy applied to

14  you, correct?

15     A    Yes.

16     Q    At the time -- this is all at the time of

17  June 2019.

18     A    Yes.

19         MR. DeBEER:  Objection.  Foundation, form.

20  BY MR. KATES:

21     Q    So based on this policy, you believe you had

22  an obligation to provide medical services and

23  scheduled versus nonscheduled sick calls on a daily

24  basis to the inmates, correct?

25     A    Yes.

Electronically signed by Jo Ann Sturm (201-381-537-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 39

1       Q    Paragraph H says:  The corrections medicine

2  staff will triage all inmates and schedule the inmates

3  on the medical provider's sick call as appropriate.

4  Emergency treatment takes priority.

5           I read that correctly?

6       A    Yes.

7       Q    And you believe that at the time, that

8  applied to you -- strike that.

9           At the time, you believed that that applied

10  to you, correct?

11      A    Yes.

12      Q    Turn to the next page, paragraph K.  Reads:

13  The inmates' in-house medical services may include,

14  but is not limited to, number four is treatment of

15  illnesses.

16           Did I read those correctly?

17      A    Yes.

18      Q    And you believe that those applied to you as

19  well.

20      A    Yes.

21      Q    I can set that one aside.

22               (Exhibit 38 was marked for

23               identification.)

24  BY MR. KATES:

25      Q    I'm going to hand you Exhibit 38.  This is

Janet Duwe

Page 40

1   policy 1307.  Have you ever seen this document before?

2        A    I don't know.  Let's see.  Might have.

3        Q    The subject line is sick call.  You

4   understand that there's a sick call policy for

5   corrections medicine at the time?

6        A    Yes.

7        Q    June 2019?

8             MR. DeBEER:  I'm going to object based on

9   foundation.

10            MS. ROBERTSON:  I'm going to make the same

11  objection I made before.  She's not the corporate rep

12  of St. Louis County.  Just a running objection.  I

13  don't want to keep interrupting you.  This is a DJS

14  policy, not a corrections medicine policy, so I'll

15  object to foundation, form.

16            MR. DeBEER:  I hadn't made that objection

17  yet because he hadn't actually asked about anything in

18  there.  But I'll join in that if you're okay with the

19  running objection.

20            MR. KATES:  Yes.

21            MS. ROBERTSON:  I think we said two

22  depositions ago an objection for one is an objection

23  for all.

24            MR. DeBEER:  Yes, I think that still

25  applies.

Electronically signed by Jo Ann Sturm (201-381-637-0608)   73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 41

```
 1              MR. KATES:  Sure.
 2    BY MR. KATES:
 3         Q    In June of 2019 did you believe that there
 4    was a sick call policy?
 5         A    Yes.
 6         Q    A sick call policy that applied to you in
 7    corrections medicine, correct?
 8         A    Yes.
 9         Q    The policy here states that:  St. Louis
10    County Department of Justice services shall provide
11    inmates the opportunity to be seen by medical
12    personnel on a daily basis.
13              Did I read that correctly?
14         A    Yes.
15         Q    And did you believe that that applied to you
16    in 2019?
17         A    Yes.
18         Q    Responsibility section says:  All St. Louis
19    County Department of Justice services, corrections and
20    corrections medicine staff are responsible for the
21    following procedures.
22              Did I read that correctly?
23         A    Yes.
24         Q    And you believed in 2000 -- in June 2019
25    that that would apply to you.
```

Janet Duwe

Page 42

1      A    Yes.

2      Q    Section B, second page, states:  Sick call

3  in the housing unit.  Number one reads:  Housing unit

4  sick call will be conducted seven days a week.

5           Did I read that right?

6      A    Yes.

7      Q    Number two says:  The housing unit officers

8  will give a sick call form to all inmates who request

9  to be placed on sick call prior to corrections

10  medicine staff arriving in the housing unit.

11          Did I read that right?

12     A    Yes.

13     Q    And you understood that -- you believed that

14  this policy applied to you in June of 2019, correct?

15     A    Yes.

16     Q    Go to page --

17          MR. DeBEER:  Are you talking about the

18  entire policy or just that section you read?

19          MR. KATES:  The entire policy.

20          MR. DeBEER:  Okay.

21  BY MR. KATES:

22     Q    You understood that this entire -- strike

23  that.

24          You believed that this entire policy applied

25  to you in 2019, correct?

Electronically signed by Jo Ann Sturm (201-381-537-0609)   73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 43

1     A    Yes.

2     Q    On the very last page, subsection D, it says

3    nonscheduled sick call.  Number one reads:  The inmate

4    will inform an officer that he or she is in need of

5    medical attention.

6          Did I read that right?

7     A    Yes.

8     Q    And it was your belief that inmates would

9    notify you when they need medical attention, correct?

10    A    Yes.

11         MR. DeBEER:  I'm going to object to that,

12   that it misstates the language under D.

13   BY MR. KATES:

14    Q    You believed that an inmate would inform

15   officers if they need medical attention back in

16   June 2019, correct?

17    A    Yes.

18    Q    Four lines down in number two, the end of

19   the paragraph -- the end of the line starts with the

20   word the.  It reads:  The infirmary or intake nurse

21   may be called if unable to contact the healthcare

22   clinic nurse.

23         Did I read that right?

24    A    Yes.

25    Q    And it was your belief that you may be

Janet Duwe

Page 44

1    called as an intake nurse for sick calls, correct?

2        A    Yes.

3        Q    And then the last one on number four reads

4    that:  The corrections medicine staff will complete

5    the examination and all necessary paperwork as in

6    Section B10 of these procedures.

7             Did I read that right?

8        A    Yes.

9        Q    And you believed back in June 2019 that it

10   would have been your responsibility to complete an

11   examination if called for a sick call, correct?

12       A    Yes.

13             (Discussion off the record.)

14   BY MR. KATES:

15       Q    The last document that I marked as Exhibit

16   38 was the policy 1307, the sick call that we were

17   just discussing, correct?

18       A    Yes.

19             MR. KATES:  For the record, I skipped

20   Exhibits 36 and 37, and the next one that we mark will

21   be marked as Exhibit 39.

22   BY MR. KATES:

23       Q    You would agree that in June of 2019, if you

24   got a sick call, you had an obligation to go see the

25   patient, correct?

Electronically signed by Jo Ann Sturm (201-381-637-0600)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 45

1     A     Yes.

2     Q     There wasn't a choice to be made whether or

3  not you could pick and choose which sick calls you go

4  to and which ones you don't go to, right?

5     A     Correct.

6     Q     If there's a sick call, you're required to

7  see the patient, right?

8     A     Yes.

9              (Exhibit 39 was marked for

10             identification.)

11            MR. KATES:  Exhibit 39.

12  BY MR. KATES:

13     Q     Miss Duwe, I've handed you an exhibit that's

14  been marked as Number 39.  Have you ever seen this

15  document before?

16     A     No -- oh, yes.

17            MR. DeBEER:  Give us a second, if you

18  wouldn't mind.

19            MR. KATES:  Sure.

20            THE WITNESS:  I believe I have.

21            MR. DeBEER:  Okay.

22  BY MR. KATES:

23     Q     Top says policy CM-30.  Do you see that?

24     A     Yes.

25     Q     The title reads:  Access to Diagnostic

Electronically signed by Jo Ann Sturm (201-381-937-0600)

73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 46

1    Services.

2          Correct?

3     A    Yes.

4     Q    Backing up just a couple of lines, you see

5    revision dates and reviewed dates.  Do you see those

6    two?

7     A    Yes.

8     Q    The most recent revision date on this

9    document reads May 2019, correct?

10    A    Yes.

11    Q    So that would have been -- the last time

12   that it was revised would have been the month before

13   Mr. Stout died, correct?

14    A    Yes.

15    Q    Do you have any reason to believe that this

16   policy was not in effect in June of 2019?

17    A    No.

18         MS. ROBERTSON:  I want to make a running

19   objection on it.  She's not the corporate rep of St.

20   Louis County, so I'm going to object to foundation.

21   And if you want to ask her what she knows, I don't

22   have a problem, but speaking for the County I have an

23   objection.

24   BY MR. KATES:

25    Q    Do you believe that this policy was in

Electronically signed by Jo Ann Sturm (201-381-537-0608)

73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 47

1    effect at the time of June 2019?

2         A    Yes.

3         Q    And the policy reads:  Inmates will have

4    access through the St. Louis County Department of

5    Public Health Corrections Medicine Program to all

6    diagnostic services required for proper evaluation as

7    ordered by the responsible medical provider.

8              Did I read that correctly?

9         A    Yes.

10                   (Exhibit 40 was marked for

11                   identification.)

12   BY MR. KATES:

13        Q    Miss Duwe, have you seen Exhibit 40 before?

14        A    I believe so.

15        Q    And the top says it's policy CM-33.

16        A    Yes.

17        Q    It also states revision date was April 2016,

18   correct?

19        A    Yes.

20        Q    Do you believe this was in place as of

21   June 2019?

22        A    Yes.

23        Q    It says the purpose is to evaluate the

24   health status of each inmate, correct?

25        A    Yes.

Janet Duwe

Page 48

1      Q    And the policy reads that -- or the section

2   labeled policy reads:  Health appraisal data will be

3   collected by St. Louis County Department of Public

4   Health Corrections Medicine personnel within 14 days

5   of an inmate being placed in a housing unit.  If

6   there's documented evidence of a health assessment

7   within 90 days, a new assessment is not required

8   unless determined by the designated health

9   authorities.

10          Did I read that right?

11      A    Yes.

12      Q    It's your belief that this policy was in

13   place in June of 2019?

14      A    Yes.

15      Q    Can I ask you, how soon are those

16   assessments done after an inmate is incarcerated?

17      A    Well, they changed the policy.  I don't know

18   if they changed the policy, but they wanted the intake

19   nurses to do the assessments before they went to the

20   floor.

21      Q    And the intake nurses are the first nursing

22   staff that the inmates see when they come to the jail.

23      A    Correct.

24      Q    So that would be something that's

25   essentially done immediately upon arrival, correct?

Janet Duwe

Page 49

1       A    Yes.

2                  (Exhibit 41 was marked for

3                  identification.)

4    BY MR. KATES:

5       Q    I hand you Exhibit 41.  Have you seen this

6    document before, Miss Duwe?

7       A    I believe so.

8       Q    Top reads Policy CM-40, correct?

9       A    Yes.

10      Q    And the title is identified as provider

11   orders, right?

12      A    Yes.

13      Q    Most recent revision date is May 2019,

14   correct?

15      A    Yes.

16      Q    So you believe this was in place in

17   June 2019?

18      A    Yes.

19      Q    The purpose of this document reads:  To

20   assure all orders from a medical provider to the St.

21   Louis County Department of Health Corrections medicine

22   staff are implemented to ensure diagnosis and

23   treatment of inmates.

24           Correct?

25      A    Yes.

Janet Duwe

Page 50

1    Q    And you believe that this was in place --

2  I'm sorry, strike that.

3         Number six on the next page reads that:  If

4  the patient exhibits any symptoms listed in the

5  exclusion criteria, the standing order will not be

6  used.  The medical provider will be notified or a note

7  will be sent to the clinic desk to schedule a clinic

8  appointment with a provider.

9         Correct?

10    A    Yes.

11    Q    So these provider orders, would this also be

12  referred to as a standing order, or is that different?

13    A    That's different.

14    Q    Fair enough.  I'll take that one back.

15  That's all I need from that one.

16         MR. KATES:  Do you want to take a break?

17              (A short recess was taken.)

18  BY MR. KATES:

19    Q    We're back on the record.  Miss Duwe, I

20  appreciate your help on these answers.

21         I do want to talk more about your specific

22  role as a nurse with corrections medicine.  You agree

23  that your role is to ensure that the patients and the

24  inmates get the appropriate care and treatment they

25  need for any illness that they develop, correct?

Electronically signed by Jo Ann Sturm (201-381-637-0608)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

1       A    Yes.

2       Q    As a nurse with corrections medicine, you're

3   in the best position to provide that treatment,

4   correct?

5       A    Yes.

6       Q    You have the education, the skill and

7   training to allow you to assess any kind of complaints

8   that they might have, correct?

9       A    Yes.

10      Q    And you're the one who's in the position

11  over the corrections officers to assess what their

12  medical needs are, correct?

13      A    Yes.

14      Q    And it's your understanding or your belief

15  that the corrections officers don't have the same

16  training or skills that you have in order to be able

17  to assess those medical needs, correct?

18      A    Yes.

19      Q    And we mentioned that if you get a sick

20  call, you're obligated to assess the patient and

21  determine what those needs would be, correct?

22      A    Yes.

23      Q    We already talked about that being that the

24  inmate is your patient, you act as an advocate for

25  them to make sure they get these needs met, correct?

Janet Duwe

Page 52

1      A     Yes.

2      Q     You certainly don't want anything to happen

3   to the patients when they complain of any kind of

4   illness or ailment that they have, right?

5      A     Yes.

6      Q     You would take every step that you could to

7   make sure that they're provided the right treatment

8   and care that they need, right?

9      A     Yes.

10      Q     When you learn of a sick patient, as their

11   advocate, you're required to make sure that they're

12   treated appropriately, right?

13      A     Yes.

14      Q     And in order to assess what their medical

15   needs are, you actually have to see and speak to the

16   patient themselves, right?

17      A     Yes.

18      Q     You can't take secondhand information from

19   someone else to be able to provide appropriate care

20   for whatever illness they might have, right?

21      A     Correct.

22      Q     Now, you mentioned Mr. Shy earlier.  He was

23   one of three deaths that occurred at St. Louis County

24   before Mr. Stout, right?

25      A     Yes.

Electronically signed by Jo Ann Sturm (201-381-637-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 53

1      Q    Prior to Mr. Stout's death, were you aware

2  of those other three deaths?

3      A    No.  I mean, I was aware of them.  I didn't

4  take care of them.

5      Q    So Mr. Stout passed away on June 11th, 2019.

6  As of June 9th, 2019, you knew that there were three

7  other deaths that year, correct?

8      A    Yes.

9      Q    You mentioned you were deposed in

10 Mr. Shy's -- in the lawsuit relating to the death of

11 Mr. Shy, right?

12     A    Yes.

13     Q    And you were sued as a party in that case,

14 correct?

15     A    Correct.

16     Q    Is that case still pending, to your

17 knowledge?

18     A    I don't think so.

19     Q    What is your understanding of what the

20 allegations were against you in that case?

21     A    Can you define allegations?

22     Q    Sure.  In the lawsuit, the plaintiff in that

23 case mentions that you did something.  Do you have an

24 understanding of what they say that you did with

25 regard to Mr. Shy?

Electronically signed by Jo Ann Sturm (201-381-537-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 54

1      A    Yes.

2      Q    And what is that?

3      A    I assessed him and sent him to the hospital.

4      Q    So you assessed him.  I believe, if I

5  remember correctly -- I'm going to hand you Exhibit

6  2 that we've marked.  Have you seen that document

7  before?

8      A    I do think I've seen this.

9      Q    That's the Internal Affairs investigation

10  report relating to the death of Mr. Shy.  You

11  mentioned that you assessed him and sent him to the

12  hospital.  What was it that he was complaining of?

13           MR. DeBEER:  I'm going to -- go ahead.

14           MS. ROBERTSON:  Go ahead.

15           MR. DeBEER:  I'm going to object to this

16  whole line of questioning on relevance based on the

17  allegations in the current action.

18           MS. ROBERTSON:  I also would object that

19  this -- that you're asking about Mr. Shy's medical

20  issues, that it violates HIPAA for her to disclose

21  that in this case.

22  BY MR. KATES:

23      Q    That being said, what was it -- what was

24  your understanding of his complaints to you?

25           MR. DeBEER:  I'm going to object to form.

Electronically signed by Jo Ann Sturm (201-381-637-0608)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 55

1    It's vague.  Sorry, I don't want it to just be

2    objection.

3            If you understand the question, you can

4    answer.

5    BY MR. KATES:

6        Q    Do you understand the question?

7        A    So what was -- what he was complaining of?

8        Q    Yes.

9        A    Abdominal pain.

10       Q    And you did an assessment on him, correct?

11       A    Correct.

12       Q    And based on your assessment, you felt it

13   was appropriate for him to go to the hospital,

14   correct?

15       A    Correct.

16       Q    And did he end up going to the hospital?

17       A    Yes.

18       Q    Let me ask you this.  In that case, was that

19   the only time that you had -- strike that.

20           On the day that he passed away, was that

21   your only interaction with him?

22       A    No.

23       Q    After you had sent him to the hospital, did

24   you interact with him a second time?

25       A    When he came back.

Janet Duwe

Page 56

1      Q    Was he making the same complaints when he

2  returned as he was making before he went to the

3  hospital?

4      A    He was better, actually.

5      Q    Did he still complain of abdominal pain?

6      A    Some, but it wasn't as bad.

7      Q    Did you have to perform a second assessment

8  on him?

9      A    No, it was a change of shift.  I just made

10  sure he got in his cell and took some vitals.

11      Q    So when they returned him to the jail, was

12  it part of your responsibility to make sure he got

13  back into his cell?

14      A    No, the correction officer puts him in the

15  cell.  I just took a set of vitals on him.

16      Q    I'm sorry?

17      A    I just took a set of vitals signs on him.

18      Q    Was that when he entered the jail or was it

19  when they put him into the cell?

20      A    When he went into the cell.

21      Q    So you took a set of vitals.  You don't

22  consider that a full assessment, right?

23      A    No.

24      Q    And then your shift was over and you left

25  for the day, right?

