Page 22

1  BY MR. PLEBAN:
2  Q   Let's go back. You understood that if a
3  patient exhibited any symptom on an exclusion list
4  that you had to notify the medical provider, correct?
5  A   Yes.
6  Q   Or you could send a note to the clinic desk,
7  right?
8  A   Yes.
9  Q   But my point to you is that these are
10 requirements of you as a nurse in the County jail
11 facility back in 2019, correct?
12 A   Well, that's correct. But I'm feeling like,
13 based on your line of questioning, that you're trying
14 to tell me I did something wrong. And if you are,
15 just come on out and say it. Just ask.
16     MR. PLEBAN: I'll just move to strike.
17     MR. DeBEER: Yeah, don't worry. Just focus
18 on what he's asking and answer that, and we'll be done
19 quicker.
20 BY MR. PLEBAN:
21 Q   I'm going to ask you my questions, you'll
22 just answer it, we'll get through all of it.
23     How did you send a note to the clinic desk
24 back in 2019? What's the procedure?
25 A   Are you referring to a specific situation?

Page 23

1      MR. DeBEER: No.
2  BY MR. PLEBAN:
3  Q   No. I'm just saying how did it happen,
4  generally speaking.
5  A   Shit. I went to my computer and just sent a
6  message.
7  Q   But what system was it on? Was it on IJMS,
8  was it on your clinical notes? Was it on Instant
9  Messenger? Was it on email?
10 A   I don't remember the system that we were
11 using. IJMS might have been for the corrections part.
12 But whatever section that I had to do it, I did it the
13 right way. Clinic desk. No, that's the clinic desk.
14 I don't know the name of the system. But I knew how
15 to do it properly at that time.
16 Q   You've since sort of forgotten a little bit.
17 A   Yes, sir. It's been a little while.
18 Q   Sure. What is the clinic desk?
19 A   That's the front area where patients are
20 brought in to be seen during the daytime hours, and
21 they get to see providers, yes, sir.
22 Q   This clinic desk, is there a doctor that's
23 there at all times?
24 A   I'm not going to say all times because
25 people's schedules rotated. We have multiple

Page 24

1  providers. Our most consistent person there would
2  have been the physician's assistant.
3  Q   When you had to speak with a doctor about a
4  patient when you were at the County jail, how would
5  you do that, by phone, by message, by IJMS? What
6  system?
7  A   Well, personally, I did it multiple ways. I
8  would send emails. I would go back and speak with
9  them directly. And I think those were the two primary
10 ones that I did.
11 Q   The email is a piece of paper, obviously,
12 that someone can see, and then would you speak with
13 someone? You noted earlier how important it was to
14 document. I'm assuming if you spoke with a doctor,
15 you'd come down and chart it somewhere so the next
16 person can see what you did, right?
17 A   Yes, sir, that's the proper way to do it.
18 Or either do what they say do, yes, sir, and put it on
19 the medical administration record.
20 Q   If you're carrying out their orders, you're
21 going to see a note for what you did, right?
22 A   Or the treatment record, yes, sir.
23 Q   Sure. One way or another, it's getting
24 written down.
25 A   You had better believe it.

Page 25

1  Q   On June 10th, 2019, do you remember seeing
2  Daniel Stout?
3  A   I didn't remember the date, but, yes, sir, I
4  do, I do remember seeing him.
5  Q   Tell me what happened.
6  A   Well, it was about ten minutes till quitting
7  time from my shift, and I think it was approaching
8  11:00 o'clock. That might have been our leave time,
9  11:00 or 11:30, something like that. And I was called
10 by the unit control for one of my patients.
11     And each area that I take care of is the
12 people that I call my patients, so I believe that was
13 the fifth floor. And I had A, B and D pod on the
14 fifth floor, unless we were short, and then I would
15 take the C pod, too. So depending on what was going
16 on, I had three pods out of four or all four. And I
17 came right up to see him, maybe within three to five
18 minutes.
19     I did a full assessment after speaking with
20 Mr. Stout. Yeah, I did a full assessment and spoke
21 with him, and he was clear. He was clear. Ultimately
22 used the standing orders, gave him some medication,
23 stood with him while he drank a couple of mini cups of
24 water. And if you can see the footage, because
25 cameras are all over the place, he laughed and joked