Janet Duwe

Page 57

1     A    I gave pass down and then left.

2     Q    Who did you -- strike that.

3          And you understand that after you had left,

4  Mr. Shy ultimately passed away, right?

5     A    Yes.

6     Q    And so back in June of 2019, you understood

7  that abdominal pain or stomach pains untreated could

8  have serious medical consequences, right?

9          MR. DeBEER:  Objection to form.  Calls for

10  an expert opinion.  Calls for speculation.  Lack of

11  foundation.

12          You can answer.

13          THE WITNESS:  Can you repeat the question?

14          MR. KATES:  Can you read it back, please?

15              (The reporter read the requested

16              material.)

17          THE WITNESS:  Yes.

18  BY MR. KATES:

19     Q    And of those serious medical consequences,

20  they could result in death, right?

21          MR. DeBEER:  Same objections.

22          THE WITNESS:  Yes.

23  BY MR. KATES:

24     Q    I'm going to hand you Exhibit 18.  Do you

25  remember the dates of the deaths of those other

Electronically signed by Jo Ann Sturm (201-381-637-0600)                    73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

1    inmates, by chance?

2              MR. DeBEER:  Objection.  Vague.

3              THE WITNESS:  No.

4    BY MR. KATES:

5        Q    I'm going to hand you what's been marked as

6    Exhibit 18.  And I've opened it to page 28.  Actually,

7    if you go to the first page, so you read the title of

8    the document, it says:  Commission on Accreditation

9    for Corrections Standard Compliance Reaccreditation

10   Audit.

11             Have you ever seen this document before?

12       A    No.

13       Q    Go back to page 28 for me.  If you see in

14   paragraph number two, about midway down, there's a

15   sentence that starts with:  All three cases.  I'm

16   sorry, the following sentence:  In review of all three

17   cases.  Do you see where that sentence starts at?

18       A    Yes.

19       Q    It reads:  In review of all three cases, the

20   CM implemented three distinct strategies to avoid

21   future issues and generally improve the providing of

22   medical care.

23             In your role, do you understand CM to mean

24   corrections medicine?

25       A    Yes.

Electronically signed by Jo Ann Sturm (201-381-637-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 59

```
 1      Q    The next line reads:  First, attention to

 2   the communication between medical and service staffs

 3   in and out of the infirmary would be improved.

 4           Do you remember any changes in policy to

 5   ensure that communication between medical and service

 6   staffs in or out of the infirmary would be improved?

 7      A    Can you repeat that?

 8      Q    Sure.  After these three individuals die,

 9   according to this document, it mentions that

10   corrections medicine implemented different -- three

11   different strategies to avoid future issues and to

12   generally improve the providing of medical care.

13           It's listed here that the first is that

14   attention to the communication between medical and

15   service staffs in and out of the infirmary would be

16   improved.  Do you know of any changes in communication

17   between medical and service staff related to the

18   infirmary after March of 2019?

19           MS. ROBERTSON:  I'm going to object to form

20   and foundation.  She's not the author or recipient of

21   this document.  If just want to ask her what she knows

22   about changes, that's fine, as it pertains to this

23   document.

24   BY MR. KATES:

25      Q    Do you know of any changes that were made
```

Janet Duwe

Page 60

1    after March of 2019?

2         A    No.

3         Q    It reads:  Secondly, the use of scheduling

4    of agency nurses would be reviewed.

5              Do you know of any changes with scheduling

6    of agency nurses?

7         A    No.

8         Q    It mentions in here a monthly meeting with

9    hospital personnel.  Did you ever attend a monthly

10   meeting with hospital personnel relating to inmates at

11   the corrections facility?

12        A    Yes.

13        Q    Was this everybody in corrections medicine?

14        A    Yes.

15        Q    Was it mandatory?

16        A    I believe so.

17        Q    What was the general -- was this

18   something -- strike that.

19             Is that something that you had to do the

20   entire time that you were employed there?

21        A    We had meetings regularly.

22        Q    Did anything about those meetings with

23   hospital personnel change after March 2019?

24        A    They were just letting us know about the

25   changes.  They would just update us on things that

Electronically signed by Jo Ann Sturm (201-381-637-0608)        73eded20-b550-4185-8666-bd8d39493886

Janet  Duwe

Page 61

1    were going on.

2         Q    Going on with what?

3         A    How they ran the infirmary and the intake.

4         Q    The last one says:  Sick call process was

5    evaluated.  It was determined that greater efforts

6    would be directed to education, assess management and

7    up-to-date medical protocols.

8              Do you know of any -- strike that.

9              Do you remember in your experience seeing

10   any changes to efforts relating to education or assess

11   management and obtain up-to-date medical protocols?

12        A    No.

13        Q    After the third death in March of 2019, but

14   before Stout passed away in June 2019, was there any

15   changes in policy or protocols or procedures relating

16   to intake or infirmary or sick calls that you

17   remember?

18        A    I just remember one.  There was a gentleman

19   who had withdrawals from alcohol and they did not give

20   him his Ativan.  They were going to give it to him in

21   the morning, and then they started protocol to start

22   the medication as soon as they got it.  If I can say

23   that now.

24             MS. ROBERTSON:  What did you say?

25             THE WITNESS:  So with one of the gentlemen

Electronically signed by Jo Ann Sturm (201-381-537-0608)            73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 62

1   that passed away, he had withdrawals from alcohol, and

2   they didn't start the medication.  They were going to

3   start it in the morning, but they -- they changed the

4   policy to where if somebody comes in and they're

5   withdrawing from alcohol, start the Ativan.

6   BY MR. KATES:

7       Q    So there was a change in procedures for when

8   to administer Ativan for inmates who were

9   demonstrating symptoms of withdrawal, right?

10      A    Correct.

11      Q    What about any changes in policies relating

12  to inmates complaining of stomach pains?

13      A    Not that I know of.

14           MR. DeBEER:  Object to foundation.

15  BY MR. KATES:

16      Q    You mentioned that change.  To your

17  recollection, were there any other changes in any kind

18  of policies as it relates to assessing patients or

19  seeing patients?

20      A    Not that I know of.

21           (Exhibit 42 was marked for

22           identification.)

23  BY MR. KATES:

24      Q    I'm going to hand you 42.  Have you ever

25  seen this one before?

Janet Duwe

Page 63

1    A    I don't remember seeing this.

2    Q    Do you have any idea whose handwriting is

3  all over that?

4    A    No.

5    Q    It says clinic desk duties at the top.  Was

6  there a location within the jail referred to as the

7  clinic desk?

8    A    Yes.

9    Q    What is that, to your understanding?

10    A    During the day they see patients in the

11  clinic, and they have separate areas that people work

12  out of.

13    Q    So the clinic would be the health clinic.

14    A    It would be the health clinic.

15    Q    Is that the same as the infirmary?

16    A    No.

17    Q    Is that the same as intake?

18    A    No.

19    Q    So now there's a third location?  There's

20  intake, infirmary and now health clinic?

21    A    This is open during the day.

22    Q    Is it located on the jail property?

23    A    Yes.

24    Q    So this would not have been where you were

25  working on June 10th and 11th, 2019, correct?

Janet Duwe

Page 64

1      A    No.

2      Q    You mentioned you had seen the Internal

3   Affairs investigation report.  It mentions training,

4   you and Connie in some sort of training.  Do you

5   remember training on June 10th to the 11th?

6           MR. DeBEER:  Can you point her to that?

7           MR. KATES:  Yeah, that's fine.

8           MR. DeBEER:  It's 6, right?

9           MR. KATES:  Yes, it's 6.

10  BY MR. KATES:

11     Q    Page 11.  Actually, back up to page ten.

12  The last paragraph states that:  Nurse Heitman stated

13  on this morning, Nurse Duwe was stressed from training

14  all night.

15          Do you remember any kind of training that

16  was taking place on June 10th?

17     A    Yes.

18     Q    Into June 11th?

19     A    Yes.

20     Q    Actually, if you go back to Exhibit 34,

21  that's the nursing schedule, right?

22          MR. DeBEER:  Yes.

23          THE WITNESS:  Yes.

24  BY MR. KATES:

25     Q    Your name's listed at the bottom next to

Janet Duwe

Page 65

1    intake orientation.

2         A    Yes.

3         Q    Was that orientation essentially training

4    for you?

5         A    Yes.

6         Q    You've been there for seven years, almost?

7         A    Almost.

8         Q    What was the training for?

9         A    I have not -- I had not been down to intake

10   in probably about five years, and they were -- they

11   had changed a lot of how they did things, their

12   procedures and just the format of how they did things.

13   They wanted me to relearn it.

14        Q    And was Connie Heitman the person that was

15   training you that day?

16        A    Yes.

17        Q    Is there anybody else that was working

18   intake with the two of you?

19        A    Pam Shaw.

20        Q    As far as proximity goes, are you all three

21   working in the same office type area or are there --

22   are you in separate rooms?

23        A    We're in separate rooms.

24        Q    All on the same floor, though, right?

25        A    Correct.

Electronically signed by Jo Ann Sturm (201-381-537-0609)    73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 66

1      Q    Are you in offices or -- as far as proximity

2   from each other, how far apart are these rooms,

3   estimate?

4      A    Probably from here to the garage -- not

5   the -- the parking lot.

6      Q    Parking lot.  That's not going to read well

7   on the record.

8      A    Probably about -- I'm not good at feet or

9   yards.

10     Q    Your offices were not next to -- didn't

11  share a wall with one another, did they?

12     A    No.  I mean, we worked -- we were on the

13  same floor.  Pam was where the people came in, and

14  then they go through the process of coming into the

15  holding area where Connie and I were.  But there's

16  doors and walls between us.

17     Q    Are you familiar with an MDC run?

18     A    Yes.

19     Q    What does MDC run mean to you?

20     A    When they take the inmates to prison.

21     Q    Essentially they're getting transferred from

22  the Justice Center to prison, right?

23     A    Yes.

24              (Exhibit 43 was marked for

25              identification.)

Janet Duwe

Page 67

1    BY MR. KATES:

2        Q    Exhibit 43.  Take a look at that for me.

3             Did you have a chance to look it over?

4        A    Yes.

5        Q    Have you ever seen that document before?

6        A    I don't think so.

7        Q    You were training on the evening of

8    June 10th and the morning of June 11th.

9        A    Yes.

10       Q    Did anyone give you any kind of training as

11   it relates to an MDC run?

12       A    No.

13       Q    Did you have any belief as to any

14   responsibilities that you would have as far as any

15   kind of communications that you might have to have

16   with a transportation officer?

17       A    No.

18       Q    Number five down here reads:  The intake

19   evening shift nurses will pass on in report that there

20   is an MDC or federal run in the a.m. and will show

21   them where the medications and paperwork are placed.

22            Did I read that right?

23       A    Yes.

24       Q    Did anyone that night give you any kind of

25   training as it relates to passing on in a report to --

Janet Duwe

Page 68

1    sorry, in a report that there's an MDC run?

2        A    No.

3        Q    Number six says:  It will be the

4    responsibility of the night shift nurse in intake to

5    go over to transportation in the morning before

6    7:00 to deliver the medical paperwork and to

7    administer all a.m. medications.

8             Did I read that right?

9        A    Yes.

10       Q    Did anybody give you any training on

11   doing -- taking those steps?

12       A    No.

13       Q    It had been five years since you had done

14   any kind of -- had any role in intake.  Was that the

15   first shift that you were on, intake?

16       A    No.

17       Q    When before June 10th had you been on

18   intake?

19       A    I don't remember the dates, but it was

20   within the last few weeks before that.

21       Q    So when you had finally gone back to intake

22   after your couple of years having not been there, you

23   had already worked a couple of shifts.

24       A    Correct.

25       Q    And in none of that time did anybody give

Janet Duwe

Page 69

1    you any kind of responsibilities or tell you what kind

2    of responsibilities you had as it relates to MDC runs.

3         A    Correct.

4         Q    At intake, did you have access to

5    patients' -- inmates' medical records?

6         A    Yes.

7         Q    Would you have had a list of the inmates

8    that were going to be transferred to MDC --

9         A    No.

10        Q    -- the following day?

11        A    No.

12        Q    So let's talk about the call that you got

13   from Officer English.  Do you remember about what time

14   that was?

15        A    It was sometime around a quarter to 6:00.

16        Q    If I mention that Officer English stated

17   that she made a phone call at 5:34, would you agree or

18   disagree or say I looked right at my watch and saw it

19   was quarter to 6:00?

20        A    It could be that.

21        Q    I'm going to back up real quick.  In your

22   experience, do you know what time the officers take

23   the inmates to transportation to be sent to MDC?

24             MR. DeBEER:  Objection.  Foundation.

25

Janet Duwe

Page 70

1    BY MR. KATES:

2        Q    To your knowledge, do you know when they do

3    that?

4        A    Around 6:00.

5        Q    Around 6:00, okay.  What do you remember

6    about the call from Officer English?

7        A    I remember getting the call.  I answered the

8    phone and she asked me if -- she told me that she had

9    a -- let me back up.  She said she was calling for

10   information only, and she wanted to know if a patient

11   could go to prison if they had vomited.

12       Q    Go ahead.

13       A    I asked Connie, and she said that was fine

14   as long as they were seeing them before they go in

15   transportation.

16       Q    The first thing that she says is I'm calling

17   for information only.

18       A    Uh-huh.

19       Q    Is that a yes?

20       A    Yes.

21       Q    And then after that, all she says is she has

22   an inmate that asked if an inmate can be transferred

23   if they vomited, right?

24       A    Correct.

25       Q    Did you have any experience with inmates

Janet Duwe

Page 71

1    being transferred prior to training with Connie?

2        A    Not much.

3        Q    So this was something new that you had to

4    confirm with her for.

5        A    Yes.

6        Q    And what was it that you relayed to Connie?

7        A    I put English on hold and I turned around,

8    because Connie was -- we were in a tight space, and

9    Connie was sitting behind me, and I said, is it okay

10   if somebody goes to prison if they vomited.

11       Q    What was her response?

12       A    She said they could go as long as they were

13   seen in intake before they left -- I mean in

14   transportation before they left.

15       Q    Did Connie ask any other information about

16   what the call was for?

17       A    She wanted to know -- trying to think.  I

18   don't remember what she asked for.

19       Q    What Connie asked for?

20       A    She could have.  I don't remember exactly.

21       Q    Do you recall any kind of discussion between

22   you and Connie other than your simple request and her

23   response?

24       A    She told me that they could be seen in

25   intake.  She wanted to know if the person was getting

Electronically signed by Jo Ann Sturm (201-381-537-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 72

1    ready to come down.  I do remember her telling me

2    that.

3         Q     Did you ask that to Officer English?

4         A     I did.

5         Q     And what was Officer English's response?

6         A     She told me that they were out of the

7    system, which means they weren't in the correction

8    officer system anymore, they were getting ready to

9    move them, and they were getting ready to send them to

10   transportation.

11        Q     I'm going to direct you to Exhibit 6, your

12   statement that you gave to Internal Affairs.

13        A     Uh-huh.

14        Q     That's page 11.

15        A     Page 11.

16        Q     You said that there was no sense -- you said

17   there was no sense of urgency in her voice.  That's

18   Officer English, right?

19        A     Yes.

20        Q     Did you ask any other details about the

21   vomiting, the patient, the inmate?

22        A     No.

23        Q     Why not?

24        A     I don't know.  It's not uncommon for

25   somebody to vomit before they go to prison.  We have a

Janet Duwe

Page 73

1    lot of people withdrawing and a lot of people who are

2    nervous.

3         Q    Did you ask any other details as to the

4    significance of the vomit?

5         A    No.

6         Q    Or any other complaints that he might have

7    had?

8         A    No.

9         Q    Did you check to see who was on the list to

10   leave for MDC the next morning?

11        A    No.

12        Q    Did you pull up any medical records?

13        A    No.

14             MR. DeBEER:  Sorry, I'm going to object to

15   that first question that it misstates prior testimony.

16   BY MR. KATES:

17        Q    Corrections -- to your knowledge and in your

18   experience, corrections officers aren't trained or

19   don't have the knowledge to provide diagnoses, do

20   they?

21        A    No.

22        Q    And you rely on their ability to report

23   information to you as it relates to the inmates that

24   they see, right?

25        A    Yes.

Janet  Duwe

Page 74

1      Q      So the facts that you were aware of at the

2   time that you got the phone call was that there was an

3   inmate who was going to be moved, right?

4      A      Correct.

5      Q      And that he vomited, right?

6      A      Correct.

7      Q      So he was experiencing some kind of stomach

8   pains, right?

9      A      Correct.

10      Q      You didn't ask for any other additional

11   information, right?

12      A      I do not believe so.

13      Q      To your understanding and in your

14   experience, are there circumstances wherein an inmate

15   who's vomiting cannot be moved?

16      A      I don't know.

17      Q      Is that something you believe Connie would

18   know?

19              MR. BANKS:  Objection.  Calls for

20   speculation.

21   BY MR. KATES:

22      Q      Do you believe Connie would have known that?

23              MR. DeBEER:  I'll join in the objection.

24              You can answer if you know what Connie

25   knows.

Janet Duwe

Page 75

1          THE WITNESS:  I don't know.

2    BY MR. KATES:

3      Q    At the time, did you think she would know,

4    as you asked her, you know, can somebody be moved if

5    they're vomiting?  Was it your expectation that she

6    would have some sort of knowledge on that?

7      A    I guess.  I don't know.

8      Q    You were training all night.  Did you have

9    any trouble retaining information that day?

10          MR. DeBEER:  I'm going to object to the form

11   of the question.

12          You can answer.

13          THE WITNESS:  I don't remember.

14   BY MR. KATES:

15     Q    If Connie in her statement makes a remark

16   that she believed that you were having trouble

17   retaining information, does that seem odd to you?