7 (Pages 22 to 25)

Exhibit A

Page 26

1  with me as well as unit control officers prior to me
2  releasing him to go back, saying that he was deemed
3  fit to go back into his pod for the night.
4      Now, on the recording, you should hear as
5  well me telling him that nursing is 24 hours, that I
6  was going to be gone in a short amount of time after I
7  went downstairs and wrapped up some stuff, and if he
8  needed anything, that he could hit that button and
9  call for it.
10     So after I did what I was supposed to do,
11 gave him what he needed, observed that he was able to
12 laugh and carry on a conversation, he was coherent,
13 alert and oriented, you know, yeah, I didn't see any
14 reason to escalate him to leave that building that
15 night. Not when I was talking with him.
16     Now, if something progressed, it did, but
17 not when I watched him. I know what I'm doing. I
18 listened to his bowels, I listened to his lungs, I
19 listened to his heart. I looked deeply into his eyes
20 as I was speaking with him, too. So I understood if
21 he had an issue, you know, and I needed to escalate
22 it, I would have.
23     Q  You said there was no reason to escalate it,
24 so I'm assuming you never called the doctor.
25     A  There was no need.

Page 27

1      Q  I'm asking if you ever called the doctor.
2      A  About Mr. Stout?
3      Q  Yes, sir.
4      A  I did not.
5      Q  Did you ever call a physician's assistant?
6      A  I did not. Don't forget, I deemed him fit
7  to go back into the pod. I'm the nurse, and I know
8  what I'm doing a thousand percent.
9      Q  And you knew what you were doing back in
10 June of 2019, right?
11     A  Yes, sir, I was caring for one of my
12 patients.
13     Q  Right. And you knew those standing orders
14 backwards and forwards, correct?
15     A  Maybe, maybe not. What's your point?
16     Q  Weren't you supposed to call a doctor that
17 night?
18     A  Why?
19     Q  You don't know any reason why?
20        MR. DeBEER: I'll object that it's
21 argumentative.
22        THE WITNESS: I'm lost.
23 BY MR. PLEBAN:
24     Q  Yeah, I know.
25     A  Call a doctor for what?

Page 28

1      Q  A man died. You know that, don't you?
2         MR. DeBEER: Again, I'll object. It's
3  argumentative. Now you're starting to harass him.
4         THE WITNESS: He was alive and well when I
5  saw him. You do understand that, right? He walked
6  back -- he walked out to me and back into that pod
7  under his own power. We didn't have to hold him or
8  carry him or anything.
9  BY MR. PLEBAN:
10     Q  Have you ever -- from 2010 or 2011 in what
11 you describe as 20 years' skill level, what did you do
12 to keep up and read on stomach pains and stomach
13 issues and problems and complications that could arise
14 out of those?
15     A  Just that one specific thing out of
16 everything that we deal with?
17     Q  Yeah.
18     A  Um. What did I read? I worked at
19 Barnes-Jewish, okay? We dealt with stuff like that on
20 a regular.
21     Q  Peritonitis?
22     A  We dealt with a variety of things on a
23 regular.
24     Q  Including peritonitis?
25     A  I might have had one patient or so.

Page 29

1      Q  You know that that patient that came in at
2  Barnes probably had to go to the OR, correct?
3         MR. DeBEER: Objection. Lack of foundation.
4         MR. PLEBAN: I'm asking if he knows.
5  BY MR. PLEBAN:
6      Q  You said you dealt with peritonitis.
7      A  That is the situation. If something breaks
8  open, you know. But like I said, when I assessed
9  Mr. Stout, everything was fine. Bowel sounds were
10 present. I even charted that.
11     Q  There were no bowel sounds.
12     A  I didn't say that. I said bowel sounds were
13 present.
14     Q  Hyperactive bowel sounds, H-Y-P-E-R?
15     A  I didn't use that word.
16     Q  What did you use?
17     A  I said bowel sounds were present in all
18 quadrants.
19     Q  What happens if bowel sounds were not
20 present? Is that a bad thing or good thing?
21     A  That's an emergency right there.
22     Q  And the word hypoactive, H-Y-P-O active
23 means there are no bowel sounds, correct?
24     A  That's correct.
25     Q  And you knew back in 2019 that hypoactive