18          MR. DeBEER:  Did you say does that seem odd

19   to her?

20   BY MR. KATES:

21     Q    Yeah, does that seem odd to you?

22          MR. DeBEER:  Object to the form.

23          THE WITNESS:  I really don't know.  I might

24   have been a little stressed out.

25

Janet Duwe

Page 76

1    BY MR. KATES:

2        Q    Did you make any comments to Connie about

3    being stressed?

4        A    I don't remember.

5        Q    Did you get into any arguments with anybody

6    because of stress?

7        A    No.

8        Q    Go to page four of the report that you have

9    in front of you.  It's the second paragraph down.  Let

10   me know when you're there.

11       A    Okay.

12       Q    Second paragraph.  It's the second line in.

13   It says:  She informed -- I'll just read the

14   beginning.

15           Officer English was asked specifically what

16   information did she relay to Nurse Duwe, and she

17   stated that she informed her that an inmate that is on

18   the list to leave for MDC had vomited and that he is

19   complaining of stomach pains.  Officer English stated

20   that she asked Nurse Duwe what they do in instances

21   such as this, meaning would they come up to the floor

22   to see him before he leaves or waited until he was

23   brought down.

24           If she told you that she had somebody on the

25   list to leave for MDC and vomited and complaining of

Janet Duwe

Page 77

1   stomach pains, would you interpret that to be a sick

2   call?

3        A    Well, are you asking me what's in here or

4   what she asked me?

5        Q    If she had said that, what's written here,

6   if she had said that to you, would you have

7   interpreted that as a sick call?

8        A    I think so.

9        Q    And if you get a sick call, you've already

10  testified that you're required to go up and see the

11  patient, right?

12       A    Correct.

13       Q    And you've got to assess them to determine

14  what kind of treatment or diagnosis they need, right?

15       A    Correct.

16       Q    And you can either do that by going up

17  physically to see the patient or having them brought

18  down to you, right?

19       A    They don't normally come down to see us

20  unless they're going to transportation, but there's a

21  transportation nurse.

22       Q    So, in other words, you would have gone up

23  to see them, correct?

24       A    Yes.

25       Q    Who was the transportation nurse?

Electronically signed by Jo Ann Sturm (201-381-637-0609)    73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 78

1      A      I think her name was Kerry.

2      Q      Is it the same person every time?

3      A      No.

4      Q      Would that nursing schedule show you who it

5   would have been that night?

6      A      Oh, no, no.

7      Q      If somebody makes a sick call, to your

8   recollection, is there any kind of standard response

9   time that you're supposed to be able to get to the

10  inmate in?

11     A      As soon as we can get there.

12     Q      Is there any policy that says you have to be

13  there within ten minutes and if you can't, you have to

14  find somebody else who is available to get to them?

15     A      I don't know.

16     Q      Would you think that 45 minutes is a long

17  time to report to a sick call?

18     A      It's a long time.

19     Q      Because a sick call could be for anything

20  that's small and minor to something that's severe and

21  significant, right?

22     A      Correct.

23     Q      It could be that an inmate with stomach

24  pains is having some serious issues that are

25  developing and he needs to be seen right away,

Electronically signed by Jo Ann Sturm (201-381-537-0600)                    73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 79

1    correct?

2         A    Yes.

3         Q    And as you were receiving the call from

4    Officer English, she says she put it at 5:34, you said

5    that it was somewhere around quarter to 6:00.  It's a

6    ten-minute window.  As far as the information that you

7    had, you knew that there was an inmate that was

8    scheduled to be moved to the Department of

9    Corrections, right?

10        A    Correct.

11        Q    And they usually move them around

12   6:00 o'clock, right?

13        A    Correct.

14        Q    You knew that the inmate was vomiting,

15   right?

16        A    Yes.

17             MR. DeBEER:  Object.  That misstates

18   testimony.  Misstates the evidence.

19   BY MR. KATES:

20        Q    You knew that the inmate had vomited, right?

21        A    Correct.

22        Q    So he was having some sort of stomach

23   troubles, right?

24        A    Correct.

25        Q    And you knew that stomach problems can --

Janet Duwe

Page 80

1    untreated could lead to some serious medical

2    conditions, right?

3            MR. DeBEER:  Object to form.  Calls for

4    speculation, calls for an expert opinion.

5            MR. KATES:  Can you repeat the question?

6                (The reporter read the requested

7                 material.)

8            THE WITNESS:  Correct.

9    BY MR. KATES:

10       Q    And those serious medical conditions could

11   include death, right?

12       A    Correct.

13       Q    And you knew, based on the sick call

14   protocols and the policies, that you had an obligation

15   to see sick inmates, right?

16       A    Correct.

17           MR. DeBEER:  I'm going to object to form.

18   Vague.

19   BY MR. KATES:

20       Q    You didn't ask Officer English any other

21   symptoms that he was experiencing, did you?

22       A    No.

23       Q    You didn't ask the frequency of how often he

24   had been vomiting, right?

25       A    No.

Janet Duwe

Page 81

1     Q    You didn't ask him how recent he had

2  vomited, right?

3     A    No.

4     Q    Why didn't you ask him any of those

5  questions?

6     A    I mean, when she told me, it wasn't a sick

7  call.  I mean, she basically just asked for

8  information, if he could go to prison.  So I didn't

9  think it was a sick call.  I just took it as

10  information.

11    Q    So Officer English is telling you that he's

12  going to be transferred to the MDC, right?

13    A    Correct.

14    Q    Do you have any information as to how soon

15  he's going to be down to the transportation officers,

16  right?  Do you?

17    A    No, they just told me he was in movement.

18    Q    He was in movement?

19    A    Correct.

20    Q    But your instructions to Officer English

21  were that he would be seen in transportation, right?

22    A    Correct.

23         MR. DeBEER:  Objection.  Misstates prior

24  testimony.

25

Janet Duwe

Page 82

1   BY MR. KATES:

2       Q    Did you notify transportation that they were

3   going to be receiving a sick patient?

4       A    No.

5       Q    Did you notify the nurse in transportation

6   that she would be receiving a sick patient?

7       A    No.

8       Q    What was the name of the person in

9   transportation medical at the time?

10      A    I believe it was Kerry.

11      Q    Do you remember Kerry's last name?

12      A    Oh, God.  I can't think of it right now.  I

13  don't remember.

14      Q    I'm going to go back to Exhibit 26 that you

15  have there.

16          MR. DeBEER:  Here it is.

17  BY MR. KATES:

18      Q    I'm going to go to page four.

19          MS. ROBERTSON:  Is this 1307?

20          MR. KATES:  1301.  If that's not Exhibit 26,

21  let me know.  It should be.

22  BY MR. KATES:

23      Q    There should be a letter S midway down on

24  page four.

25      A    Yes.

Janet Duwe

Page 83

1    Q    Letter S says:  The corrections medicine
2    staff will give a completed medical transfer sheet,
3    parentheses, see attachment one, or a federal medical
4    transfer sheet to the transportation supervisor
5    designee when an inmate with a medical condition is
6    transported by transportation officers to other
7    authorities.
8         I think there was a second parenthetical
9    that I missed, but did I read that correctly?
10   A    Yes.
11        MR. DeBEER:  I'm going to object to any
12   questions related to this policy on the basis that
13   it's a DJC policy, does not apply specifically to
14   corrections medicine.
15        MR. PLEBAN:  You guys have a running on
16   that, don't you?
17        MR. DeBEER:  Can we the rest of the time?
18        MR. PLEBAN:  Straight across the board, you
19   just got it.
20        MR. DeBEER:  All the objections.
21   BY MR. KATES:
22   Q    So in your time training that night, did
23   Connie, or even in your time training any other time,
24   did anyone else tell you about a medical transfer
25   sheet?

Janet Duwe

Page 84

```
 1       A    No.

 2       Q    Do you know what a medical transfer sheet

 3  is?

 4       A    No.  Other than the ones we use in the

 5  infirmary.

 6       Q    Do you know if there's any other medical

 7  transfer sheets that are used within corrections

 8  medicine?

 9       A    Just in the infirmary.

10       Q    And what are those typically used for in

11  your experience?

12       A    Sending people to the hospital.

13       Q    And do you know if there's any kind of

14  documentation that you and intake are supposed to

15  provide to the transportation nurse for any inmate

16  that's transferring to MDC?

17       A    No.

18       Q    It goes without saying, but you did not

19  prepare a transfer sheet to turn over to

20  transportation, did you?

21       A    No.

22       Q    As far as the IA investigation goes, did you

23  meet with investigators?

24       A    No.

25       Q    Why not?
```

Electronically signed by Jo Ann Sturm (201-381-537-0608)     73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 85

1      A    I don't know why.  I mean, like -- were they
2  supposed to call me?
3      Q    Any kind of verbal meeting, statement that
4  you gave to them.
5      A    I just gave the statement I gave to
6  Sharon Gardner.
7      Q    And that's the statement that's on page 11
8  of Exhibit 6, right?
9      A    I believe so.
10     Q    Did anyone notify you that refusing to meet
11  with Internal Affairs -- strike that.
12          To your knowledge, did anyone from Internal
13  Affairs try to set up a meeting?
14     A    No.
15     Q    Did anyone ever mention to you that failure
16  to meet with Internal Affairs would result in
17  termination?
18     A    I don't remember.  Oh, I think
19  Sharon Gardner sent me something in the email about
20  that.
21     Q    What's your recollection of what
22  Sharon Gardner said in her email?
23     A    Well, it was really just about the
24  statement, that if I didn't provide a statement, that
25  I could be in big trouble.

Electronically signed by Jo Ann Sturm (201-381-637-0609)

Janet Duwe

Page 86

1      Q    Did Sharon Gardner mention anything about

2   meeting with Internal Affairs?

3      A    I don't think so.

4      Q    Nobody ever tell you that if you don't meet

5   with Internal Affairs, you can be terminated?

6      A    I don't remember.

7      Q    What's your understanding of -- strike that.

8           You said the last time -- you stopped

9   working there in July of 2019, July 1st, correct?

10     A    Correct.

11     Q    Tell me the nature of your separation.

12     A    I received a letter saying that my position

13  was eliminated.

14              (Exhibit 44 was marked for

15               identification.)

16     Q    Is Exhibit 44 a copy of that letter?

17          MR. DeBEER:  I don't need it.

18          THE WITNESS:  Yes.

19  BY MR. KATES:

20     Q    Did you reach out to speak to -- the

21  letter's signed by Emily Doucette.  Did you reach out

22  to Emily Doucette to inquire as to why you were

23  terminated as of July 1st, 2019?

24     A    No.

25     Q    Were you aware that you had the right to

Janet Duwe

Page 87

1    appeal the termination?

2        A    I guess.  I really had no heart to want to

3    try to stay with the county.  I was pretty sour on the

4    county by that time.

5        Q    Why were you sour on the county?

6        A    It's a pretty toxic environment.  I was

7    looking to leave there anyway.

8        Q    Do you know -- can you describe the toxic

9    environment for me?

10       A    Yes.

11       Q    Will you please describe the toxic

12   environment for me?

13       A    I was just tired of hearing the F word about

14   100 times a night.  I was tired of just the treatment

15   of the inmates towards the staff and the staff towards

16   inmates.

17       Q    So there were poor relations between staff

18   and inmates.

19       A    Yes.

20       Q    What are some of the things about the way

21   that the staff treated the inmates that you didn't

22   like?

23       A    I want to say the language, just -- that was

24   the biggest part, the language.

25       Q    Was it insulting language or was it just --

Electronically signed by Jo Ann Sturm (201-381-637-0608)    73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 88

1    strike that.

2              Describe the language that you didn't like.

3        A     The swearing.  I mean, there were nurses

4    that called patients the F word, there were patients

5    that called nurses the F word.  I mean, every time you

6    turned around you heard the F word.  There were other

7    words, too, not just that word.  I was just getting

8    tired of it.

9        Q     Did you receive any discipline relating to

10   your involvement in Mr. Stout's death?

11       A     I mean, I was let go.

12       Q     Is it your understanding that your

13   termination was a result of Mr. Stout's death?

14             MR. DeBEER:  I'm going to object to form.

15   BY MR. KATES:

16       Q     Let me rephrase it.

17       A     I'm not sure what I'm supposed to do.

18             MR. DeBEER:  Do you understand the question?

19             THE WITNESS:  No.

20             MR. KATES:  Can you repeat the question?

21                 (The reporter read the requested

22                  material.)

23   BY MR. KATES:

24       Q     Go ahead.

25       A     I think I was a scapegoat.

Electronically signed by Jo Ann Sturm (201-381-537-0608)                    73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 89

1      Q      Why do you think you were a scapegoat?

2      A      I think they were looking for somebody to

3    blame.

4      Q      Did you disagree with the decision?

5      A      I didn't try to fight it.  I didn't think it

6    was fair, but I didn't try to fight it because I

7    really didn't want to be there anymore.

8      Q      Who do you think was trying to make you the

9    scapegoat?

10     A      I think the county had a problem, and I

11   think the county needed to find someone to blame it

12   on.  And I think they figure if they can blame it on

13   me and get rid of me, then they got rid of the

14   problem.  Then they fix the problem and then they can

15   go on.

16     Q      What do you think the problem was?

17     A      They just -- they just needed someone to

18   blame.

19     Q      And in your opinion, do you think it was

20   related to Mr. Stout's death or for all of the deaths?

21     A      Oh, not all the deaths.

22     Q      Do you have any evidence to support the

23   belief that you think you're the scapegoat?

24            MR. DeBEER:  Object to the form.

25            You can answer.

Electronically signed by Jo Ann Sturm (201-381-537-0608)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 90

```
 1              THE WITNESS:  I just -- can you rephrase
 2    that?
 3    BY MR. KATES:
 4         Q    Do you think that there's anything out there
 5    that you believe that supports your opinion that you
 6    were the scapegoat?
 7              MR. DeBEER:  I'll object to the form as
 8    vague.
 9              THE WITNESS:  I'm not sure.
10    BY MR. KATES:
11         Q    Did you ever speak to anybody who said
12    they're just trying to get rid of you because you're
13    the one who handled the phone call?
14         A    Oh, no.
15         Q    Did you ever get any emails that said we've
16    got to put this on somebody, it's you?
17         A    No.
18         Q    Any conversations with anybody that you
19    believe support the idea that you were a scapegoat?
20         A    No, that's just the way I feel.
21         Q    Other than this incident, have you ever been
22    disciplined during your time with the county?
23         A    No.
24         Q    Have you ever had any complaints filed
25    against you that did not lead to discipline?
```

Electronically signed by Jo Ann Sturm (201-381-637-0609)                              73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 91

1        A    I don't think so.

2             MR. PLEBAN:  Let's take a break.

3                  (A short recess was taken.)

4    BY MR. KATES:

5        Q    Back on the record.  Just a couple follow-up

6    questions for you.

7             You had mentioned the toxic environment at

8    the jail.  You had mentioned the language being used

9    between inmates to the staff and staff to the inmates.

10   Do you remember that testimony?

11       A    Yes.

12       Q    Did you ever hear

13   Lieutenant Michelle Wright-Berry call one of the

14   inmates and use the F word?

15       A    I'm not sure I know who she is.

16       Q    Do you ever recall hearing

17   Officer Glenda Johnson call one of the inmates the F

18   word?

19       A    I don't remember.  I don't know who she is.

20       Q    Do you know who -- as you sit here today,

21   who do you remember using the F word towards any of

22   the inmates?

23       A    I don't know if I can give names.  I mean,

24   is that something I can say?

25       Q    It's to your recollection, what you

Janet Duwe

Page 92

1    remember.

2         A    I'm trying to think.  I don't know all the

3    officers' names, to be honest with you.

4         Q    Do you know who Officer English is?

5         A    Yes.

6         Q    Did you ever hear her use that?

7         A    No.

8         Q    What about, do you know who Brian Mitchell

9    is, Lieutenant Brian Mitchell?

10        A    Name sounds familiar.  I can't remember.

11        Q    But as you sit here today, you can't

12   remember the names of any specific staff members using

13   the F word towards any of the inmates.

14        A    I mean, I can -- there's a couple of night

15   shift, you know, correction medicines that did.

16        Q    Do you remember who they were?

17        A    I think one of them's name was Cogshell.

18        Q    Can you spell that?

19        A    I think it's C-O-G-S-H-E-L-L, I think.

20        Q    Anybody else that you can think of?

21        A    Not offhand.  I don't remember their names.

22        Q    Did you ever hear Nurse Robert Adams call

23   the inmates the F word?

24        A    I didn't work with him.

25        Q    What about Connie?  Did you ever hear her

Janet Duwe

Page 93

1    call any of the inmates the F word?

2          A    No.

3          Q    A couple final questions about these

4    informational calls.

5               You mentioned that the call from

6    Officer English was -- you interpreted it as an

7    informational call, right?

8          A    Correct.

9          Q    Are there any written policies outlining how

10   to handle informational calls?

11         A    Not that I know of.

12         Q    Was there ever any training on how to handle

13   informational calls?

14         A    No.

15         Q    Do you have anything in writing that you've

16   ever seen that refers to informational calls?

17         A    No.

18         Q    So as far as this call with English, she was

19   calling -- your testimony is that she was calling for

20   information, right?

21         A    Yes.

22         Q    And you're testifying that she called

23   relating to an inmate that had vomited, right?

24         A    Yes.

25         Q    So she was calling asking about a sick

Electronically signed by Jo Ann Sturm (201-381-637-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 94

1    inmate, right?

2        A    Yes.

3        Q    And it's your job to treat sick inmates,

4    right?