8 (Pages 26 to 29)

Page 30

1  bowel sounds was an emergency, correct?
2      A   That's correct. Hypo.
3      Q   H-Y-P-O, right?
4      A   No. The absence of bowel sounds is an
5  emergency.
6      Q   Correct.
7      A   Hypo is normal to a degree, especially in
8  the jail. One of my main things I would do, because
9  I'm the nurse that would talk to people about deep
10 breathing. I'm the nurse that would talk to people
11 about distracting themselves by reading things and
12 exercising and consumption of water.
13         It was a lot of people in that jail that had
14 bowel movement issues, and it was simply because they
15 wasn't drinking enough water. So I'm that nurse. If
16 you go to any of my floors back at that time and talk
17 to any of those inmates, they'll tell you I was like
18 their cheerleader, encouraging them to always do the
19 right thing. And water consumption was definitely one
20 of the most number one things.
21         So hypo was normal.
22     Q   Whatever the --
23     A   Absent was not.
24     Q   Correct. Whatever the term is, the absence
25 of bowel sounds you knew meant was an emergency

Page 31

1  situation, correct?
2      A   We didn't have that with Mr. Stout.
3      Q   What I'm asking you is back in 2019,
4  June 2019, you knew the absence of bowel sounds meant
5  that that inmate had an emergency that needed to be
6  dealt with immediately, correct?
7      A   If he had had that, yes.
8      Q   Correct. And by emergency, you mean that
9  man needed to go to the hospital if there was an
10 absence of bowel sounds, correct?
11     A   If he had had that, yes. He did not have
12 that with me.
13     Q   And certainly you know the difference
14 between hypoactive, H-Y-P-O, and hyperactive,
15 H-Y-P-E-R, right?
16         MR. DeBEER: Objection. Asked and answered.
17 We just went through this.
18         THE WITNESS: About three or four times.
19 BY MR. PLEBAN:
20     Q   You know the difference, though, right?
21     A   Well, when I --
22     Q   I'm just asking you if you know the
23 difference between hypoactive and hyperactive.
24     A   But you didn't answer my question.
25     Q   I don't have to. That's the good news.

Page 32

1          Here's the question. Do you know the
2  difference, as a guy who you call 20-year skill level,
3  between hypoactive and hyperactive? Yes or no?
4      A   Do I know the difference between hyper and
5  hypo?
6      Q   Yes, sir.
7      A   I do.
8      Q   And when you note things down in your chart,
9  you don't make mistakes doing that, do you?
10     A   If you found one, show it to me.
11     Q   You told me earlier that you don't make
12 mistakes.
13     A   Did I say that?
14         MR. DeBEER: I don't think he said that.
15         THE WITNESS: I don't remember saying that.
16 BY MR. PLEBAN:
17     Q   So you do make mistakes.
18     A   Show me my mistake.
19     Q   Will do.
20         MR. DeBEER: It's argumentative. Is that
21 what -- what are we doing here?
22 BY MR. PLEBAN:
23     Q   Look at Exhibit 7.
24     A   And the whole while I want you to think
25 about it, too. Have you ever made one in your entire

Page 33

1  career doing what you're doing right now?
2      Q   We're not going to deal with this. Here's
3  the deal. You're going to ask questions and we're
4  going to answer questions. That's how this is going
5  to go.
6      A   What am I supposed to be looking at here?
7      Q   You're supposed to look at Exhibit 7 and
8  read it.
9      A   So the whole thing?
10     Q   Take your time. As long as you want.
11         MR. DeBEER: Why don't we take a break?
12         MR. PLEBAN: That sounds good.
13         THE WITNESS: That's a lot of reading. I
14 don't have my glasses.
15         MR. DeBEER: Can you put it up close?
16         THE WITNESS: I'm wearing the little
17 cheaters. I think, what is it, one percent or
18 something? But, yeah.
19         MR. DeBEER: Can I blow that up on a screen
20 for you, Rob, to where you could see it?
21         MR. PLEBAN: Do you want me to pull it up on
22 that huge screen up there?
23         MR. DeBEER: Yeah.
24         MR. PLEBAN: Let's go off.
25         (Discussion off the record.)