5        A    Yes.

6        Q    But you didn't go up to see the sick inmate,

7    did you?

8        A    No.

9        Q    But you could have.

10       A    He was in movement.  We don't see people in

11   movement.

12       Q    Are you not allowed to see anybody who's in

13   transport?

14       A    Well, no.  I don't normally see.  I don't

15   work down there very often, so that was kind of new to

16   me.  I've never seen anybody at transportation.  I

17   took one person one medicine down there because I was

18   asked to one time.

19       Q    Who asked you to do that?

20       A    This was years ago.  I was in the infirmary.

21   Somebody asked me to take a pill down to somebody in

22   transportation.

23       Q    So if there's an inmate waiting in the sally

24   port to be moved and he has a medical emergency, you

25   can go and see him, though, can't you?

Electronically signed by Jo Ann Sturm (201-381-637-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 95

1      A      No, they would call code one.  If it was an
2  emergency, like if somebody was having a heart attack
3  or somebody was having a stroke or a seizure or
4  something like that, they would call a code one.
5      Q      But you can go up and see them, right?
6      A      Yes.
7      Q      And if they have other symptoms or
8  conditions that they need to see a nurse for, you can
9  go up and see them, right?
10     A      Not in movement.  When they're in movement,
11 we don't see them.  But if they're in transportation,
12 if they call a code, I would definitely go see them.
13     Q      Is the sally port, to your understanding,
14 considered to be a movement?
15     A      That's after they get downstairs, they're in
16 the sally port.  That's right before they go to MCD.
17     Q      But what if they're still on the housing
18 unit floors?
19     A      Oh.  If they were -- if they asked for a
20 sick call, I would have gone up there.
21     Q      There's a difference -- I say sally port and
22 you say he's down being transported at the buses.
23            What I'm referring to is the sally port on
24 the fifth floor.  Do you understand that there's a
25 sally port on the fifth floor?

Janet Duwe

Page 96

```
 1      A    Yes.

 2      Q    So when I say he's up on the fifth floor in

 3 the sally port and you get a call for a sick inmate,

 4 you can go up and see him up there, right?

 5      A    Yes.

 6      Q    So if they're having some medical issue,

 7 emergency or regular just complaints of symptoms that

 8 they're having, they can call you and you can go up

 9 and see them, right?

10      A    Yes.

11      Q    So up until the point when they actually

12 took Mr. Stout out of the sally port on the fifth

13 floor, you could have gone up to see him, right?

14      A    Yes.

15      Q    But you didn't.

16      A    Yes.

17           MR. DeBEER:  Objection.  Argumentative.

18 Asked and answered numerous times.

19 BY MR. KATES:

20      Q    You had conversations with Connie, right?

21      A    Yes.

22      Q    About this lawsuit before the lawsuit was

23 filed, correct?

24      A    Yes.

25      Q    What did you talk about as it relates to the
```

Electronically signed by Jo Ann Sturm (201-381-637-0609)                    73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 97

1    lawsuit?

2        A    Just the phone call.

3        Q    Did anybody mention the possibility of a

4    lawsuit being filed?

5        A    She did.

6        Q    What did she say about the possibility that

7    a lawsuit could be filed?

8        A    She said there's probably going to be a

9    lawsuit with this one.

10       Q    Did she elaborate on that?

11       A    No.

12       Q    Did you give your opinion?

13       A    I said there probably would be.

14       Q    Why did you think there was going to be a

15   lawsuit filed?

16       A    Because anytime that someone leaves the jail

17   and they die within 24 hours, that's not normal.  I

18   mean...

19            MR. KATES:  Nothing further.

20            MR. BANKS:  I have no questions.

21            MS. ROBERTSON:  I have some questions.

22                CROSS-EXAMINATION

23                BY MS. ROBERTSON

24       Q    Mrs. Duwe -- am I saying that right?

25       A    Yes.

Janet Duwe

Page 98

1      Q     We talked about Exhibit 6.  Do you have that

2    in front of you?  Is it open to page 11 there?

3      A     This is 18.

4            MR. DeBEER:  Are you sure?

5            THE WITNESS:  6 is right here.  Page what,

6    I'm sorry?

7    BY MS. ROBERTSON:

8      Q     Page 11.  You were asked about your

9    statement on page 11, and you had an opportunity to

10   read that before this deposition; is that fair?

11     A     Yes.

12     Q     Is that a fair and accurate depiction of the

13   statement that you provided to Sharon Gardner?

14     A     Yes.

15     Q     Is there anything you wish to add or change

16   about that statement?

17     A     Let me see.  Give me a second.  No.

18     Q     Nothing you wish to add or change; is that

19   right?

20     A     No.

21     Q     Were you asked to meet with Tina Johnson?

22            MR. DeBEER:  Objection.  Asked and answered.

23            You can answer, if you want to answer again.

24            THE WITNESS:  I don't remember.

25   Tina Johnson?  I'm not sure who she is.

Janet Duwe

1   BY MS. ROBERTSON:

2       Q    Were you asked to meet with an Internal

3   Affairs investigator?

4       A    Just to give a, what was it called, an exit

5   interview?

6       Q    Did you meet with that Internal Affairs

7   investigator?

8       A    No.

9       Q    You refused to meet with her?

10      A    I don't think I was ever asked.

11      Q    You just told me -- you just called it an

12  exit interview.

13      A    Is that what that is, then?  I just thought

14  it was an exit interview.  They just wanted to get

15  my...

16      Q    Who reached out to you?

17      A    Someone from HR.

18      Q    Do you know who Sharon Gardner is?

19      A    Yes.

20      Q    Does Sharon Gardner work in HR?

21      A    Yes.

22      Q    Is Sharon Gardner who reached out to you?

23      A    Not for the exit interview.

24      Q    What did Sharon Gardner reach out to you

25  about?

Electronically signed by Jo Ann Sturm (201-381-537-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 100

1       A     About the statement.

2       Q     The statement in Exhibit 6?

3       A     Yes.

4       Q     And did Sharon Gardner ask you to meet in

5    person with someone?

6             MR. DeBEER:  Object to form.  Vague.

7             THE WITNESS:  I don't think so.

8    BY MS. ROBERTSON:

9       Q     What did Sharon Gardner ask you?

10      A     For the statement that's on there.

11            MR. DeBEER:  Same objection.

12   BY MS. ROBERTSON:

13      Q     She only asked you for a written statement?

14      A     Yes.

15      Q     As of June 10th of 2019, you were done with

16   the county?

17      A     As of when?

18      Q     June 10th of 2019?

19      A     No, I worked a couple more shifts at the end

20   of the month.

21      Q     You didn't want to work there anymore,

22   though.

23      A     No, I didn't want to stay there.  I knew if

24   I was going to leave, I wouldn't come back.  I

25   wouldn't try to fight for my job.

Janet Duwe

Page 101

1      Q    I believe that Mr. Kates asked you earlier a

2   question, and you said you didn't want to work -- you

3   didn't want to be there anymore.  Is that wrong?

4      A    I mean, I didn't -- if I lost my job, I

5   wasn't going to fight for it, but I wasn't going to

6   leave on my own.

7      Q    I believe you also told Mr. Kates you were

8   sour on the county; is that right?

9      A    Yes.

10     Q    You said it was a toxic environment; is that

11  right?

12     A    Yes.

13     Q    Did you ever report to anyone that the F

14  word was being used?

15     A    I mean, it's commonplace.  I've heard that

16  from the first day I started there.

17     Q    Did you ever file a grievance?

18     A    No.

19     Q    Did you ever report this to a supervisor?

20     A    No.  The supervisors use the F word.

21     Q    Did you report it to the Civil Service

22  Commission?

23     A    No.  I just took it as part of the

24  environment.

25     Q    But you can't recall who used the F word,

Janet  Duwe

Page 102

1    correct?

2         A    Everybody used the F word.

3         Q    Do you use the F word?

4         A    No, no.

5         Q    You never use the F word?

6         A    I don't.

7              MR. DeBEER:  It's argumentative.  She said

8    no.

9              THE WITNESS:  I go to church.  I don't have

10   any reason to use it.

11   BY MS. ROBERTSON:

12        Q    Your prior deposition in 1993, that was

13   because a patient died?

14        A    Yes.

15        Q    And you have a nursing license in California

16   and Missouri?

17        A    Yes.

18        Q    Is your nursing license in California still

19   active?

20        A    It's inactive.

21        Q    It's inactive?  And what is the basis for

22   that?

23        A    I moved here.

24        Q    Why did you move here?

25        A    We adopted a little boy.  We wanted him to

Electronically signed by Jo Ann Sturm (201-381-537-0609)                                                          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 103

1    know our parents.

2         Q    Are you from St. Louis?

3         A    Yes.  Well, not originally, but I lived here

4    most of my life.

5         Q    Which portions of your life have you lived

6    in St. Louis?

7         A    Moved here from St. Paul, Minnesota when I

8    was 15, and then moved to San Diego when I was 31 --

9    32, actually.

10        Q    Have you ever had any complaints about

11   either of your nursing licenses?

12        A    No.

13        Q    When you spoke with Officer English, did

14   that call ring directly to you or was that call

15   transferred to you?

16        A    It was directly to me.

17        Q    And how do you know that?

18        A    It came from the floor she's on.

19        Q    And you were working intake; is that right?

20        A    Correct.

21        Q    And your job duties in intake were what?

22        A    To oversee the intake patients and do the

23   assessments and help them with their medications.

24        Q    And also respond to sick calls on the

25   floors?

Janet Duwe

Page 104

1       A    Yes.

2       Q    And when Officer English called you -- I'm

3   going to strike that.

4            Was Pamela Shaw working that night?

5       A    Yes.

6       Q    And what role did Pamela Shaw have, to your

7   recollection?

8       A    She was in the other department, other side

9   of the intake department.

10      Q    Which department is that?

11      A    Where people come in for the first time.

12      Q    And do you know what her job duties were?

13      A    To do the initial assessment.

14      Q    And were her job duties also to see the

15  transportation inmates who were going to MDC?

16      A    I'm not sure if she had that duty or not.

17      Q    Whose duty was that?

18      A    I don't know.  I thought it was from the med

19  room because the med room nurses come in at 6:00 on

20  those days.

21           MR. PLEBAN:  Did you say med room?

22           THE WITNESS:  Med room, uh-huh.

23  BY MS. ROBERTSON:

24      Q    Did you ask Connie Heitman whose duty it was

25  to see the transportation inmates?

Electronically signed by Jo Ann Sturm (201-381-637-0608)                 73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

1     A    No.

2     Q    But you knew nursing -- or, I'm sorry,

3  excuse me.  You knew Officer English was calling about

4  an inmate who was about to go to prison.

5     A    Yes.

6     Q    And you didn't ask who should see that

7  inmate.

8     A    No, I said he could be seen downstairs in

9  transportation.

10    Q    Did you transfer the call to transportation?

11    A    They aren't there yet.

12    Q    How do you know that?

13    A    Because they don't come in till about 6:00.

14    Q    And who are "they"?

15    A    The med room nurses.

16    Q    Did you call the med room nurses at 6:00?

17    A    No.

18    Q    Why not?

19    A    I don't know.  I just know they go down

20  there.

21    Q    What was your employment status as of

22  June 10th and 11th, 2019?  And by that I mean were you

23  employed full-time, part-time or something else?

24    A    Per diem.

25    Q    What does that mean?

Electronically signed by Jo Ann Sturm (201-381-537-0609)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 106

1      A    P.R.N., as needed.

2      Q    And did you have another job at that time?

3      A    No.

4      Q    How many times a week would you work?

5      A    Two to three.

6      Q    Did anyone ever tell you St. Louis County

7  wanted to blame you for Mr. Stout's death?

8      A    No.

9      Q    Do you have any evidence that St. Louis

10 County wanted to blame you for Mr. Stout's death?

11          MR. DeBEER:  Asked and answered.

12          THE WITNESS:  No.

13 BY MS. ROBERTSON:

14     Q    What hours were your shift on June 10th?

15     A    10:45 to 7:00 -- I think -- no, 10:30 to

16 7:00, I think.  They changed them, because they used

17 to be 11:00 to 7:30, then they changed them to

18 10:30 to 7:00.

19          MS. ROBERTSON:  I don't have any other

20 questions.

21               REDIRECT EXAMINATION

22                 BY MR. KATES

23     Q    Just real quick.  Who paid you during this

24 time?

25     A    St. Louis County.

Janet Duwe

Page 107

1      Q    If you would have gone up to see Stout

2   sometime between 5:30 and whenever your shift ended,

3   would you have had to write any kind of paperwork?

4      A    Yes.

5      Q    What would you have had to document?

6      A    A sick call form.

7      Q    Did you take any other calls between

8   5:30 and 6:15?

9      A    I don't recall.

10      Q    Did you have any other sick calls that

11   night?

12      A    I don't think we did.

13          MR. KATES:  I don't have any other

14   questions.

15          MR. BANKS:  I have no questions.

16          MS. ROBERTSON:  Nothing further from me.

17          MR. DeBEER:  Janet, do you want to -- you

18   have the option to read your testimony on the written

19   transcript and make sure everything's accurate and

20   make any changes if something is inaccurate.  Or you

21   can waive signature and assume the court reporter took

22   everything down right today.

23          THE WITNESS:  I'll waive my signature.

24          MR. DeBEER:  That's a good choice.

25          (Discussion off the record.)

Janet Duwe

Page 108

1          MR. DeBEER:  This is Greg DeBeer, attorney

2   for multiple defendants in this case, one of which is

3   Defendant Robert Adams.

4          Robert Adams' deposition was scheduled and

5   properly noticed for tomorrow at 10:00 o'clock a.m.

6   Unfortunately I have not been able to get in touch

7   with Mr. Adams for the last few days.

8          Therefore, so we don't waste everyone's

9   time, we're going to go ahead and reschedule that

10  deposition.

11         MR. PLEBAN:  We obviously object to

12  rescheduling it and would want to take it as

13  scheduled, but I understand based on Greg's

14  announcement, we'll put it at the back end of this

15  record to create a record.  Therefore, no one is going

16  to show up at 10:00 a.m. just to make a record

17  everyone good with that?

18         MS. ROBERTSON:  No objection from the

19  County.

20         MR. BANKS:  Yes.

21         MR. DeBEER:  While we're on the record, I'll

22  put on the record that I understand that we all

23  understand that a mediation is scheduled in this case

24  for August 10th.

25         As a result, I will make whatever efforts

Janet Duwe

Page 109

1    are possible to secure Mr. Adams for a deposition with

2    plenty of time before the mediation.

3            Thanks.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Jo Ann Sturm (201-381-537-0608)          73eded20-b550-4185-8666-bd8d39493886

Janet Duwe

Page 110

1                    REPORTER CERTIFICATE

2

3          I, JO ANN STURM, CSR, CCR, do hereby certify
    that there came before me

4                         JANET DUWE

5   who was by me first duly sworn to testify to the truth
    and nothing but the truth of all knowledge touching
6   and concerning the matters in controversy in this
    cause; that the witness was thereupon carefully
7   examined under oath and said examination was reduced
    to writing by me; and that this deposition is a true
8   and correct record of the testimony given by the
    witness.

9

          I further certify that I am neither attorney
10  nor counsel for nor related nor employed by any of the
    parties to the action in which this deposition is
11  taken; further, that I am not a relative or employee
    of any attorney or counsel employed by the parties
12  hereto or financially interested in this action.