Electronically signed by Jo Ann Sturm (201-381-537-0609)                    0d7a9408-acde-4047-893e-eb0c553bec2b

Page 34

1  BY MR. PLEBAN:
2      Q   Sir, have you had time to read Exhibit 7?
3      A   Yes.
4      Q   We put it up on the big screen as well so
5  that you could actually see it without the reading
6  glasses, correct?
7      A   Yes, sir.
8      Q   In medicine, you rate pain levels on a
9  one-to-ten scale, correct?
10     A   Yes, sir.
11     Q   Ten is the worst pain, right?
12     A   Yes, sir.
13     Q   Ten out of ten is the worst pain, right?
14     A   Yes, sir.
15     Q   That was the same back in 2019, right?
16     A   Yes, sir.
17     Q   How do you define hypoactive bowel sounds,
18  H-Y-P-O?
19     A   We just went through that.  But basically,
20  hypo is slow.  Yeah, slow bowel sounds.
21     Q   And are slow bowel sounds something that
22  require hospitalization?
23     A   Of course not.  It's all depending.
24     Q   On what?
25     A   There's so many variables I'd have to have a

Page 35

1  sheet of paper.
2      Q   Name some that come to mind.
3      A   Well, known time of last bowel moment, water
4  consumption.  You know, were you eating, what are you
5  eating, is it fiber or is it -- you know, there's
6  variables.  I'll stop right there.
7      Q   What about the known time of last bowel
8  movement?  So let's say someone hadn't had a bowel
9  movement for two or three days with hypoactive bowels.
10  What does that mean?
11     A   Two or three days.  Is it two or three?
12     Q   Two to three, yeah.
13     A   Can we be more definite?
14     Q   Does it matter?
15     A   I would say yes.
16     Q   Let's assume it's three days.
17     A   Okay.
18     Q   Three days, hypoactive bowel sounds,
19  H-Y-P-O.
20     A   Well, I probably get them going on the
21  constipation protocol, yes, sir.  And I would
22  possibly -- what I would do, I would follow up with
23  people, if anything changes, if anything's new.  When
24  I come back after a shift or whatever, I'm always
25  checking with them to make sure everything's okay.

Page 36

1  And if it's not, then I do something different, you
2  know.  And so, yeah, that's what I do.
3      Q   What about a person hasn't had a bowel
4  movement in three days, has hypoactive bowels and had
5  vomited.  Does that change things for you?
6      A   I don't think emesis was -- which is
7  vomit -- I don't think emesis was in question.
8      Q   I'm not talking about that.  I'm saying if
9  someone hasn't had a bowel movement in three days, has
10  hypoactive bowels and has vomited, does that change
11  anything for you in terms of treatment?
12     A   Not anybody specific, huh?
13         MR. DeBEER:  He's asking you a hypothetical.
14         THE WITNESS:  Sure it does.  Of course it
15  does.
16  BY MR. PLEBAN:
17     Q   How does that change things for you?
18     A   Well, what I would do is I would want to get
19  some kind of imaging done.
20     Q   Right.  So someone with three days of black
21  bowel movements, hypoactive bowels and had vomited,
22  you knew back in 2019 that person should require
23  imaging, correct?
24     A   Even before 2019.
25     Q   You've known it for a long time, right?

Page 37

1      A   It would possibly require imaging or, you
2  know, for me, a level above mine is where I would take
3  that to.
4      Q   A doctor.
5      A   PA, the doctor, and let them make that call.
6      Q   You'd at least do something, right?
7      A   Yes, sir.
8      Q   And does it make it worse if a person had,
9  you know, three days of no bowel movement, hypoactive
10  bowel sounds, was vomiting, and what if they
11  complained about pain at a ten out of ten?  Does that
12  make it even worse?
13     A   A ten out of ten.  Yes, sir, that would be
14  bad.
15     Q   That would mean you would what, need to go
16  to the emergency room, talk to the doctor?
17     A   Yes, sir.
18     Q   Both of those things, right?
19     A   Possibly, yeah.  With throw up and all of
20  that, yes, sir.
21     Q   And you knew that back in 2019, or even
22  before, right?
23     A   Yes, sir.
24     Q   When a person has a stomach that you feel
25  and it feels like knots binding up, what does that say