13

14          Dated July 22, 2021.

15

16

17   _____
          JO ANN STURM, CSR, CCR
18        ILLINOIS CSR NUMBER: 084-002267
          MISSOURI CCR NUMBER: 716

19

20

21

22

23

24

25

Janet Duwe

## A

**a.m** 29:8 67:20 68:7 108:5,16
**abdominal** 55:9 56:5 57:7
**Aberdeen** 25:14 25:18,22
**ability** 73:22
**able** 51:16 52:19 78:9 108:6
**access** 36:1 45:25 47:4 69:4
**accomplished** 31:16
**Accreditation** 58:8
**accurate** 98:12 107:19
**ACLS** 27:2,3
**act** 51:24
**action** 15:4 54:17 110:10 110:12
**actions** 15:9 17:16 20:3
**active** 102:19
**actively** 25:10
**actual** 9:1 12:4
**Adams** 5:7 14:13,14 20:18 20:24,24 21:2 21:17,22 22:5 22:12,12,19,24 23:2,5,8,13,18 23:24 92:22 108:3,7 109:1
**Adams'** 108:4
**add** 98:15,18
**additional** 74:10
**address** 6:20 34:8
**administer** 62:8 68:7
**administered**

6:12
**adopted** 102:25 106:11
**Advanced** 27:4
**advocate** 33:2 51:24 52:11
**advocates** 32:18
**advocating** 33:4
**Affairs** 9:17 54:9 64:3 72:12 85:11,13 85:16 86:2,5 99:3,6
**age** 6:10
**agency** 60:4,6
**ago** 6:25 40:22 94:20
**agree** 44:23 50:22 69:17
**AGREED** 6:1
**agreement** 6:7
**ahead** 54:13,14 70:12 88:24 108:9
**ailment** 52:4
**al** 1:9 4:8
**alcohol** 61:19 62:1,5
**allegations** 53:20,21 54:17
**allow** 51:7
**allowed** 94:12
**Amended** 10:2
**ANGELA** 1:5 4:4 5:2
**Ann** 1:18 4:15 6:4 110:2,17
**announcement** 108:14
**answer** 7:24 8:8 18:2 20:11 22:15 32:4,5,5 55:4 57:12 74:24 75:12 89:25 98:23,23
**answered** 70:7

96:18 98:22 106:11
**answers** 7:16 50:20
**anybody** 10:22 10:25 11:6,7 65:17 68:10,25 76:5 90:11,18 92:20 94:12,16 97:3
**anymore** 72:8 89:7 100:21 101:3
**anytime** 97:16
**anyway** 87:7
**apart** 66:2
**appeal** 87:1
**applied** 36:23 37:25 38:13 39:8,9,18 41:6 41:15 42:14,24
**applies** 31:25 40:25
**apply** 32:1,14 41:25 83:13
**appointment** 50:8
**appraisal** 48:2
**appreciate** 50:20
**appropriate** 39:3 50:24 52:19 55:13
**appropriately** 34:23 52:12
**approximate** 11:16
**approximately** 13:25
**April** 47:17
**area** 27:11 29:21 29:21 65:21 66:15
**areas** 27:7 63:11
**argumentative**

96:17 102:7
**arguments** 76:5
**arrest** 29:25
**arrival** 48:25
**arriving** 17:24 42:10
**aside** 39:21
**asked** 7:25 20:19 33:17 40:17 70:8,13 70:22 71:18,19 75:4 76:15,20 77:4 81:7 94:18,19,21 95:19 96:18 98:8,21,22 99:2,10 100:13 101:1 106:11
**asking** 8:24 16:2 18:15 19:8 20:6 54:19 77:3 93:25
**asserted** 38:4
**asserting** 14:25
**assess** 51:7,11 51:17,20 52:14 61:6,10 77:13
**assessed** 54:3,4 54:11
**assessing** 62:18
**assessment** 48:6 48:7 55:10,12 56:7,22 104:13
**assessments** 48:16,19 103:23
**assigned** 28:24
**assistant** 14:10 14:11 23:23 24:1,12
**assisted** 25:20
**assume** 7:24 107:21
**assure** 49:20
**Ativan** 61:20

62:5,8
**attachment** 83:3
**attack** 95:2
**attend** 60:9
**attending** 13:22
**attention** 17:11 43:5,9,15 59:1 59:14
**attorney** 10:23 11:1 108:1 110:9,11
**Audit** 58:10
**August** 108:24
**author** 59:20
**authorities** 48:9 83:7
**available** 33:15 78:14
**Avenue** 1:21 5:6 5:11
**avoid** 19:11 58:20 59:11
**aware** 17:5 53:1 53:3 74:1 86:25
**awareness** 31:20

## B

**B** 2:9 34:10 42:2
**B10** 44:6
**Bachelor's** 26:17 27:10
**back** 7:12 35:7 43:15 44:9 50:14,19 55:25 56:13 57:6,14 58:13 64:11,20 68:21 69:21 70:9 82:14 91:5 100:24 108:14
**background** 24:21,22
**Backing** 46:4
**backtrack** 16:20

Janet Duwe

**bad** 17:18 19:9
56:6
**Banks** 5:5,5
20:10 74:19
97:20 107:15
108:20
**based** 33:25
38:21 40:8
54:16 55:12
80:13 108:13
**basically** 21:18
81:7
**basis** 18:25
33:22 37:12
38:24 41:12
83:12 102:21
**beginning** 35:23
76:14
**behalf** 1:15 4:13
**behaviors** 20:4
34:11
**belief** 43:8,25
48:12 51:14
67:13 89:23
**believe** 9:12
12:18 16:24
19:6 20:1
24:16 30:19
32:9,12,13
38:21 39:7,18
41:3,15 45:20
46:15,25 47:14
47:20 49:7,16
50:1 54:4
60:16 74:12,17
74:22 82:10
85:9 90:5,19
101:1,7
**believed** 38:13
39:9 41:24
42:13,24 43:14
44:9 75:16
**Bend** 4:15 5:4
**Benjamin** 5:3
**best** 51:3

**better** 56:4
**big** 4:15 5:4
85:25
**biggest** 87:24
**blame** 89:3,11
89:12,18 106:7
106:10
**board** 83:18
**bottom** 28:6
30:20 37:8
64:25
**Boulevard** 4:15
5:4
**boxes** 28:10
**boy** 102:25
**break** 8:6,7,9
13:20 50:16
91:2
**Brian** 92:8,9
**bring** 30:1
**brought** 29:24
76:23 77:17
**BSN** 26:18 27:8
27:9
**buses** 95:22

**C**

**C** 5:1
**C-O-G-S-H-E...**
92:19
**California**
102:15,18
**call** 12:10 15:15
17:16 19:24
20:7,9 21:20
29:18 37:13
39:3 40:3,4
41:4,6 42:2,4,8
42:9 43:3
44:11,16,24
45:6 51:20
61:4 69:12,17
70:6,7 71:16
74:2 77:2,7,9
78:7,17,19

79:3 80:13
81:7,9 85:2
90:13 91:13,17
92:22 93:1,5,7
93:18 95:1,4
95:12,20 96:3
96:8 97:2
103:14,14
105:10,16
107:6
**called** 15:23,24
43:21 44:1,11
88:4,5 93:22
99:4,11 104:2
**calling** 97:9,16
93:19,19,25
105:3
**calls** 32:2 34:25
37:12,17 38:23
44:1 45:3 57:9
57:10 61:16
74:19 80:3,4
93:4,10,13,16
103:24 107:7
107:10
**cardiac** 27:4
**care** 2:14 25:20
30:17 31:5
33:5,21 35:10
35:18 50:24
52:8,19 53:4
58:22 59:12
**carefully** 110:6
**case** 1:7 4:7 7:5
7:11 53:13,16
53:20,23 54:21
55:18 108:2,23
**cases** 58:15,17
58:19
**Catherine** 5:10
38:3
**cause** 110:6
**CCR** 1:18,19
110:2,17,18
**cell** 56:10,13,15

56:19,20
**Center** 27:14
66:22
**Central** 5:11
**certainly** 52:2
**CERTIFICA...**
110:1
**certificates**
26:25
**Certified** 4:16
4:16 6:4
**certify** 110:2,9
**chance** 58:1
67:3
**change** 56:9
60:23 62:7,16
98:15,18
**changed** 48:17
48:18 62:3
65:11 106:16
106:17
**changes** 59:4,16
59:22,25 60:5
60:25 61:10,15
62:11,17
107:20
**charge** 28:20,21
**check** 73:9
**Chesterfield**
25:4
**choice** 45:2
107:24
**choose** 45:3
**Chouteau** 5:6
**church** 102:9
**circumstances**
74:14
**Civil** 101:21
**clean** 7:21
**clear** 15:2,5
**clients** 25:11
**clinic** 2:22 43:22
50:7,7 63:5,7
63:11,13,13,14
63:20

**CM** 58:20,23
**CM-30** 2:17
45:23
**CM-33** 2:19
47:15
**CM-40** 2:20
49:8
**CN** 28:19
**code** 95:1,4,12
**Cogshell** 92:17
**collaborative**
31:17 34:5
**collected** 48:3
**columns** 28:7
**come** 17:4 25:11
29:18,19 48:22
72:1 76:21
77:19 100:24
104:11,19
105:13
**comes** 62:4
**coming** 66:14
**comment** 23:14
**comments** 23:5
24:2,4,5,7,9,11
76:2
**Commission**
58:8 101:22
**commonplace**
101:15
**communication**
59:2,5,14,16
**communicatio...**
67:15
**community**
25:19 31:19
**complain** 52:3
56:5
**complaining**
21:20 54:12
55:7 62:12
76:19,25
**complaints**
21:25 51:7
54:24 56:1

Janet Duwe

73:6 90:24
96:7 103:10
**complete** 44:4
44:10
**completed** 83:2
**Compliance**
58:9
**concerning**
110:6
**concierge** 25:14
25:16
**condition** 83:5
**conditions** 80:2
80:10 95:8
**conducted** 42:4
**conference** 17:3
**confined** 33:9
**confirm** 71:4
**Connie** 11:11,12
11:23 12:1,8,8
14:12 16:13
18:6,9,16,21
19:5,22,23
20:14,19 64:4
65:14 66:15
70:13 71:1,6,8
71:9,15,19,22
74:17,22,24
75:15 76:2
83:23 92:25
96:20 104:24
**consequences**
57:8,19
**consider** 56:22
**considered**
29:22 95:14
**contact** 43:21
**contained** 10:9
**content** 19:18
**controversy**
110:6
**conversation**
12:4
**conversations**
10:22 90:18

96:20
**cooperation**
35:25
**copy** 8:20 86:16
**corporate** 37:2
40:11 46:19
**correct** 7:20
10:10 13:22,25
14:3 16:23
17:6 19:5
20:25 21:23
22:21,23 26:9
28:1 29:5,9
30:12,24 32:15
32:19 33:11
34:7,9,24 36:2
36:12,20,21,23
37:18 38:14,24
39:10 41:7
42:14,25 43:9
43:16 44:1,11
44:17,25 45:5
46:2,9,13
47:18,24 48:23
48:25 49:8,14
49:24 50:9,25
51:4,8,12,17
51:21,25 52:21
53:7,14,15
55:10,11,14,15
62:10 63:25
65:25 68:24
69:3 70:24
74:4,6,9 77:12
77:15,23 78:22
79:1,10,13,21
79:24 80:8,12
80:16 81:13,19
81:22 86:9,10
93:8 96:23
102:1 103:20
110:8
**correction** 32:23
56:14 72:7
92:15

**correctional**
33:1,17
**corrections** 26:6
26:12 30:23
31:1,11,12
33:20 35:20
36:5,9,9,22
37:3,10,17
38:10 39:1
40:5,14 41:7
41:19,20 42:9
44:4 47:5 48:4
49:21 50:22
51:2,11,15
58:9,24 59:10
60:11,13 73:17
73:18 79:9
83:1,14 84:7
**correctly** 39:5
39:16 41:13,22
47:8 54:5 83:9
**counsel** 3:3 6:2,2
6:7 110:10,11
**Counselor's**
5:11
**county** 1:9 4:8
4:16 5:9,11
10:7 13:12,15
26:2 31:14,16
31:18 35:24
36:8 37:2
40:12 41:10,19
46:20,22 47:4
48:3 49:21
52:23 87:3,4,5
89:10,11 90:22
100:16 101:8
106:6,10,25
108:19
**couple** 28:10
46:4 68:22,23
91:5 92:14
93:3 100:19
**course** 22:25
23:3

**courses** 27:13
**court** 1:1 4:1,16
6:4,12 7:15
15:4 31:18
107:21
**CPR** 27:2
**create** 108:15
**criteria** 50:5
**criticisms** 20:3
20:20 21:10
**critiques** 20:3
20:20 21:10
**Cross-Examin...**
2:5 97:22
**CSR** 1:18,18
110:2,17,18
**current** 54:17
**currently** 11:5
24:23,24 25:1
25:24
**custody** 12:17
**customer** 32:16

**D**

**D** 2:1,9 5:7 43:2
43:12
**daily** 37:12
38:23 41:12
**Daniel** 14:2
**data** 48:2
**date** 11:16,19
46:8 47:17
49:13
**Dated** 110:14
**dates** 46:5,5
57:25 68:19
**Davis** 14:9 23:23
**day** 4:14 18:11
18:22 25:16
27:15 31:8
33:16 55:20
56:25 63:10,21
65:15 69:10
75:9 101:16
**days** 28:4 42:4

48:4,7 104:20
108:7
**death** 12:23 13:1
14:2 53:1,10
54:10 57:20
61:13 80:11
88:10,13 89:20
106:7,10
**deaths** 52:23
53:2,7 57:25
89:20,21
**DeBeer** 5:7 8:23
9:19 14:13
15:13 17:17
18:1,14 19:2
20:11 22:14
23:10 24:13
31:4,8 32:2,7
33:12 34:25
35:6,9 37:5,22
38:2,8,11,19
40:8,16,24
42:17,20 43:11
45:17,21 54:13
54:15,25 57:9
57:21 58:2
62:14 64:6,8
64:22 69:24
73:14 74:23
75:10,18,22
79:17 80:3,17
81:23 82:16
83:11,17,20
86:17 88:14,18
89:24 90:7
96:17 98:4,22
100:6,11 102:7
106:11 107:17
107:24 108:1,1
108:21
**December** 7:1
**decision** 89:4
**Defendant** 5:5
108:3
**defendants** 1:10

4:9 5:7,9 6:3
108:2
**define** 53:21
**definitely** 95:12
**degree** 26:16,23
**deliver** 68:6
**demonstrating**
62:9
**department**
26:4 29:2
31:13,14 35:24
35:25 36:8,10
41:10,19 47:4
48:3 49:21
79:8 104:8,9
104:10
**depiction** 98:12
**DEPONENT**
2:3
**deposed** 6:23
7:11 53:9
**deposes** 6:13
**deposition** 1:12
4:13 6:3 7:4,7
8:12 10:18,23
98:10 102:12
108:4,10 109:1
110:7,10
**depositions**
40:22
**describe** 87:8,11
88:2
**designated** 48:8
**designee** 83:5
**desk** 2:22 25:16
50:7 63:5,7
**detail** 12:7
**details** 72:20
73:3
**determine** 51:21
77:13
**determined** 48:8
61:5
**develop** 50:25
**developing**

78:25
**diagnoses** 73:19
**diagnosis** 49:22
77:14
**diagnostic** 45:25
47:6
**die** 59:8 97:17
**died** 12:11 18:12
18:23 46:13
102:13
**Diego** 103:8
**diem** 105:24
**dies** 12:16
**difference** 95:21
**different** 29:13
50:12,13 59:10
59:11
**direct** 2:4 6:15
72:11
**directed** 61:6
**direction** 31:13
**directly** 103:14
103:16
**disagree** 69:18
89:4
**discipline** 88:9
90:25
**disciplined**
90:22
**disclose** 54:20
**disclosure** 13:14
**discuss** 15:18
**discussed** 16:12
**discussing** 44:17
**discussion** 13:18
44:13 71:21
107:25
**distinct** 58:20
**DISTRICT** 1:1
1:1 4:1,1
**DIVISION** 1:2
4:2
**DJC** 83:13
**DJS** 38:9 40:13
**doctor** 14:8

**document** 2:11
2:23 8:17 9:23
27:21,23 35:15
36:16,20 37:7
40:1 44:15
45:15 46:9
49:6,19 54:6
58:8,11 59:9
59:21,23 67:5
107:5
**documentation**
84:14
**documented**
48:6
**documents** 8:15
9:12,15
**doing** 68:11
**doors** 66:16
**Doucette** 14:8
23:22 86:21,22
**downstairs**
17:21 95:15
105:8
**DOYLE** 5:5
**Dr** 14:9
**duly** 110:5
**duties** 63:5
103:21 104:12
104:14
**duty** 2:22
104:16,17,24
**Duwe** 1:12 2:3
4:13 5:7 6:3,9
6:19 13:20
45:13 47:13
49:6 50:19
64:13 76:16,20
97:24 110:4

---
**E**
---
**E** 2:1,1,9,9 5:1,1
**earlier** 24:14
32:8 52:22
101:1
**EASTERN** 1:1

1:2 4:1,2
**education** 51:6
61:6,10
**effect** 46:16 47:1
**effort** 34:22
**efforts** 61:5,10
108:25
**either** 77:16
103:11
**elaborate** 97:10
**eliminated**
86:13
**email** 85:19,22
**emails** 90:15
**emergency** 39:4
94:24 95:2
96:7
**Emily** 14:8
86:21,22
**employed** 11:5
24:23,24 25:1
25:12 60:20
105:23 110:10
110:11
**employee**
110:11
**employment**
35:20 105:21
**encouraging**
31:17
**ended** 29:8
107:2
**English** 12:10
15:16,19,22
16:2,8,11,18
17:8,14,21
19:25 20:9
69:13,16 70:6
71:7 72:3,18
76:15,19 79:4
80:20 81:11,20
92:4 93:6,18
103:13 104:2
105:3
**English's** 72:5

**ensure** 49:22
50:23 59:5
**entered** 56:18
**entire** 42:18,19
42:22,24 60:20
**environment**
34:5 87:6,9,12
91:7 101:10,24
**Eric** 5:5
**essentially** 48:25
65:3 66:21
**estimate** 14:22
66:3
**et** 1:9 4:8
**evaluate** 47:23
**evaluated** 61:5
**evaluation** 47:6
**evening** 67:7,19
**everybody** 14:8
60:13 102:2
**everyone's**
108:8
**everything's**
107:19
**evidence** 48:6
79:18 89:22
106:9
**exactly** 71:20
**examination** 2:4
2:6 6:15 44:5
44:11 106:21
110:7
**examined** 4:13
6:10 110:7
**exclusion** 50:5
**excuse** 10:16
15:23 36:5
105:3
**exhibit** 2:11,12
2:14,15,17,18
2:20,21,23 3:1
3:3 9:4,7,11,22
10:5,5,9,14,17
10:17 27:17,20
30:8,13,16,16

Janet Duwe

31:5 39:22,25
44:15,21 45:9
45:11,13 47:10
47:13 49:2,5
54:5 57:24
58:6 62:21
64:20 66:24
67:2 72:11
82:14,20 85:8
86:14,16 98:1
100:2
**exhibits** 3:2
44:20 50:4
**exit** 99:4,12,14
99:23
**expectation**
37:16 75:5
**expectations**
32:17
**expected** 34:12
**experience** 34:1
61:9 69:22
70:25 73:18
74:14 84:11
**experiences** 34:2
**experiencing**
74:7 80:21
**expert** 57:10
80:4

**F**

**F** 2:1,9 87:13
88:4,5,6 91:14
91:17,21 92:13
92:23 93:1
101:13,20,25
102:2,3,5
**facilitate** 31:19
**facility** 29:19
60:11
**facts** 19:19
21:15 74:1
**factual** 19:23
20:6,15 21:5
21:16 24:4,5