10 (Pages 34 to 37)

Page 42

BY MR. PLEBAN:
Q   What about a person who hasn't had a bowel movement in three days, knotting up stomach, ten out of ten pain and vomited?  Is that something that you always have to escalate to a doctor or a physician?
A   If the person had all of those, I probably would.  I'd try to get them in as soon as possible.
Q   That's something you would have been aware of prior to 2019, right?
A   Yes, sir.
Q   We talked about the pain scales of one being the least pain, ten being the worst pain, right?  As a nurse, does something qualify as severe pain once it hits seven, eight, nine?  Where does severe pain qualify for you?
A   When they say it's severe.
Q   If someone gave you a pain scale of ten out of ten, you would understand they were reporting severe pain, correct?
A   Yes, sir.  I would get off into more questioning about the pain, though.  I wouldn't just take that number.  I would have to know more.  Or if I go to present that to my physician assistant, he would tell me what to ask and send me back.
Q   Sure.

Page 43

A   We're really good at training there.
Q   If you thought the patient was malingering, that is something you would note down in the record so that the next doctor or nurse could have your mental impressions for his or her benefit, right?
A   I haven't heard that word in a while.  Yeah, yeah, I would.  It's a possibility I would chart it, it's a possibility I would verbally give that.  There's so many variables.  On my first interaction with the person, I would not.
Q   And the word malingering, I suppose, just to make it an everyday word, is sort of faking or exaggerating, right?
A   Yes, sir.  In the jail it's pretty prevalent.
Q   So if someone complains of severe pain, you ignore it or you take it seriously?
     MR. DeBEER:  Objection.  Asked and answered.
     THE WITNESS:  Right.  Take everything serious.
BY MR. PLEBAN:
Q   When Mr. Stout first saw you, he was complaining of stomach pains, right?
A   Yes, sir.
Q   With stomach pains comes some nausea I'm

Page 44

sure that he was reporting that are associated with it, right?
A   No nausea was reported, to my recollection.
Q   Did he tell you that he had vomited?
A   No, sir, that had not happened.
Q   Did anybody tell you he vomited?
A   Nobody did.  Not that I recall, no, sir.
Q   Did Officer Johnson tell you that he, meaning Stout, had vomited?
A   I don't even know Officer Johnson.  But, yeah, I don't recall anybody mentioning that he vomited.
Q   Well, do you recall a conversation with Glenda Johnson on or about June 10th, 2019 about Mr. Stout?
A   Glenda Johnson?  No, sir, I don't even know Glenda Johnson.  I don't recall.
Q   And if you had a conversation with Officer Johnson about Mr. Stout, you don't remember the substance of it, correct?
A   Right.  Yeah, I don't recall any of that.
Q   What specifically did Mr. Stout report to you when he saw you first?
A   Um, I believe he reported stomach pain and that he wasn't able to go.  And then I just asked

Page 45

questions from there and --
Q   What questions did you ask?
A   Oh, man, a variety of questions.
Q   Tell me all that you remember.
A   Well, it was kind of normal.  They just kind of fly, the questions just kind of fly because I'm seeking to understand better than to be understood.  And so I might have asked about the quality of the pain.  I might have asked about his consumption of water.
Q   Here's what I'm --
A   I might have even asked, you know -- I remember asking this, why didn't he get in my med line earlier during the day?  Because it was my first time seeing him at that time when it was, you know, maybe -- I probably ended up staying there beyond my clock-out time, but that doesn't matter.  The objective was to make sure he was okay.  And so I tarried with him.  It took time.  It takes time to do an assessment.
Q   How long?
A   That's a great question.  It varies.  It's so many variables.  But in order for me to understand what's going on with him, and that was my first time seeing him, if he was in that building when I was in

12 (Pages 42 to 45)