24:11
**failure** 85:15
**fair** 9:2 50:14
89:6 98:10,12
**familiar** 9:9
66:17 92:10
**far** 15:21 16:8
18:9,9 19:22
26:16 28:7
65:20 66:1,2
67:14 79:6
84:22 93:18
**federal** 13:15
67:20 83:3
**feel** 90:20
**feet** 66:8
**felt** 55:12
**fifth** 95:24,25
96:2,12
**fight** 89:5,6
100:25 101:5
**figure** 89:12
**file** 101:17
**filed** 11:1,3,4,6,8
90:24 96:23
97:4,7,15
**final** 93:3
**finally** 68:21
**financially**
110:12
**find** 78:14 89:11
**fine** 15:7 31:7
38:6 59:22
64:7 70:13
**firm** 5:3,5,8
**first** 8:17 10:2
29:19 32:17
48:21 58:7
59:1,13 68:15
70:16 73:15
101:16 104:11
110:5
**five** 34:10,14
65:10 67:18
68:13

**fix** 89:14
**floor** 48:20
65:24 66:13
76:21 95:24,25
96:2,13 103:18
**floors** 95:18
103:25
**follow** 17:23
**follow-up** 91:5
**following** 12:25
14:2 17:16
34:11 36:11
41:21 58:16
69:10
**forget** 29:18
**form** 15:13 18:1
33:12 37:1
38:8,19 40:15
42:8 54:25
57:9 59:19
75:10,22 80:3
80:17 88:14
89:24 90:7
100:6 107:6
**format** 65:12
**foundation**
15:13 19:3
37:1 38:19
40:9,15 46:20
57:11 59:20
62:14 69:24
**foundational**
15:1 19:1,17
**four** 30:20 39:14
43:18 44:3
76:8 82:18,24
**frame** 11:2
**frequency** 80:23
**fresh** 7:8
**front** 25:16
35:13 76:9
98:2
**full** 56:22
**full-time** 105:23
**further** 15:4

97:19 107:16
110:9,11
**future** 58:21
59:11

**G**

**G** 37:10,25
**garage** 66:4
**Gardner** 85:6
85:19,22 86:1
98:13 99:18,20
99:22,24 100:4
100:9
**general** 27:12
60:17
**generally** 58:21
59:12
**gentleman** 61:18
**gentlemen** 61:25
**getting** 13:12
66:21 70:7
71:25 72:8,9
88:7
**give** 9:7 12:3
14:22 15:9
18:6 20:2
21:13 24:7,9
38:4 42:8
45:17 61:19,20
67:10,24 68:10
68:25 83:2
91:23 97:12
98:17 99:4
**given** 110:8
**giving** 15:2 17:7
**glancing** 9:11
**Glenda** 91:17
**go** 7:8,14 12:7
12:22 13:3,7
15:1 16:3,6,14
19:20 20:17,23
21:20 22:17,20
22:22 24:21
27:11 28:6
42:16 44:24

45:3,4 54:13
54:14 55:13
58:7,13 64:20
66:14 68:5
70:11,12,14
71:12 72:25
76:8 77:10
81:8 82:14,18
88:11,24 89:15
94:6,25 95:5,9
95:12,16 96:4
96:8 102:9
105:4,19 108:9
**God** 82:12
**goes** 32:23 65:20
71:10 84:18,22
**going** 7:6,8,24
11:14 18:24
19:2 20:17,23
30:16 32:16
35:4,7 36:25
38:2 39:25
40:8,10 43:11
46:20 54:5,13
54:15,25 55:16
57:24 58:5
59:19 61:1,2
61:20 62:2,24
66:6 69:8,21
72:11 73:14
74:3 75:10
77:16,20 80:17
81:12,15 82:3
82:14,18 83:11
88:14 97:8,14
100:24 101:5,5
104:3,15 108:9
108:15
**good** 8:2 66:8
107:24 108:17
**gosh** 12:9
**gotten** 21:20
24:20
**greater** 61:5
**Greg** 8:13 108:1

Janet Duwe

**Greg's** 108:13
**Gregory** 5:7
**grievance** 101:17
**ground** 7:8,14
**group** 15:9 16:9 16:16 17:3,9 17:13,15,22 19:13
**guaranteed** 33:3
**guess** 14:21 75:7 87:2
**guys** 83:15

**H**

**H** 2:9 37:20 39:1
**hand** 9:22 24:16 24:17 27:20 30:16 35:4 39:25 49:5 54:5 57:24 58:5 62:24
**handed** 45:13
**handle** 93:10,12
**handled** 90:13
**handwriting** 63:2
**Hanley** 5:8
**happen** 12:16 52:2
**happened** 7:7 12:2,5
**happens** 13:9
**happy** 8:4
**head** 7:17
**health** 26:4 31:14,20 35:25 36:10 47:5,24 48:2,4,6,8 49:21 63:13,14 63:20
**healthcare** 33:2 33:3,9,15 34:23 43:21
**hear** 17:11

91:12 92:6,22 92:25
**heard** 18:11,20 19:24 88:6 101:15
**hearing** 87:13 91:16
**Hearsay** 20:10 22:14 24:13
**heart** 87:2 95:2
**Heights** 25:14 25:18,22
**Heitman** 11:11 14:12 18:6,16 18:21 19:22 20:8 23:24 64:12 65:14 104:24
**Heitman's** 18:9
**HEITMANN** 5:7
**help** 50:20 103:23
**hereto** 110:12
**high** 31:15
**HIPAA** 54:20
**hold** 18:14,14 23:10 71:7
**holding** 29:21 66:15
**honest** 92:3
**hospital** 25:2 54:3,12 55:13 55:16,23 56:3 60:9,10,23 84:12
**hour** 24:19
**hours** 4:14 33:16 97:17 106:14
**housing** 37:12 42:3,3,7,10 48:5 95:17
**HR** 99:17,20

**I**

**IA** 84:22
**idea** 63:2 90:19
**identification** 9:5 27:18 30:14 39:23 45:10 47:11 49:3 62:22 66:25 86:15
**identified** 49:10
**Illinois** 1:18 4:16 110:18
**illness** 50:25 52:4,20
**illnesses** 39:15
**immediately** 48:25
**implemented** 49:22 58:20 59:10
**improve** 58:21 59:12
**improved** 59:3,6 59:16
**in-house** 39:13
**inaccurate** 107:20
**inactive** 102:20 102:21
**incarcerated** 31:15,20 33:2 33:3 48:16
**incident** 90:21
**include** 34:12 39:13 80:11
**increased** 31:19
**independent** 25:20
**individuals** 16:21,22 59:8
**INF** 28:22
**infirmary** 2:14 22:17,20,22 28:23 29:22 30:5,8,11,17

31:5,6,25 35:10 43:20 59:3,6,15,18 61:3,16 63:15 63:20 84:5,9 94:20
**inform** 43:4,14
**information** 15:24 16:2 24:22 52:18 70:10,17 71:15 73:23 74:11 75:9,17 76:16 79:6 81:8,10 81:14 93:20
**informational** 93:4,7,10,13 93:16
**informed** 76:13 76:17
**initial** 104:13
**injury** 24:17
**inmate** 12:16 20:4 36:1 43:3 43:14 47:24 48:5,16 51:24 70:22,22 72:21 74:3,14 76:17 78:10,23 79:7 79:14,20 83:5 84:15 93:23 94:1,6,23 96:3 105:4,7
**inmate's** 33:1
**inmates** 30:1 32:21,24 33:8 34:8,23 38:24 39:2,2 41:11 42:8 43:8 47:3 48:22 49:23 50:24 58:1 60:10 62:8,12 66:20 69:7,23 70:25 73:23 80:15 87:15,16

87:18,21 91:9 91:9,14,17,22 92:13,23 93:1 94:3 104:15,25
**inmates'** 39:13 69:5
**inquire** 86:22
**instances** 76:20
**instruct** 32:4
**instructions** 81:20
**insulting** 87:25
**INT** 28:11,17
**intake** 28:14,15 28:16,18 29:2 29:12,17,23,24 30:1,10 32:1 32:14 43:20 44:1 48:18,21 61:3,16 63:17 63:20 65:1,9 65:18 67:18 68:4,14,15,18 68:21 69:4 71:13,25 84:14 103:19,21,22 104:9
**interact** 55:24
**interaction** 20:8 20:21 55:21
**interested** 110:12
**interject** 14:24
**Internal** 9:17 54:9 64:2 72:12 85:11,12 85:16 86:2,5 99:2,6
**interpret** 77:1
**interpreted** 77:7 93:6
**interrupting** 40:13
**interview** 99:5 99:12,14,23

Janet Duwe

**investigation**
54:9 64:3
84:22
**investigator**
99:3,7
**investigators**
84:23
**involvement**
88:10
**issue** 96:6
**issues** 31:20
54:20 58:21
59:11 78:24

**J**

**J.C** 5:3
**jail** 29:14,25
30:2 33:9
48:22 56:11,18
63:6,22 91:8
97:16
**Jan** 32:4
**Janet** 1:12 2:3
4:13 6:3,9,19
107:17 110:4
**January** 25:6
**Jo** 1:18 4:15 6:4
110:2,17
**job** 94:3 100:25
101:4 103:21
104:12,14
106:2
**John** 12:23
**Johnson** 91:17
98:21,25
**join** 37:5 40:18
74:23
**July** 1:16 4:14
26:8,14 86:9,9
86:23 110:14
**June** 11:20
13:25 18:23
27:25 28:7,7
28:25,25 29:1
29:3,4,8,8 31:1

38:17 40:7
41:3,24 42:14
43:16 44:9,23
46:16 47:1,21
48:13 49:17
53:5,6 57:6
61:14 63:25
64:5,16,18
67:8,8 68:17
100:15,18
105:22 106:14
**justice** 27:14
31:18 35:24
36:8 37:3
41:10,19 66:22

**K**

**K** 6:19 14:9
39:12
**Kate** 38:3
**Kates** 2:4,6 5:3
6:16 9:2,6,20
9:21 10:2,4
13:19 14:17
15:7,8,14
17:18,19 18:5
18:17,18 19:4
19:20,21 20:13
22:18 23:12
24:18 27:19
30:15 31:7,10
32:10 33:13
35:3,7,10,12
36:18,19 37:6
37:24 38:6,12
38:20 39:24
40:20 41:1,2
42:19,21 43:13
44:14,19,22
45:11,12,19,22
46:24 47:12
49:4 50:16,18
54:22 55:5
57:14,18,23
58:4 59:24

62:6,15,23
64:7,9,10,24
67:1 70:1
73:16 74:21
75:2,14,20
76:1 79:19
80:5,9,19 82:1
82:17,20,22
83:21 86:19
88:15,20,23
90:3,10 91:4
96:19 97:19
101:1,7 106:22
107:13
**Kathy** 14:9,9
23:23
**keep** 40:13
**Kerry** 78:1
82:10
**Kerry's** 82:11
**kind** 20:17,20
30:7 51:7 52:3
62:17 64:15
67:10,15,24
68:14 69:1,1
71:21 74:7
77:14 78:8
84:13 85:3
94:15 107:3
**kinds** 7:18
**Kirkwood** 6:22
**knew** 53:6 79:7
79:14,20,25
80:13 100:23
105:2,3
**know** 8:1,3,18
13:3,6 14:8,19
15:4 16:3,6,12
18:21 19:6,7
19:11,12 22:16
23:7,17,18,20
24:14 32:6
40:2 48:17
59:16,25 60:5
60:24 61:8

62:13,20 69:22
70:2,10 71:17
71:25 72:24
74:16,18,24
75:1,3,4,7,23
76:10 78:15
82:21 84:2,6
84:13 85:1
87:8 91:15,19
91:20,23 92:2
92:4,8,15
93:11 99:18
103:1,17
104:12,18
105:12,19,19

**knowledge**
53:17 70:2
73:17,19 75:6
85:12 110:5
**known** 74:22
**knows** 46:21
59:21 74:25

**L**

**labeled** 48:2
**Lack** 57:10
**Lane** 6:21,22
**language** 43:12
87:23,24,25
88:2 91:8
**law** 4:14 5:3,5,5
5:8 13:14 32:6
33:4
**lawful** 6:10
**lawsuit** 8:20
10:25 11:6,8
53:10,22 96:22
96:22 97:1,4,7
97:9,15
**lay** 19:1
**lead** 80:1 90:25
**learn** 34:1 52:10
**leave** 73:10
76:18,25 87:7
100:24 101:6

**leaves** 76:22
97:16
**leeway** 15:3
**left** 7:15 16:15
28:7 56:24
57:1,3 71:13
71:14
**let's** 10:11 40:2
69:12 91:2
**letter** 3:1 82:23
83:1 86:12,16
**letter's** 86:21
**letting** 60:24
**license** 102:15
102:18
**licenses** 103:11
**Lieutenant**
91:13 92:9
**life** 27:4 103:4,5
**limited** 34:13
39:14
**line** 40:3 43:19
54:16 59:1
76:12
**lines** 43:18 46:4
**list** 69:7 73:9
76:18,25
**listed** 50:4 59:13
64:25
**little** 75:24
102:25
**lived** 103:3,5
**living** 25:20,20
**LLC** 4:15 5:3,5
**located** 63:22
**location** 28:24
30:5 63:6,19
**locations** 29:13
29:16 30:10
**long** 6:25 7:12
25:5 26:11
70:14 71:12
78:16,18
**look** 9:22 13:11
67:2,3

Janet Duwe

looked 8:16 9:9
  9:13,16,23
  10:17 69:18
looking 87:7
  89:2
looks 9:8
lost 101:4
lot 65:11 66:5,6
  73:1,1
loud 17:10
Louis 1:9,22 4:8
  4:15,16 5:4,6,8
  5:9,10,11
  13:12,15 26:2
  31:13,16,18
  35:24 36:8
  37:2 40:12
  41:9,18 46:20
  47:4 48:3
  49:21 52:23
  103:2,6 106:6
  106:9,25
Luke's 25:2,3,4

**M**

M 2:1 5:10
maintain 32:25
making 56:1,2
MALCICH 1:5
  4:4 5:2
male 14:11
  23:23
management
  61:6,11
mandatory
  60:15
manual 2:14
  30:17 31:6
  35:11
March 59:18
  60:1,23 61:13
mark 9:3,25
  44:20
marked 3:3 8:22
  9:4,7 27:17

30:13 35:4,8
39:22 44:15,21
45:9,14 47:10
49:2 54:6 58:5
62:21 66:24
86:14
material 57:16
  80:7 88:22
matters 13:16
  110:6
McAuliffe 5:8
MCD 95:16
MDC 66:17,19
  67:11,20 68:1
  69:2,8,23
  73:10 76:18,25
  81:12 84:16
  104:15
mean 23:18
  27:12 28:13,22
  29:6 53:3
  58:23 66:12,19
  71:13 81:6,7
  85:1 88:3,5,11
  91:23 92:14
  97:18 101:4,15
  105:22,25
meaning 76:21
means 72:7
med 104:18,19
  104:21,22
  105:15,16
mediation
  108:23 109:2
medical 33:21
  35:18 36:1,5
  36:10 38:22
  39:3,13 41:11
  43:5,9,15 47:7
  49:20 50:6
  51:12,17 52:14
  54:19 57:8,19
  58:22 59:2,5
  59:12,14,17
  61:7,11 68:6

69:5 73:12
80:1,10 82:9
83:2,3,5,24
84:2,6 94:24
96:6
medication
  61:22 62:2
medications
  67:21 68:7
  103:23
medicine 26:6
  26:12 27:1
  30:24 31:1,12
  31:12 33:21
  35:21 36:9,22
  37:4,10,17
  38:10 39:1
  40:5,14 41:7
  41:20 42:10
  44:4 47:5 48:4
  49:21 50:22
  51:2 58:24
  59:10 60:13
  83:1,14 84:8
  94:17
medicines 92:15
meet 84:23
  85:10,16 86:4
  98:21 99:2,6,9
  100:4
meeting 11:15
  11:15,17,24
  12:13,14,22,25
  13:4,7,21,24
  14:5 16:1,17
  18:7,13,16,20
  18:22 19:13,14
  20:15,25 21:3
  21:17,23 22:5
  22:13,19 23:14
  23:22 60:8,10
  85:3,13 86:2
meetings 12:19
  13:10,13 60:21
  60:22

MELLENTHIN
  5:10
members 92:12
memory 25:20
mention 21:25
  69:16 85:15
  86:1 97:3
mentioned
  22:12 51:19
  52:22 53:9
  54:11 62:16
  64:2 91:7,8
  93:5
mentions 53:23
  59:9 60:8 64:3
met 34:23 51:25
Michelle 91:13
mid 11:19
mid-June 11:19
middle 33:14
midway 34:10
  58:14 82:23
mind 45:18
Minnesota
  103:7
minor 78:20
minutes 78:13
  78:16
missed 83:9
mission 31:11
  31:25 32:13
missions 30:23
Missouri 1:1,19
  1:22 4:1,15,17
  5:4,11 6:22
  102:16 110:18
misstates 23:10
  43:12 73:15
  79:17,18 81:23
Mitchell 5:10
  92:8,9
MO 5:6,8
month 26:13
  46:12 100:20
monthly 60:8,9

morning 61:21
  62:3 64:13
  67:8 68:5
  73:10
move 72:9 79:11
  102:24
moved 74:3,15
  75:4 79:8
  94:24 102:23
  103:7,8
movement 81:17
  81:18 94:10,11
  95:10,10,14
multiple 108:2