Page 46

1 that pod on the inside of the pod, why didn't he come
2 to me?  Or why didn't he have his officer have me come
3 to him?  I've gone inside of the cells with their
4 protection to make sure if somebody's not good.  I
5 need to look at them.  I need to touch and feel and go
6 through everything with them.  And so he doesn't have
7 an answer for that.  He did not have an answer for
8 that.
9     Q   What did he say?
10    A   He shrugged his shoulders.  He might have
11 even said I don't know.
12    Q   Did you write that down anywhere?
13    A   Nope.
14    Q   Why not?
15    A   I don't think so.  Because I'm seeking to
16 understand more than to be understood, to make sure he
17 gets what he needed.  I noted that, but I don't think
18 I did write it down.  If you could get the recording,
19 you'll hear it.
20    Q   What recording?
21    A   Oh, the cameras.  They're always recording,
22 right?  So if you could get that footage and the
23 sounding of it, you'd hear everything that I'm saying
24 to be the truth.
25    Q   Do you have that video?

Page 47

1    A   No, sir.  They're not privy to anybody like
2 me.
3    Q   Have you ever reviewed video from jail?
4    A   No, sir, it's not privy to me.
5    Q   You don't know whether or not it records
6 sound, do you?
7    A   That's a good question.  I'm assuming it
8 does.
9    Q   But you don't know as you sit here today.
10   A   They've got recorders all around that
11 building.  But I don't know if that was recorded or
12 not.
13   Q   Listen, this is my chance to ask you
14 questions.  All I want to know is what you remember
15 saying to Mr. Stout and what you remember Mr. Stout
16 saying back to you the very first time that you saw
17 him.  Other than what you told me, do you remember
18 anything else?
19   A   In addition to that?
20   Q   Yes, sir.
21   A   Shoot.  I gave him my spiel that I give all
22 of the new inmates.
23   Q   What's that?
24   A   About water intake, you have to drink water.
25 You can't sit in there and not drink water.  I might

Page 48

1 have even talked about exercise and walking.  Walking
2 is a really good exercise to keep your motility
3 working.  You have an alimentary tract that goes from
4 your mouth to your asshole, and basically, walking
5 helps with that and water consumption helps with that.
6 And, you know, they could only eat what they ate, so I
7 didn't check the fiber content of what they were
8 eating and things of that sort.
9       I think water and exercise were two of the
10 main things I stressed, along with deep breathing,
11 because it's so therapeutically relaxing.  So I might
12 have gone over all of that with him.
13   Q   Do you remember if you did or not?
14   A   The water intake I know for a fact I did.
15   Q   What else do you know for a fact that you
16 said to him and he said to you?
17   A   I got him the medicine, I watched him take
18 it.
19   Q   What medicine?
20   A   Colace.  I watched him drink some mini cups.
21      Go ahead, what is it?
22   Q   You gave him medicine before you had an
23 initial conversation with him?
24   A   No, this was after the talk.  I wouldn't do
25 that.

Page 49

1    Q   Let's back up.  All I want to know is what
2 you said and what was said back to you in that initial
3 consultation.
4    A   Wow.
5    Q   If you remember.  If you don't remember, all
6 you have to say is I don't remember, and we go to the
7 next one.  Other than what you've already told me.
8    A   Other than that, I don't think it was much.
9 I don't think it was much at all.  Like I said, he
10 walked out to me, and during that course of time I had
11 him go into the bathroom and fill his cup up, because
12 that was the only spot he could fill his cup up.  He
13 might have done that twice.  So he had one cup of
14 water with me, then he went and got two for himself,
15 or at least one.
16      We stood out talking.  I don't remember what
17 we were laughing about, but I've been blessed with a
18 little bit of humor, so we were all laughing, him and
19 I and then the people at unit control, too.  And then
20 I deemed him safe after my full assessment to go back
21 into the pod.
22      And he went back in under his own power and
23 that was the end of it, after -- after he waited for
24 me to go get the medicine and then come back.  I don't
25 believe I had my medicine cart with me that night.  If

13 (Pages 46 to 49)