**N**

N 2:1,1,1,9 5:1
name 6:17 8:18
  14:10,12 28:19
  78:1 82:8,11
  92:10,17
name's 64:25
named 16:20
names 14:18
  91:23 92:3,12
  92:21
nature 7:4 20:15
  21:5 86:11
necessary 44:5
need 8:6 43:4,9
  43:15 50:15,25
  52:8 77:14
  86:17 95:8
needed 16:14
  89:11,17 106:1
needs 33:16 34:8
  51:12,17,21,25
  52:15 78:25
neither 110:9
nervous 73:2
never 94:16
  102:5
new 48:7 71:3
  94:15
night 12:6 21:18

28:8,14,15,16
28:23 30:8
64:14 67:24
68:4 75:8 78:5
83:22 87:14
92:14 104:4
107:11
**NOC** 28:11
**Nods** 7:17
**nonjudgmental**
32:25
**nonscheduled**
37:11,18 38:23
43:3
**normal** 97:17
**normally** 77:19
94:14
**note** 50:6
**noticed** 108:5
**notified** 13:6
50:6
**notify** 43:9 82:2
82:5 85:10
**number** 1:18,19
14:19 34:14
35:18 37:21
39:14 42:3,7
43:3,18 44:3
45:14 50:3
58:14 67:18
68:3 110:18,18
**numerous** 96:18
**nurse** 20:24 21:2
21:22 22:19
23:2,5 25:8
26:3,11 27:24
28:20,21 33:4
33:20,25 34:18
43:20,22 44:1
50:22 51:2
64:12,13 68:4
76:16,20 77:21
77:25 82:5
84:15 92:22
95:8

**nurses** 29:14
32:17,23,24
33:1 34:6,19
48:19,21 60:4
60:6 67:19
88:3,5 104:19
105:15,16
**nursing** 2:13
25:21 26:16,17
26:22 48:21
64:21 78:4
102:15,18
103:11 105:2

---

**O**

**O** 2:1,1,9
**o'clock** 79:12
108:5
**oath** 6:12 110:7
**object** 13:11
15:13 18:1,24
19:2 33:12
36:25 40:8,15
43:11 46:20
54:15,18,25
59:19 62:14
73:14 75:10,22
79:17 80:3,17
83:11 88:14
89:24 90:7
100:6 108:11
**objection** 17:17
19:15 20:10
22:14 24:13
31:4 32:2
34:25 38:5,19
40:11,12,16,19
40:22,22 46:19
46:23 55:2
57:9 58:2
69:24 74:19,23
81:23 96:17
98:22 100:11
108:18
**objections** 38:3

57:21 83:20
**obligated** 51:20
**obligation** 38:22
44:24 80:14
**obtain** 61:11
**obviously** 33:8
108:11
**OC** 28:22
**occurred** 13:24
52:23
**odd** 75:17,18,21
**offhand** 92:21
**office** 5:11 65:21
**officer** 12:10
15:16,19,22
16:2,8,11,18
17:8,14,21,25
19:25 20:9
33:17 43:4
56:14 67:16
69:13,16 70:6
72:3,5,8,18
76:15,19 79:4
80:20 81:11,20
91:17 92:4
93:6 103:13
104:2 105:3
**officers** 30:1
42:7 43:15
51:11,15 69:22
73:18 81:15
83:6
**officers'** 92:3
**offices** 4:14 66:1
66:10
**oh** 8:21 12:9
45:16 78:6
82:12 85:18
89:21 90:14
95:19
**okay** 8:4,5,9,10
14:18 23:4
40:18 42:20
45:21 70:5
71:9 76:11

**ones** 45:4 84:4
**online** 8:14
**open** 63:21 98:2
**opened** 58:6
**opinion** 19:11
19:18 24:9
57:10 80:4
89:19 90:5
97:12
**opinions** 20:21
21:13
**opportunity**
41:11 98:9
**option** 107:18
**order** 50:5,12
51:16 52:14
**ordered** 47:7
**orders** 49:11,20
50:11
**orientation**
28:17,18 65:1
65:3
**original** 3:2
**originally** 103:3
**other's** 34:2
**outlining** 93:9
**outside** 10:23
17:4 29:25
**overnight** 29:5
**oversee** 103:22

---

**P**

**P** 5:1,1
**p.m** 4:14,14 29:7
**P.R.N** 106:1
**page** 10:12
30:20,21 34:10
37:7 39:12
42:2,16 43:2
50:3 58:6,7,13
64:11,11 72:14
72:15 76:8
82:18,24 85:7
98:2,5,8,9
**paid** 106:23

**pain** 21:21 55:9
56:5 57:7
**pains** 22:7 57:7
62:12 74:8
76:19 77:1
78:24
**Pam** 65:19 66:13
**Pam's** 28:19
**Pamela** 104:4,6
**panel** 16:9 17:22
**paperwork** 44:5
67:21 68:6
107:3
**paragraph**
33:14 37:20,25
39:1,12 43:19
58:14 64:12
76:9,12
**parentheses**
37:13 83:3
**parenthetical**
83:8
**parents** 103:1
**parking** 66:5,6
**part** 6:11 29:17
29:19 56:12
87:24 101:23
**part-time**
105:23
**parties** 110:10
110:11
**parts** 29:17
**party** 53:13
**pass** 57:1 67:19
**passed** 12:11
27:15 53:5
55:20 57:4
61:14 62:1
**passing** 67:25
**patient** 15:24
16:14 33:3
44:25 45:7
50:4 51:20,24
52:10,16 70:10
72:21 77:11,17

Janet Duwe

82:3,6 102:13
**patient's** 32:18
**patients** 25:10
32:21,24 33:1
33:16,22 50:23
52:3 62:18,19
63:10 88:4,4
103:22
**patients'** 69:5
**Paul** 103:7
**paying** 17:11
**peer** 13:13 19:18
20:2,20 21:9
24:7
**pending** 8:8
53:16
**people** 14:7,16
14:19 15:10
16:10,16 17:22
28:3 63:11
66:13 73:1,1
84:12 94:10
104:11
**people's** 20:3
**perform** 56:7
**person** 65:14
71:25 78:2
82:8 94:17
100:5
**personnel** 41:12
48:4 60:9,10
60:23
**pertains** 59:22
**petition** 9:1 10:3
**Petruska** 4:15
5:3
**phone** 12:10
15:15,19,22
17:16 19:24
20:7,8 69:17
70:8 74:2
90:13 97:2
**physically** 77:17
**physician** 14:10
14:11 25:8,8

**physician's**
23:23 24:1,12
**pick** 45:3
**pill** 94:21
**place** 47:20
48:13 49:16
50:1 64:16
**placed** 42:9 48:5
67:21
**plaintiff** 1:6,15
4:5,13 5:2 6:2
6:11 53:22
**please** 6:18
57:14 87:11
**Pleban** 4:14 5:3
5:3 13:17
83:15,18 91:2
104:21 108:11
**plenty** 109:2
**point** 8:6 35:20
64:6 96:11
**policies** 35:17
62:11,18 80:14
93:9
**policy** 2:16,17
2:19,20 35:23
36:23 37:3,4
37:13,21 38:9
38:10,13,21
40:1,4,14,14
41:4,6,9 42:14
42:18,19,24
44:16 45:23
46:16,25 47:3
47:15 48:1,2
48:12,17,18
49:8 59:4
61:15 62:4
78:12 83:12,13
**poor** 87:17
**population**
31:15
**port** 94:24 95:13
95:16,21,23,25
96:3,12

**portions** 103:5
**position** 51:3,10
86:12
**possibility** 11:8
97:3,6
**possible** 109:1
**posting** 29:11
**postmortem**
11:15,17,24
12:13,14,19,22
12:25 13:7,10
13:21
**practice** 12:14
**preparation**
10:17
**prepare** 8:11
84:19
**present** 18:20
19:23
**pretty** 7:7 87:3,6
**prior** 23:10 42:9
53:1 71:1
73:15 81:23
102:12
**priority** 39:4
**prison** 15:25
16:4,7 66:20
66:22 70:11
71:10 72:25
81:8 105:4
**prisoners** 29:24
**privilege** 13:12
13:13,16 14:25
18:25
**probably** 65:10
66:4,8 97:8,13
**problem** 46:22
89:10,14,14,16
**problems** 79:25
**procedures**
35:18 36:11
41:21 44:6
61:15 62:7
65:12
**process** 61:4

66:14
**produced** 4:13
6:10
**professional**
34:12
**Program** 47:5
**prohibited**
13:14
**proper** 47:6
**properly** 108:5
**property** 63:22
**protocol** 61:21
**protocols** 61:7
61:11,15 80:14
**provide** 31:14
36:1 37:11,17
38:22 41:10
51:3 52:19
73:19 84:15
85:24
**provided** 33:22
52:7 98:13
**provider** 47:7
49:10,20 50:6
50:8,11
**provider's** 39:3
**providers** 36:10
**providing** 58:21
59:12
**proximity** 65:20
66:1
**Public** 31:14
47:5 48:3
**pull** 73:12
**purpose** 47:23
49:19
**put** 56:19 71:7
79:4 90:16
108:14,22
**puts** 56:14

**Q**

**quality** 31:15
**quarter** 69:15
69:19 79:5

**question** 7:23,25
8:1,7 17:18
18:3 19:1,8,16
19:17 31:8
38:7 55:3,6
57:13 73:15
75:11 80:5
88:18,20 101:2
**questioning**
54:16
**questions** 8:2
15:1 20:18
81:5 83:12
91:6 93:3
97:20,21
106:20 107:14
107:15
**quick** 14:25
16:20 69:21
106:23

**R**

**R** 5:1
**ran** 61:3
**Reaccreditation**
58:9
**reach** 86:20,21
99:24
**reached** 99:16
99:22
**read** 8:13 31:22
33:6,18 34:16
36:20 37:14
39:5,16 41:13
41:22 42:5,11
42:18 43:6,23
44:7 47:8
48:10 57:14,15
58:7 66:6
67:22 68:8
76:13 80:6
83:9 88:21
98:10 107:18
**reads** 32:17
33:24 39:12

42:3 43:3,20
44:3 45:25
46:9 47:3 48:1
48:2 49:8,19
50:3 58:19
59:1 60:3
67:18
**ready** 72:1,8,9
**real** 14:24 16:20
69:21 106:23
**really** 19:16
75:23 85:23
87:2 89:7
**reason** 46:15
102:10
**reassert** 38:2
**recall** 13:24
14:20 20:22
71:21 91:16
101:25 107:9
**receive** 88:9
**received** 86:12
**receiving** 79:3
82:3,6
**recess** 50:17
91:3
**recipient** 59:20
**recognize** 27:20
32:24 33:15,25
**recollection** 12:3
62:17 78:8
85:21 91:25
104:7
**record** 6:17 7:19
7:21 8:8 13:17
13:18 44:13,19
50:19 66:7
91:5 107:25
108:15,15,16
108:21,22
110:8
**records** 69:5
73:12
**Redirect** 2:6
106:21

**reduced** 110:7
**referenced** 30:7
**referral** 25:8,9
**referrals** 25:11
**referred** 50:12
63:6
**referring** 95:23
**refers** 93:16
**refused** 99:9
**refusing** 85:10
**regard** 53:25
**regards** 21:10
**regular** 96:7
**regularly** 60:21
**relate** 18:10
**related** 15:11
20:4 21:6
24:15 59:17
83:12 89:20
110:10
**relates** 62:18
67:11,25 69:2
73:23 96:25
**relating** 12:23
17:15 20:7
21:13 27:1
53:10 54:10
60:10 61:10,15
62:11 88:9
93:23
**relations** 87:17
**relationship**
31:17 32:25
**relative** 110:11
**relay** 76:16
**relayed** 71:6
**relearn** 65:13
**relevance** 54:16
**rely** 73:22
**remark** 75:15
**remember** 8:15
11:12,19 12:9
13:5,8 14:10
14:12,15 16:12
18:4 20:12,14

23:1,2,3,25
54:5 57:25
59:4 61:9,17
61:18 63:1
64:5,15 68:19
69:13 70:5,7
71:18,20 72:1
75:13 76:4
82:11,13 85:18
86:6 91:10,19
91:21 92:1,10
92:12,16,21
98:24
**rep** 40:11 46:19
**repeat** 57:13
59:7 80:5
88:20
**rephrase** 8:1,4
38:6 88:16
90:1
**report** 9:17
54:10 64:3
67:19,25 68:1
73:22 76:8
78:17 101:13
101:19,21
**reported** 17:13
22:5,12,19
**reporter** 4:16,16
6:5,12 7:15
57:15 80:6
88:21 107:21
110:1
**REPORTING**
1:21
**representative**
37:2
**represented** 5:3
5:5,7,10
**request** 42:8
71:22
**requested** 57:15
80:6 88:21
**required** 45:6
47:6 48:7

52:11 77:10
**reschedule**
108:9
**rescheduling**
108:12
**residents** 31:21
**resources** 31:19
**respond** 33:16
103:24
**responding** 6:11
**response** 12:8
16:8,10,17
17:9 71:11,23
72:5 78:8
**responsibilities**
36:4 67:14
69:1,2
**responsibility**
36:7 41:18
44:10 56:12
68:4
**responsible** 33:4
36:10 41:20
47:7
**rest** 83:17
**result** 57:20
85:16 88:13
108:25
**retained** 3:2
**retaining** 75:9
75:17
**retirement**
25:19
**retracing** 12:5
**returned** 56:2
56:11
**returning** 23:6
**review** 8:20
13:13 19:18
20:2,20 21:9
24:7 58:16,19
**reviewed** 46:5
60:4
**revised** 46:12
**revision** 46:5,8

47:17 49:13
**rid** 89:13,13
90:12
**right** 7:15,23
11:24 27:15
28:4 30:8,11
31:2,22 32:21
33:6,10,18,22
34:3,6,8,16
35:13 36:15,18
37:14 38:1,11
42:5,11 43:6
43:23 44:7
45:4,7 48:10
49:11 52:4,7,8
52:12,16,20,24
53:11 56:22,25
57:4,8,20 62:9
64:8,21 65:24
66:22 67:22
68:8 69:18
70:23 72:18
73:24 74:3,5,8
74:11 77:11,14
77:18 78:21,25
79:9,12,15,20
79:23 80:2,11
80:15,24 81:2
81:12,16,21
82:12 85:8
86:25 93:7,20
93:23 94:1,4
95:5,9,16 96:4
96:9,13,20
97:24 98:5,19
101:8,11
103:19 107:22
**ring** 103:14
**Rob** 14:12,14
**Robert** 20:24
92:22 108:3,4
**Robertson** 2:5
5:10 9:25
13:11 14:24
18:24 19:15

Janet Duwe

36:16,25 37:21
37:23 38:9
40:10,21 46:18
54:14,18 59:19
61:24 82:19
97:21,23 98:7
99:1 100:8,12
102:11 104:23
106:13,19
107:16 108:18
**role** 25:7,15 26:3
32:14 33:20
50:22,23 58:23
68:14 104:6
**room** 16:25 17:3
29:20 104:19
104:19,21,22
105:15,16
**rooms** 65:22,23
66:2
**route** 19:20
**rude** 7:20
**rules** 7:9,14
**run** 66:17,19
67:11,20 68:1
**running** 31:4
38:4 40:12,19
46:18 83:15
**runs** 69:2

**S**

**S** 2:9 5:1 82:23
83:1
**sally** 94:23
95:13,16,21,23
95:25 96:3,12
**San** 103:8
**save** 8:24
**saw** 21:6 23:8,15
69:18
**saying** 23:17
30:4 36:14
84:18 86:12
97:24
**says** 6:13 28:8

28:11 30:17,21
33:15 34:11,14
35:17,18 36:4
36:7,16,17,20
37:7,10 39:1
41:18 42:7
43:2 45:23
47:15,23 58:8
61:4 63:5 68:3
70:16,21 76:13
78:12 79:4
83:1
**scapegoat** 88:25
89:1,9,23 90:6
90:19
**schedule** 2:13
27:24 39:2
50:7 64:21
78:4
**scheduled** 37:11
37:18 38:23
79:8 108:4,13
108:23
**scheduling** 60:3
60:5
**Science** 26:17
**scroll** 9:8
**second** 11:20
18:14 23:6,8
23:15,19 42:2
45:17 55:24
56:7 76:9,12
76:12 83:8
98:17
**secondhand**
52:18
**Secondly** 60:3
**section** 34:10
36:7 37:10
41:18 42:2,18
44:6 48:1
**secure** 109:1
**see** 9:8 10:11
21:19,20 23:6
23:19 25:10,11

27:12 28:8
29:6 37:13
40:2 44:24
45:7,23 46:4,5
48:22 52:15
58:13,17 63:10
73:9,24 76:22
77:10,17,19,23
80:15 83:3
94:6,10,12,14
94:25 95:5,8,9
95:11,12 96:4
96:9,13 98:17
104:14,25
105:6 107:1
**seeing** 61:9
62:19 63:1
70:14
**seek** 15:4
**seen** 16:15 17:14
17:21,24 24:14
29:20 30:17
34:11 35:15,19
40:1 41:11
45:14 47:13
49:5 54:6,8
58:11 62:25
64:2 67:5
71:13,24 78:25
81:21 93:16
94:16 105:8
**seizure** 95:3
**send** 72:9
**sending** 15:24
84:12
**sense** 72:16,17
**sent** 8:14 50:7
54:3,11 55:23
69:23 85:19
**sentence** 33:24
58:15,16,17
**separate** 30:4
63:11 65:22,23
**separation**
86:11