Page 50

1  I did, I just gave it to him instead of going
2  downstairs to get it and then coming back.
3      Q   Are there any other conversations you recall
4  with Mr. Stout on the initial consultation?
5      A   Yes.  I want to reiterate the fact that I
6  told him I was about to leave when I was done right
7  before he went back into the pod, that I was about to
8  leave.  Nursing is 24 hours, and if he needs anything,
9  to hit his button.
10         And I've told that to so many inmates at
11 that time of the night because I go above and beyond.
12 I'm not trying to toot my own horn.  I'm not trying to
13 pat myself on the back, so to speak.  It's just the
14 truth.
15         But I needed him to know.  And usually, when
16 I come back for my next shift, I check on that person,
17 whoever it is.  I want to see how they're doing.  And
18 when I walked in that day, as soon as I walked into
19 the med room, which is like the office for us, they
20 asked me, hey, you remember such and such that you saw
21 last night?  And I said, yeah.  They said, he died.
22         Man, I was floored, because I couldn't
23 believe it.  I watched that man walk into his pod, and
24 how did that happen from that?  Because if I had seen
25 any indicators that something's wrong with him to that

Page 51

1  level, he would have been in the hospital, point
2  blank.
3      Q   Except he wasn't and you didn't.
4      A   Right.  You can write that all day.  I did
5  what I was supposed to do.
6      Q   How do you send an inmate to the hospital?
7  What's that process?
8      A   I would have to call the physician
9  assistant, tell him what I think, what I'm seeing, ask
10 for his approval on it.  If he had any additional
11 questions to what I was seeing, he would have me go
12 back and get that answer and then call him back, maybe
13 from the floor or from the office, yes, sir.  And then
14 a lot of times I could actually get the physician
15 assistant on the phone from the unit control, too.  So
16 we've done it all different types of ways to make sure
17 people get what they need.
18     Q   But when you say that you would get somebody
19 to the hospital, you mean contact the physician's
20 assistant or a doctor, and then they make the call and
21 the person goes to the hospital.  That's the process.
22     A   Whoever is on call for the night, yes, sir,
23 the doctor or physician assistant.
24     Q   So what you have to do as a nurse to get
25 somebody emergency treatment is first contact the

Page 52

1  physician's assistant or doctor.
2      A   There's something that happens prior to
3  that, sir.
4      Q   Give it to me.
5      A   The need to go.  The assessment of the need
6  to go.  And when I checked Mr. Stout, there was no
7  need to go.
8      Q   Do you remember being interviewed by IA,
9  Internal Affairs?
10     A   Was that for the Justice Center or was that
11 Department of Corrections?
12     Q   Do you remember either way, or know the
13 difference between the two?
14     A   Well, there was one meeting I did have with
15 Sharon Gardner, and I can't remember the other lady's
16 name.  So I did have a meeting with two ladies, and
17 they did ask about the situation, and they even
18 recorded it.
19     Q   Didn't you tell them that the inmate needed
20 to go to the hospital?
21     A   Where is that at?
22     Q   I'm just asking if you remember telling him
23 that or not.
24     A   I told them more than likely a synopsis of
25 what I just told you, yeah, because there was no

Page 53

1  reason for me to fear from the truth of what happened.
2      Q   All I'm asking you, sir, is whether or not
3  you told the people that you spoke with that Mr. Stout
4  needed to go to the hospital.  That's it.
5      A   I feel like I need to ask does that make
6  sense after everything I say now.
7      Q   Very easy.  Did you tell them that or not?
8  Did you tell the people who interviewed you that
9  Mr. Stout needed to go to the hospital?  Yes or no?
10     A   In that meeting --
11         MR. DeBEER:  Hold on.  I'm just going to
12 object to the vagueness of the question.  You're
13 talking about -- you're not talking about in
14 retrospect, you're talking about at the time of his
15 evaluation.
16         MR. PLEBAN:  I'm just asking him if he ever
17 told the people that you interviewed with that
18 Mr. Stout needed to go to the hospital, that's it.
19 Subject to your objection.
20         THE WITNESS:  Just as sure as I told you, I
21 didn't see a need.  I sent him back into his pod.
22 That's just what I told them, what I told you.  Why
23 would I say that to them?  Why would I change it?
24 BY MR. PLEBAN:
25     Q   Were you ever disciplined in this case