**September**
25:23
**serious** 57:8,19
78:24 80:1,10
**served** 8:18
**service** 8:25,25
32:16 59:2,5
59:15,17
101:21
**services** 1:21
31:15,18 35:19
35:24 36:1,8
37:3 38:22
39:13 41:10,19
46:1 47:6
**set** 39:21 56:15
56:17,21 85:13
**setting** 17:4
**seven** 26:13 42:4
65:6
**severe** 78:20
**shakes** 7:17
**share** 66:11
**Sharon** 85:6,19
85:22 86:1
98:13 99:18,20
99:22,24 100:4
100:9
**Shaw** 65:19
104:4,6
**sheet** 83:2,4,25
84:2,19
**sheets** 84:7
**shift** 28:14,15,23
29:5,7 30:8
56:9,24 67:19
68:4,15 92:15
106:14 107:2
**shifts** 68:23
100:19
**short** 50:17 91:3
**shorthand** 4:16
6:4
**show** 67:20 78:4
108:16

**shows** 28:3
**shy** 7:5 12:23
13:1 26:13,14
52:22 53:11,25
54:10 57:4
**Shy's** 53:10
54:19
**sick** 37:11,13,17
38:23 39:3
40:3,4 41:4,6
42:2,4,8,9 43:3
44:1,11,16,24
45:3,6 51:19
52:10 61:4,16
77:1,7,9 78:7
78:17,19 80:13
80:15 81:6,9
82:3,6 93:25
94:3,6,9,20
96:3 103:24
107:6,10
**side** 104:8
**signature** 6:6
107:21,23
**signed** 86:21
**significance**
73:4
**significant**
78:21
**signs** 56:17
**similar** 7:6
**simple** 71:22
**sit** 91:20 92:11
**sitting** 71:9
**six** 14:18 50:3
68:3
**skill** 51:6
**skilled** 25:21
**skills** 33:25 34:2
51:16
**skipped** 44:19
**small** 78:20
**somebody** 62:4
71:10 72:25
75:4 76:24

Janet Duwe

78:7,14 89:2
90:16 94:21,21
95:2,3
**soon** 48:15
61:22 78:11
81:14
**sorry** 9:25 15:5
16:5 22:3
32:11 38:3
50:2 55:1
56:16 58:16
68:1 73:14
98:6 105:2
**sort** 64:4 75:6
79:22
**sounds** 92:10
**sour** 87:3,5
101:8
**South** 4:15 5:3,8
5:11
**space** 71:8
**speak** 11:10
52:15 86:20
90:11
**speaking** 46:22
**specialist** 25:9
**specific** 8:15
26:25 27:7,11
50:21 92:12
**specifically**
18:10,15 19:7
19:10 20:6
76:15 83:13
**specifics** 12:4
**speculation** 32:3
35:1 57:10
74:20 80:4
**spell** 92:18
**spoke** 11:12
103:13
**St** 1:9,22 4:8,15
4:16 5:4,6,8,9
5:10,11 13:12
13:15 25:2,3,4
26:2 31:13,16

31:17 35:24
36:8 37:2
40:12 41:9,18
46:19 47:4
48:3 49:20
52:23 103:2,6
103:7 106:6,9
106:25
**staff** 36:9,9
37:11,17 39:2
41:20 42:10
44:4 48:22
49:22 59:17
83:2 87:15,15
87:17,21 91:9
91:9 92:12
**staffs** 59:2,6,15
**stand** 28:20
**standard** 12:14
27:10 58:9
78:8
**standing** 50:5,12
**start** 25:22
61:21 62:2,3,5
**started** 15:6
25:23 26:14
29:7 61:21
101:16
**starts** 43:19
58:15,17
**state** 4:17 6:17
13:14 32:23
**stated** 64:12
69:16 76:17,19
**statement** 10:7
21:2 32:13
72:12 75:15
85:3,5,7,24,24
98:9,13,16
100:1,2,10,13
**statements** 18:6
18:10,12,21
19:5,22,23
20:2,7,14 21:5
21:9,11,17

22:24
**states** 1:1 4:1
31:12 35:23
36:14,15 41:9
42:2 47:17
64:12
**stationed** 29:14
**status** 47:24
105:21
**statute** 13:14,15
**stay** 24:15 87:3
100:23
**step** 52:6
**steps** 12:5 17:23
68:11
**STIPULATED**
6:1
**STLCO** 30:21
37:7
**stomach** 21:21
22:2,4,6 24:15
57:7 62:12
74:7 76:19
77:1 78:23
79:22,25
**stop** 19:16
**stopped** 26:8
86:8
**Stout** 12:20 14:2
15:11 17:14,24
18:12,23 21:25
22:6,11,20,22
22:25 23:6,8
23:14,15,18
27:15 46:13
52:24 53:5
61:14 96:12
107:1
**Stout's** 20:4
21:7,10,14
53:1 88:10,13
89:20 106:7,10
**Straight** 83:18
**strategies** 58:20
59:11

**Stratford** 1:21
**stress** 76:6
**stressed** 64:13
75:24 76:3
**strike** 18:19
23:4 29:25
36:5,6 39:8
42:22 50:2
55:19 57:2
60:18 61:8
85:11 86:7
88:1 104:3
**strives** 31:14
**stroke** 95:3
**study** 27:7,11
**stuff** 17:7 19:11
24:21
**Sturm** 1:18,21
4:15 6:4 110:2
110:17
**subject** 35:18
40:3
**subsection** 43:2
**sued** 53:13
**Suite** 5:8
**summon** 33:9
**supervisor** 83:4
101:19
**supervisors**
101:20
**support** 27:4
89:22 90:19
**supports** 90:5
**supposed** 78:9
84:14 85:2
88:17
**sure** 7:21 8:21
15:3 19:20
34:22 35:16
41:1 45:19
51:25 52:7,11
53:22 56:10,12
59:8 88:17
90:9 91:15
98:4,25 104:16

107:19
**Surprisingly**
24:19
**surrounding**
19:24
**swearing** 88:3
**sworn** 4:13 6:10
110:5
**symptoms** 22:11
22:16 50:4
62:9 80:21
95:7 96:7
**system** 31:18
72:7,8

**———— T ————**

**T** 2:1,9
**take** 8:7,9 13:9
27:8 50:14,16
52:6,18 53:4
66:20 67:2
69:22 91:2
94:21 107:7
108:12
**taken** 1:15 6:4
50:17 91:3
110:11
**takes** 39:4
**talk** 11:6,7 12:1
15:15 50:21
69:12 96:25
**talked** 10:25
11:23 12:9
21:18 51:23
98:1
**talking** 13:21
18:25 42:17
**team** 34:15,20
**tell** 12:13 14:5,7
15:10,21 17:15
17:20,22 21:16
69:1 83:24
86:4,11 106:6
**telling** 72:1
81:11

Janet Duwe

ten 14:23 16:22 64:11 78:13
ten-minute 79:6
tend 7:19
terminated 86:5 86:23
termination 3:1 85:17 87:1 88:13
terms 32:6
testified 77:10
testify 18:15 110:5
testifying 93:22
testimony 23:11 73:15 79:18 81:24 91:10 93:19 107:18 110:8
Thank 10:13 31:9
Thanks 37:23 109:3
them's 92:17
thing 70:16
things 7:18 8:13 12:11 21:22 60:25 65:11,12 87:20
think 7:12 8:22 8:23 9:19,20 10:12 11:18 13:11 23:7,8,9 23:13,21 24:17 35:16,19 40:21 40:24 53:18 54:8 67:6 71:17 75:3 77:8 78:1,16 81:9 82:12 83:8 85:18 86:3 88:25 89:1,2,5,8,10 89:11,12,16,19 89:23 90:4

91:1 92:2,17 92:19,19,20 97:14 99:10 100:7 106:15 106:16 107:12
third 11:20 61:13 63:19
Thirty-five 35:10
Thirty-three 10:16,16
thought 99:13 104:18
three 26:14 52:23 53:2,6 58:15,16,19,20 59:8,10 65:20 106:5
tight 71:8
till 105:13
time 7:12 8:24 11:2,14 17:1 23:6,8,15,19 38:16,16 39:7 39:9 40:5 46:11 47:1 55:19,24 60:20 68:25 69:13,22 74:2 75:3 78:2 78:9,17,18 82:9 83:17,22 83:23,23 86:8 87:4 88:5 90:22 94:18 104:11 106:2 106:24 108:9 109:2
times 87:14 96:18 106:4
Tina 98:21,25
tired 87:13,14 88:8
title 45:25 49:10 58:7
titled 31:5

today 8:12 91:20 92:11 107:22
told 15:19,22 16:9,13,16 17:8,9,10,14 22:1,6,20 32:7 70:8 71:24 72:6 76:24 81:6,17 99:11 101:7
tomorrow 108:5
top 30:23 35:17 45:23 47:15 49:8 63:5
total 16:22
touch 108:6
touching 110:5
toxic 87:6,8,11 91:7 101:10
Trailcrest 6:21 6:21
trained 73:18
training 2:23 16:13 51:7,16 64:3,4,5,13,15 65:3,8,15 67:7 67:10,25 68:10 71:1 75:8 83:22,23 93:12
transcribed 6:5
transcript 107:19
transfer 83:2,4 83:24 84:2,7 84:19 105:10
transferred 66:21 69:8 70:22 71:1 81:12 103:15
transferring 84:16
translate 7:18
transport 94:13
transportation 16:15 17:25

67:16 68:5 69:23 70:15 71:14 72:10 77:20,21,25 81:15,21 82:2 82:5,9 83:4,6 84:15,20 94:16 94:22 95:11 104:15,25 105:9,10
transported 83:6 95:22
treat 94:3
treated 52:12 87:21
treatment 20:4 21:7,14 22:25 23:3 39:4,14 49:23 50:24 51:3 52:7 77:14 87:14
triage 39:2
trouble 75:9,16 85:25
troubles 79:23
TROY 5:5
true 110:7
truth 110:5,5
try 85:13 87:3 89:5,6 100:25
trying 11:18 15:1 16:12 19:12 71:17 89:8 90:12 92:2
turn 30:20 34:10 39:12 84:19
turned 71:7 88:6
two 10:6 28:4,6 29:17 30:10 37:7 40:21 42:7 43:18 46:6 58:14 65:18 106:5
type 17:3 65:21

typewriting 6:5
typically 8:2 84:10

**U**

uh-huh 7:22 10:8 70:18 72:13 104:22
uh-huhs 7:18
uh-uhs 7:18
ultimately 57:4
unable 43:21
uncommon 72:24
Underneath 28:10
understand 7:25 8:3 18:2 33:8 40:4 55:3,6 57:3 58:23 88:18 95:24 108:13,22,23
understanding 31:24 51:14 53:19,24 54:24 63:9 74:13 86:7 88:12 95:13
understood 7:24 33:21 34:18 37:25 42:13,22 57:6
Unfortunately 108:6
unit 42:3,3,7,10 48:5 95:18
UNITED 1:1 4:1
units 37:12
untreated 57:7 80:1
up-to-date 61:7 61:11
update 60:25
urgency 72:17
use 60:3 84:4

Janet Duwe

91:14 92:6
101:20 102:3,5
102:10
**usually** 79:11

---

**V**

**vague** 17:17
55:1 58:2
80:18 90:8
100:6
**verbal** 7:17 85:3
**verbally** 17:10
**versus** 38:23
**violates** 54:20
**vitals** 56:10,15
56:17,21
**voice** 72:17
**vomit** 72:25
73:4
**vomited** 16:4,7
22:9 70:11,23
71:10 74:5
76:18,25 79:20
81:2 93:23
**vomiting** 22:4
72:21 74:15
75:9 79:14
80:24
**vs** 1:7 4:7

---

**W**

**waited** 76:22
**waiting** 17:4
29:20,20 94:23
**waive** 107:21,23
**waived** 6:6
**waiver** 8:25
**waivers** 8:24
**waiving** 13:13
13:16
**wall** 66:11
**walls** 66:16
**want** 15:2 18:21
19:7,12,16
24:21 38:4

40:13 46:18,21
50:16,21 52:2
55:1 59:21
87:2,23 89:7
98:23 100:21
100:23 101:2,3
107:17 108:12
**wanted** 16:3,6
19:11 22:17,20
22:22 48:18
65:13 70:10
71:17,25 99:14
102:25 106:7
106:10
**wanting** 19:10
**wasn't** 29:4 38:8
45:2 56:6 81:6
101:5,5
**waste** 108:8
**watch** 69:18
**way** 17:20 33:14
87:20 90:20
**we'll** 7:14 19:20
108:14
**we're** 7:6 14:25
19:12 50:19
65:23 108:9,21
**we've** 18:25
24:19 54:6
90:15
**week** 11:20
25:17 42:4
106:4
**weeks** 26:14
68:20
**went** 14:5 48:19
56:2,20
**weren't** 72:7
**Wiedner** 5:8
**window** 79:6
**wish** 98:15,18
**withdrawal** 62:9
**withdrawals**
61:19 62:1
**withdrawing**

62:5 73:1
**witness** 6:6,7
14:14 15:3
18:4,19 20:12
22:16 24:14
32:6,9 35:2
37:1 45:20
57:13,17,22
58:3 61:25
64:23 75:1,13
75:23 80:8
86:18 88:19
90:1,9 98:5,24
100:7 102:9
104:22 106:12
107:23 110:6,8
**WOODS** 5:10
**word** 6:22 43:20
87:13 88:4,5,6
88:7 91:14,18
91:21 92:13,23
93:1 101:14,20
101:25 102:2,3
102:5
**words** 77:22
88:7
**work** 25:14,16
34:1,14,19
63:11 92:24
94:15 99:20
100:21 101:2
106:4
**worked** 34:6
66:12 68:23
100:19
**working** 26:8
27:14 28:3
31:6 34:19
63:25 65:17,21
86:9 103:19
104:4
**wouldn't** 45:18
100:24,25
**Wright-Berry**
5:10 91:13

**write** 107:3
**writing** 93:15
110:7
**written** 77:5
93:9 100:13
107:18
**wrong** 101:3

---

**X**

**X** 2:1,1,9,9

---

**Y**

**yards** 66:9
**yeah** 8:21 17:18
19:2 27:10
29:6 64:7
75:21
**year** 53:7
**years** 26:13 65:6
65:10 68:13,22
94:20

---

**Z**

---

**0**

**003346** 37:7
**00585** 30:21
**084-002267** 1:18
110:18

---

**1**

**1** 6:22
**10:00** 108:5,16
**10:30** 106:15,18
**10:45** 106:15
**100** 87:14
**1010** 5:8
**106** 2:6
**10th** 27:25 28:7
28:25 29:1,3,8
31:1 63:25
64:5,16 67:8
68:17 100:15
100:18 105:22
106:14 108:24
**11** 10:12 18:23

64:11 72:14,15
85:7 98:2,8,9
**11:00** 29:7
106:17
**11th** 27:25 28:7
28:25 29:4,8
31:2 53:5
63:25 64:5,18
67:8 105:22
**12** 14:23 16:22
**1301** 35:18
37:22 82:20
**1307** 2:16 37:13
40:1 44:16
82:19
**14** 1:16 4:14
48:4
**1450** 5:8
**15** 103:8
**18** 57:24 58:6
98:3
**1824** 5:6
**1983** 26:21
**1993** 102:12
**1st** 26:8 86:9,23

---

**2**

**2** 54:6
**2:07** 4:14
**2000** 41:24
**2001** 6:21
**2010** 4:15 5:3
**2012** 26:15
**2016** 47:17
**2019** 11:21,22
13:25 18:23
25:23 26:8
31:2 38:17
40:7 41:3,16
41:24 42:14,25
43:16 44:9,23
46:9,16 47:1
47:21 48:13
49:13,17 53:5
53:6 57:6

---

Janet Duwe

Page 126

59:18 60:1,23
61:13,14 63:25
86:9,23 100:15
100:18 105:22
**2020** 7:2,3 25:6
**2021** 1:16 4:14
110:14
**22** 110:14
**23rd** 26:14
**24** 33:15 97:17
**24-hour** 33:22
**26** 35:5,6,13
82:14,20
**27** 2:12
**28** 58:6,13

**3**

**3** 7:12
**30** 2:14
**31** 10:14 103:8
**314** 1:22
**32** 103:9
**33** 2:11 9:4,7,11
10:1,5,15,17
**34** 2:12 27:17,20
64:20
**35** 2:14 30:13,16
30:17 35:11
**36** 3:3 44:20
**37** 3:3 44:20
**38** 2:15 39:22,25
44:16
**39** 2:15,17 44:21
45:9,11,14

**4**

**4:20-CV-01030**
1:7 4:7
**40** 2:18 47:10,13
**41** 2:20 5:11
49:2,5
**42** 2:21 62:21,24
**43** 2:23 66:24
67:2
**44** 3:1 86:14,16

**45** 2:17 78:16
**47** 2:18
**49** 2:20

**5**

**5:21** 4:14
**5:30** 107:2,8
**5:34** 69:17 79:4

**6**

**6** 2:4 9:19,20,22
10:5,9,14,17
25:6 64:8,9
72:11 85:8
98:1,5 100:2
**6:00** 69:15,19
70:4,5 79:5,12
104:19 105:13
105:16
**6:15** 107:8
**62** 2:21
**63103** 5:6
**63105** 5:8,11
**63117** 4:15 5:4
**63130** 1:22
**66** 2:23

**7**

**7:00** 29:8 68:6
106:15,16,18
**7:30** 106:17
**716** 1:19 110:18
**7419** 1:21
**780-2816** 1:22

**8**

**86** 3:1

**9**

**9** 2:11
**90** 48:7
**93** 7:12
**94** 7:12
**97** 2:5
**9th** 53:6